IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| PHOENIX CAPITAL GROUP HOLDINGS, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 1:23-cv-00209 |
| INCLINE ENERGY PARTNERS, L.P. | § § | |
| Defendant. | § § | |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS BASED ON
ABSTENTION, OR ALTERNATIVELY, MOTION TO TRANSFER VENUE**

## TABLE OF CONTENTS

I.    SUMMARY ................................................................................................................... 1

II.    STATEMENT OF FACTS ........................................................................................... 1

    A.    Phoenix's First Lawsuit Alleged Incline Defamed It by Informing FIBT that Phoenix's Founder and Controlling Executive, Ferrari, is a Felon .................. 1

    B.    Phoenix's Second Lawsuit Alleges Francis Defamed Ferrari by Informing FIBT that Ferrari is a Felon ......................................................................... 4

    C.    The Texas Appellate Court Dismissed All But One of Phoenix's Claims and Remanded The Remaining Claim for Dismissal. .............................................. 6

    D.    Phoenix Seeks a Third Bite at the Apple, Alleging Again, that Incline Improperly Disclosed Adam Ferrari's Criminal Record to FIBT .......................... 6

    E.    Witness Location and Importance .......................................................................... 8

III.    ARGUMENTS & AUTHORITIES ............................................................................. 8

    A.    The Court Should Abstain From Exercising Its Jurisdiction and Dismiss In Favor of the Texas State Case ........................................................................... 8

        1.    Legal Standard Applicable to Abstention .................................................... 8

        2.    The Texas State Case is a Parallel Proceeding ............................................ 9

        3.    Exceptional Circumstances Justify Abstention........................................... 13

    B.    In the Alternative, the Case Should be Transferred to the Northern District of Texas........................................................................................................... 15

        1.    Legal Standard for a Motion to Transfer Venue ........................................ 15

            i.    Two Related Cases in Texas and Phoenix's Improper Effort to Circumvent Its Loss in Texas Mandate Transfer ............................. 16

            ii.    Additional "Interests of Justice" Factors Weigh in Favor of Transfer ............................................................................................ 19

                a.    Judicial Economy, Phoenix's Choice Of Forum, Comparative Costs, Enforcement And Obstacles To Fairness Weigh In Favor Of Transfer ................................. 19

                b.    Conflicts of Law Issues and Having a Texas Court Determine Issues Controlled by Texas Law Also Weigh in Favor of Transfer. ........................................... 20

iii.    The Interests of the Parties and the Witnesses Also Support
        Transfer ......................................................................................... 23

        a.    The Interests of the Parties Point to Texas ........................... 23

        b.    Phoenix Already Conceded Texas Is Convenient for
              Witnesses ............................................................................ 24

IV.    CONCLUSION ............................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amstadt v. U.S. Brass Corp.*
  919 S.W.2d 644 (Tex.1996)................................................................. 10

*Bank of Okla., N.A. v. Tharaldson Motels II, Inc.*
  671 F. Supp. 2d 1058 (D.N.D. 2009)............................................... 9, 14

*Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Services, Inc.*
  500 S.W.3d 26 (Tex. App.—Houston [1st Dist.] 2016, pet. denied)....................... 11

*Bhd. of Maint. of Way Employes Div./IBT v. Union Pac. R.R. Co.*
  485 F. Supp. 3d 1048 (D. Neb. 2020)................................................. 23

*Birnstill v. Home Sav. of Am.*
  907 F.2d 795 (8th Cir. 1990) ......................................................... 22

*Black & Decker Corp. v. Amirra, Inc.*
  909 F. Supp. 633 (W.D. Ark. 1995)................................................... 16

*Citizens Ins. Co. of Am. v. Daccach*
  217 S.W.3d 430 (Tex. 2007).......................................................... 11

*Colorado River Water Conservation Dist. v. United States*
  424 U.S. 800, 96 S. Ct. 1236, 47 L.Ed.2d 483 (1976)................................. 9

*Compania Financiara Libano, S.A. v. Simmons*
  53 S.W.3d 365 (Tex. 2001)........................................................ 10, 15

*Continental Grain Co. v. The FBL—585*
  364 U.S. 19, 80 S.Ct. 1470, 4 L.Ed.2d 1540 (1960)................................... 16

*Cosmetic Warriors Ltd. v. Abrahamson*
  723 F. Supp. 2d 1102 (D. Minn. 2010)............................................... 19

*Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*
  591 S.W.3d 127 (Tex. 2019)........................................................... 3

*Dakota W. Bank of N. Dakota v. N. Am. Nutrition Companies, Inc.*
  284 F. Supp. 2d 1232 (D.N.D. 2003)................................................. 24

*Daley v. Am. States Preferred Ins. Co.*
  1998 ND 225, 587 N.W.2d 159 ...................................................... 21

*DataTreasury Corp. v. First Data Corp.*
  243 F. Supp. 2d 591 (N.D. Tex. 2003) ............................................... 15

*De Melo v. Lederle Labs.*
  801 F.2d 1058 (8th Cir.1986) ................................................................. 17

*EEOC v. Jefferson Dental Clinics, PA*
  478 F.3d 690 (5th Cir. 2007) ............................................................ 18, 20

*Engelman Irrigation Dist. v. Shields Bros., Inc.*
  514 S.W.3d 746 (Tex. 2017)..................................................................... 10

*Follette v. Wal-Mart Stores, Inc.*
  41 F.3d 1234 (8th Cir. 1994) ............................................................ 10, 20

*Fru-Con Const. Corp. v. Controlled Air, Inc.*
   574 F.3d 527 (8th Cir. 2009) .............................................................. 9, 14

*Hardwick v. Factor*
  2011 WL 1831706 (S.D. Tex. May 9, 2011) .............................................. 16

*In re Apple, Inc.*
  602 F.3d 909 (8th Cir. 2010) ........................................................... 17, 23

*Kelly v. Lexxus Intern., Inc.*
  No. 4:05CV3201, 2006 WL 436047 (D. Neb. Feb. 21, 2006)........................ 16, 19

*Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.*
  342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952) ....................................... 9

*Levitt v. Maryland Deposit Insurance Fund Corp.*
  643 F.Supp. 1485 (E.D.N.Y.1986) ........................................................... 16

*Martinez v. Hardy*
  864 S.W.2d 767 (Tex. App.—Houston [14th Dist.] 1993, no writ) ...................... 21

*May Dept. Stores Co. v. Wilansky*
  900 F.Supp. 1154 (E.D.Mo.1995)........................................................... 19

*Melichar v. Blue Cross and Blue Shield of Kansas, Inc.*
  309 F. Supp. 3d 719 (D. Neb. 2018)....................................................... 23

*Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*
  460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)................................... 14

*Nath v. Tex. Children's Hosp.*
  446 S.W.3d 355 (Tex. 2014)................................................................... 21

*R.D. Offutt Co. v. Lexington Ins. Co.*
  342 F. Supp. 2d 838 (D.N.D. 2004)................................................... 15, 19

*Reid–Walen v. Hansen*
   933 F.2d 1390 (8th Cir.1991) ........................................................ 24

*Reiffin v. Microsoft Corp.*
   104 F. Supp. 2d 48 (D.D.C. 2000) ................................................ 16

*Spectra Comm's Grp., LLC v. City of Cameron, Mo.*
   806 F.3d 1113 (8th Cir. 2015) ................................................... 9, 14

*Steward v. Up N. Plastics, Inc.*
   177 F. Supp. 2d 953 (D. Minn. 2001) ......................................... 16

*Sundance Leasing Co. v. Bingham*
   503 F. Supp. 139 (N.D. Tex. 1980) .............................................. 17

*Terra Int'l, Inc. v. Mississippi Chem. Corp.*
   119 F.3d 688 (8th Cir.1997) ......................................................... 15

*The Whistler Grp., Inc. v. PNI Corp.*
   2003 WL 22939214 (N.D. Tex. Dec. 5, 2003) ............................ 17

*Van Dyke v. Boswell, O'Toole, Davis & Pickering*
   697 S.W.2d 381 (Tex. 1985)......................................................... 10

*Wal–Mart Stores, Inc. v. Sturges*
   52 S.W.3d 711 (Tex. 2001).......................................................... 21

## Statutes

17 Moore's Federal Practice § 111.13[1][o] ................................... 15

Restatement (Second) of Conflict of Laws, § 145(2)(a)-(d) (1971) ........................................... 22

Tex. Civ. Prac. & Rem. Code § 27.003 ........................................... 3

Tex. Civ. Prac. & Rem. Code § 73.055(c) ..................................... 21

Pursuant to Rule 12(b)(1) and *Colorado River* abstention, Defendant Incline Energy Partners, L.P. ("Incline") moves to the Court to abstain from exercising its jurisdiction and dismiss or stay this case.  In the alternative, pursuant to 28 U.S.C. § 1404(a), Incline requests transfer of this case to the United States District Court for the Northern District of Texas, Dallas Division.  In support, Incline respectfully shows the Court as follows.

## I.  SUMMARY

Phoenix and the person who controls it, Adam Ferrari, have now filed three lawsuits against Incline or its principal. All three lawsuits turn on whether Ferrari is factually a felon, and whether in violation of SEC regulations, he controls Phoenix.  In this lawsuit, Phoenix seeks to avoid the soon to be preclusive effect of a partial interlocutory judgment that has already been affirmed by a Texas state appellate court and through which virtually identical claims asserted here were dismissed. Because this case is parallel to the Texas State Case and other exceptional circumstances exist, this Court should abstain from exercising its jurisdiction and dismiss this case.

In the alternative, if it declines to abstain, the Court should transfer the case to the Northern District of Texas, where a third, related case is pending and where both parties have offices.

## II.  STATEMENT OF FACTS

### A.  Phoenix's First Lawsuit Alleged Incline Defamed It by Informing FIBT that Phoenix's Founder and Controlling Executive, Ferrari, is a Felon

1.     Phoenix is a Delaware corporation headquartered in Colorado.[1]  Phoenix recently opened an office in Dallas, Texas.[2]  Incline is a Texas entity, headquartered in Dallas, Texas.[3]

2.     On June 15, 2022, Phoenix filed suit against Incline and its principal, William

---

[1] Dkt. 1, ¶ 1.

[2] The Court may judicially notice Phoenix's public information. *See* https://phxcapitalgroup.com/blog/2023/07/20/phoenix-capital-group-expands-presence-with-opening-of-new-office-in-dallas-texas/

[3] Dkt. 1, ¶ 2.

Francis, in a Texas state district court.[4] *See Phoenix Capital Group Holdings, LLC v. William Francis and Incline Energy Partners, LP*, Cause No. DC 06360, pending in the 116th District Court for Dallas County, Texas (the "Texas State Case").

3. In the Texas State Case, Phoenix judicially admitted that Ferrari, at least as of the date it filed its Original Petition, was its "expert consultant."[5] Phoenix now identifies Ferrari as its Vice President of Engineering.[6]

4. The Texas State Case rests on the same, and additional similar facts underlying this lawsuit, including allegations that:

> "Mr. Francis began emailing and sending anonymous packets to mineral rights sellers and industry executives, claiming that Mr. Ferrari was Phoenix's Chief Executive Officer and a convicted felon."

> "In early May of 2022, Phoenix was moving to close on a $50,000,000 loan with its primary bank, First International Bank and Trust ("FIBT"). . . . On May 11, 2022, Phoenix received a call from FIBT, informing Phoenix that FIBT was backing out of the transaction. Phoenix later learned that someone had sent FIBT an anonymous packet regarding Mr. Ferrari, which caused FIBT to back out of the transaction. Upon information and belief, Mr. Francis intentionally interfered with the transaction by defaming Phoenix."[7]

5. Additionally, based on an email from Incline to a Colorado mineral owner in which Ferrari's felony status and control over Phoenix were discussed, (the "Taylor email,") Phoenix alleged Incline interfered with its purchase of minerals from Colorado residents, the Krystal

---

[4] A true and correct copy of Phoenix's Original Petition (the "Original Petition") filed in the Texas State Case is attached to the Declaration of Charlene Koonce, ("Koonce Dec.") as Exhibit A-1. The Court can also view the docket in the Texas State Case here: https://courtsportal.dallascounty.org/DALLASPROD/Home/WorkspaceMode?p=0.   .

[5] Original Petition, ¶ 7.

[6] *See* https://phxcapitalgroup.com/our-team/.

[7] Original Petition ¶¶ 21; 26; 35-38.

Family.[8] With respect to that transaction, however, Phoenix admitted Incline had already closed the sale and Phoenix later attempted to convince the mineral owner to breach.[9]

6.      In the Texas State Case, Phoenix asserted claims for (a) defamation, slander, libel, and slander/libel per se; (b) business disparagement; (c) tortious interference with contract; (d) tortious interference with prospective contract; (d) unfair competition; and (e) civil conspiracy.[10]

7.      Texas has codified First Amendment protection by creating a statutory framework that authorizes motions to dismiss challenging "legal actions" that are "based on" or "in response to" a party's exercise of its "right of free speech, right to petition, or right of association . . ."  TEX. CIV. PRAC. & REM. CODE § 27.003 (the Texas Citizen's Participation Act, "the TCPA"); *see also Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 131 (Tex. 2019).  Relying on the TCPA, Incline and Francis moved to dismiss Phoenix's claims.[11]

8.      Notably, to eliminate expensive discovery on claims that are improper, while a TCPA motion is pending, unless the trial court expressly authorizes discovery in furtherance or response to the motion, discovery is stayed.  *See* TEX. CIV. PRAC. & REM. CODE § 27.003(c).  The trial court did not authorize any discovery while Incline's motion was pending, and thus discovery was stayed in August 2022, when Incline filed its TCPA motion.[12]

9.       In support of their TCPA motion, Incline and Francis demonstrated the truth of Ferrari's status as a felon, based on his guilty plea to one out of fourteen felony counts and arising

---

[8] Original Petition ¶¶ 31-32, and Exhibit B.  Notably, as discussed below, the Texas appellate court concluded that Phoenix, not Incline, was engaged in interference with respect to the Krystal Family transaction.

[9] *See* Texas State Court Appellate Opinion (further defined below), attached to the Koonce Dec. as Exhibit A-5, at pp. 14-15.

[10] Original Petition, pp. 7-10.

[11] *See* Koonce Dec. A-4.

[12] *See* Koonce Dec. ¶ 8.

out of his forgery of a mineral owner's signature on a deed.[13]  It also demonstrated numerous defects with many of Phoenix's other claims, including statute of limitations, the absence of an existing contract with respect to the tortious interference with existing contract claim, and justification or privilege.

10.     The trial court granted Incline's motion to dismiss in part and dismissed Phoenix's (a) tortious interference with existing contract claim, and (b) business disparagement and defamation claims, to the extent those claims relied on any statement *other than* the Taylor email (i.e., the FIBT email, and other time-barred communications alleged in the Petition). The trial court denied the motion with respect to Phoenix's claims for tortious interference with prospective contract, disparagement and defamation relying on the Taylor email, and conspiracy and unfair competition.[14]

11.     In November 2022, Incline appealed the partial denial of its motion to dismiss to the Texas Fifth District Court of Appeals, *Incline et al. v. Phoenix Group Holdings, LLC,* Appeal No. 05-22-01260-CV.  As discussed below, the Texas appellate court reversed the partial denial of Incline's motion to dismiss except for one claim, which it remanded with instructions for the trial court to consider dismissing based on an affirmative defense that the court found was supported by the evidence.

**B.     Phoenix's Second Lawsuit Alleges Francis Defamed Ferrari by Informing FIBT that Ferrari is a Felon**

12.     On the same day Incline filed its Reply brief in support of its appeal, on February 28, 2023, Adam Ferrari filed suit against William Francis in the United States District Court for

---

[13] *See* the true and correct copy of the Declaration of Mary Ann Sobel, submitted by Incline in support of its Motion to Dismiss, attached to the Koonce Dec. as Exhibit A-3; *see also* Order Denying Motion to Seal, Dkt. 31, from the Texas Federal Case (defined below), attached to the Koonce Dec. as Exhibit A-6.

[14] *See* Koonce Dec. ¶ 11, Exhibit A-4.

the Northern District of Texas, Dallas Division. *See* Ferrari v. Francis, Case No. 23-CV-455, in

the in the United States District Court for the Northern District of Texas ("Texas Federal Case").[15]

13.     The Texas Federal Case regurgitates many of the same facts included in the Texas

State Case, including the allegation that Francis's communications with First International Bank

and Trust, ("FIBT") regarding the same loan transaction at issue in this lawsuit, harmed Ferrari,

individually:

> "In approximately 2021 or 2022, upon information and belief, Mr. Francis sent one
> of his slanderous packets to First International Bank and Trust ("FIBT") in order to
> further disparage Mr. Ferrari and damage relations between Mr. Ferrari and
> potential investors. Based on information and belief, as well as Mr. Francis' pattern
> and practice of publishing false statements against Mr. Ferrari, Mr. Francis
> published false statements to FIBT, including that Mr. Ferrari was a felon, was
> acting as the CEO of Phoenix, and was defrauding mineral owners and investors."[16]

14.     In addition to other allegations that are time-barred, the Texas Federal Case also

includes allegations that Francis slandered Ferrari by calling out his fraud to other mineral owners;

that Francis made false statements, also about Ferrari's felony status and his control over Phoenix,

to Dalmore Capital, a brokerage firm engaged by Phoenix (a contention also pleaded in the Texas

State Case) and FINRA.[17]

15.     In the Texas Federal Case, Ferrari alleged that venue was proper in the Northern

District of Texas because this is the Judicial District in which Mr. Francis resides and because, as

explained more fully below, a substantial part of the events or omissions giving rise to the action

occurred within this judicial district."[18]

16.     On June 15, 2024, the Texas Federal Court stayed discovery until seven days after

---

[15] A true and correct copy of the Amended Complaint filed in the Texas Federal Case ("Amended Complaint") is
attached to the Koonce Dec. as Exhibit A-7.

[16] Amended Complaint, ¶ 25.

[17] Amended Complaint, ¶¶ 26-35.

[18] Amended Complaint, ¶ 5.

the Court ruled on Francis's Motion to Dismiss Ferrari's Amended Complaint.[19]  The Court denied

that motion to dismiss on October 31, 2023, and thus discovery commenced on November 8,

2023.[20]

**C.    The Texas Appellate Court Dismissed All But One of Phoenix's Claims and Remanded The Remaining Claim for Dismissal.**

17.    On August 29, 2023, the Texas appellate court entered a judgment reversing denial

of Incline's motion to dismiss all claims, except for defamation per se, which was remanded for

the trials court's consideration of an applicable affirmative defense, and attorney's fees.[21]

18.    Phoenix filed a petition for rehearing, which was denied on October 11, 2023.

Because the remand requires the Texas trial court to reconsider the final claim pursuant to the

TCPA, discovery in the Texas State Case will remain stayed.

19.    The day after counsel conferred about this motion, Phoenix's Texas counsel

conferred about a request for a *two-month* extension in which to file its petition for review to the

Texas Supreme Court, in an effort to slow down the preclusive effect that will result from a final

judgment upon remand.[22]  Review of such a petition is discretionary, and review, as well as

reversal, is rare.[23]

**D.    Phoenix Seeks a Third Bite at the Apple, Alleging Again, that Incline Improperly Disclosed Adam Ferrari's Criminal Record to FIBT.**

20.    Undeterred by, or perhaps because of the impending final judgment in the Texas

State Case, Phoenix filed this lawsuit, nine days after its petition for rehearing was denied in the

---

[19] Texas Federal Case, Dkt. 29.

[20] In the Texas Federal Case, Ferrari seeks discovery on many issues that relate to Phoenix's alleged damages, and which are far outside of the one-year limitations period for his defamation claim.  Koonce Dec. ¶ 18.  Incline will address these issues with the Texas Federal Case judge.

[21] *See* Koonce Dec., Exhibit A-5.

[22] *See* Koonce Dec. ¶ 13.

[23] *See* Koonce Dec. ¶ 13.

Texas State Case.

21.     Here, Phoenix alleges again that Incline tortiously interfered with the loan transaction between Phoenix and FIBT, as well as transactions between Phoenix and undisclosed North Dakota mineral owners, by allegedly defamatory statements made by Incline, to the effect that Ferrari is a felon and controls Phoenix.  Dkt. 1, ¶ 18 ("Incline's principal . . . has lashed out at Phoenix . . ., including making defamatory statements to customers, lenders, investors, regulators both directly and via pseudonyms online."); *Id.* ¶ 22 ("As part of its campaign to take advantage of North Dakota mineral rights holders, Incline's agents told potential lessors, including but not limited to the Bakke Family, that Phoenix was operated by criminals, among other false statements . . .").

22.     Phoenix also seeks redress, again, for FIBT's cancellation of its potential loan. Although Phoenix concedes for the first time that closing the loan was contingent on FIBT's *sole discretion* so long as the discretion was exercised in good faith, as in both Texas cases, Phoenix alleges that it sought to borrow $50,000,000 from FIBT.  *Id.* at ¶31-32.  Again, as in both Texas cases, Phoenix contends that Francis's communication with FIBT interfered with the transaction:

> 48.  At 10:17 p.m. on May 5, 2022, Francis emailed Brown, "I've attached what I put together on Adam's association with Phoenix. While some claims in here might be brushed off as hearsay and conjecture, the entirety of the body of evidence points to a convicted criminal who pleaded guilty to defrauding mineral owners in Colorado as the controlling force that's actually running Phoenix. After digesting all of the instruments which have been filed with the SEC and elsewhere, for someone to consume those and still believe Adam is not actually running Phoenix would be akin to believing his paralyzed father has been one of the most active mineral buyers in the Williston since Adam was arrested."

> "49. The attachments to the 10:17 p.m. email made numerous false accusations about Phoenix's current Vice President of Engineering, Adam Ferrari, accused him of committing various crimes while omitting the fact that the charges were dropped and the matter vacated, and lying to investors about his role in the business."

*Id.*, ¶ 48-49.

23.     Phoenix asserts here, as in both Texas cases (but following further communications between Phoenix and FIBT), that FIBT "terminated the agreement to provide $50,000,000 in financing to Phoenix in bad faith based on the statements made by Francis on behalf of Incline. *Id.*, ¶ 54.[24] As in the Texas State Case, Phoenix quantifies its damages, at least in part, on the loss of the FIBT loan. *Id.,* ¶¶ 55-60; 63-70.

## E.     Witness Location and Importance

24.     Incline has no employees or agents in North Dakota.  It currently employs no contractors within the state. [25]  Incline, instead, is based in Texas, and Mr. Francis resides and works in Dallas.  Any statements made by Francis on which Phoenix's claims depend, were made from Texas.   All other Incline employees reside in Texas.[26]

## III.     ARGUMENTS & AUTHORITIES

## A.     The Court Should Abstain From Exercising Its Jurisdiction and Dismiss In Favor of the Texas State Case

Although circumstances justifying *Colorado River* abstention are rare, this case fits squarely within the doctrine.  Because this lawsuit evidences blatant forum shopping, a desperate effort to avoid res judicata, coupled with a colossal waste of judicial resources, this Court should dismiss this case in deference to the Texas State Case, or stay it.

## 1.     Legal Standard Applicable to Abstention

Although federal courts generally have an "unflagging" obligation to exercise their jurisdiction, "exceptional circumstances" afford discretion to stay or dismiss a case in favor of a parallel state proceeding. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800,

---

[24] *See also* Original Petition ¶¶ 36-39; First Amended Complaint ¶ 25.

[25] *See* Declaration of William Francis, attached at **Exhibit B.**

[26] *Id.*

817, 96 S. Ct. 1236, 47 L.Ed.2d 483 (1976); *Fru-Con Const. Corp. v. Controlled Air, Inc.*, 574 F.3d 527, 534 (8th Cir. 2009) (plurality opinion). *Colorado River* abstention rests on "'conservation of judicial resources and comprehensive disposition of litigation.'" *Colorado River Water Conservation Dist.*, 424 U.S.at 817 (quoting *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952)). Application of the doctrine requires two conditions: "1) parallel state and federal actions, and 2) exceptional circumstances." *Bank of Okla., N.A. v. Tharaldson Motels II, Inc.*, 671 F. Supp. 2d 1058, 1062 (D.N.D. 2009); *Fru–Con Constr. Corp.,* 574 F.3d at 534. Both conditions exist here.

### 2.      The Texas State Case is a Parallel Proceeding

Whether two cases are parallel turns on whether a "substantial similarity" exists between the cases such that "there is a substantial likelihood that the state proceeding will fully dispose of the claims presented in the federal court." *Spectra Comm's Grp., LLC v. City of Cameron, Mo.*, 806 F.3d 1113, 1121 (8th Cir. 2015) (quoting *Fru–Con,* 574 F.3d at 535)). The analysis does not require that the matters are identical; instead, courts advance the policies underlying the doctrine by favoring the most complete action. *Spectra Comm's Grp., LLC*, 806 F.3d at 1122; *Fru-Con Const. Corp.*, 574 F.3d at 535. Thus, the presence of additional parties or issues does not destroy parallelism. *Bank of Okla., N.A.*, 671 F. Supp. 2d at 1062.

In the Texas State Case Phoenix asserts claims against Incline and its principal Francis. It alleged the same tortious interference and unfair competition claims, based on the same purported defamatory statements asserted here. Moreover, the Texas case is more comprehensive than this one, since in Texas, Phoenix also asserted the defamation and business disparagement claims on which its tortious interference claims depend, as well as a "conspiracy" claim.[27] Here, based on

---

[27] In the Texas State Case, Phoenix also judicially admitted during a hearing that its claims rested solely on two communications: the FIBT communication and the Taylor email. Koonce Dec. ¶ 10.

the same nucleus of facts—deprivation of the FIBT loan and purportedly defamatory statements to mineral owners who chose to contract with Incline rather than Phoenix—Phoenix also alleges an implausible "unjust enrichment" claim.[28]

Most importantly, final resolution of the Texas State Case will bar Phoenix's claims here, as well as Ferrari's claims in the Texas Federal Case. Texas law, as the substantive law that controls the interlocutory judgment already issued in the Texas State Case, will govern the preclusive effect of a final judgment on the claims asserted here. *Follette v. Wal-Mart Stores, Inc.*, 41 F.3d 1234, 1237 (8th Cir. 1994) ("When a federal court is sitting in diversity, the preclusive effect of a prior judgment is determined by the preclusion rules of the forum which provided the substantive law underlying that prior judgment."). In Texas, "[r]es judicata bars the relitigation of claims that have been finally adjudicated or that could have been litigated in the prior action." *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 750 (Tex. 2017) (internal quotation omitted); *Compania Financiara Libano, S.A. v. Simmons,* 53 S.W.3d 365, 367 (Tex. 2001). The doctrine focuses on what could have been litigated, rather than just the actual claims asserted. *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 384 (Tex. 1985).

Under Texas law, Incline will be entitled to a res judicata bar when it demonstrates (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action grounded on the same claims as those raised or that could have been raised in the first action." *Amstadt v. U.S. Brass Corp.,* 919 S.W.2d 644, 652 (Tex.1996). Each element is easily satisfied by the Texas State Case.

---

[28] Dkt. 1. 83-89. As set forth in Incline's Rule 12(b)(6) motion to dismiss which is filed concurrently with this motion, Phoenix's unjust enrichment and unfair competition claims are legally implausible, and its tortious interference claim premised solely on the FIBT transaction, Count I, also lacks plausibility given the absence of a breach.

First, resolution based on the TCPA will qualify as a final judgment on the merits.[29]  *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Services, Inc.*, 500 S.W.3d 26, 40 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("A dismissal with prejudice under the TCPA constitutes a final determination on the merits for res judicata purposes.").  Likewise, no question exists that in both lawsuits, Phoenix Capital Group Holdings, LLC is the Plaintiff and Incline Energy Partners, LP is the Defendant.  And finally, this case is grounded on the same facts and claims raised in Texas, all of which could have been raised in the Texas State Case.

In evaluating the final factor governing res judicata, Texas courts follow the transactional approach, which requires examining the factual basis, rather than the legal theories, presented in the cases. *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007).  Here, Phoenix alleges Incline, its competitor, has sought to disparage Phoenix in communications with mineral owners, FIBT, and others, by informing those third persons that Adam Ferrari controls Phoenix and is factually, a felon.[30]   In the Texas State Case, Phoenix alleged the same factual basis for its claims:

> 7.   Phoenix brought together industry experts with decades of experience in their fields to build an industry leader in mineral rights. One of those experts with whom Phoenix consulted regularly was Adam Ferrari ("Mr. Ferrari"), an individual with years of experience and expertise in the mineral rights industry.
>
> ***
>
> 10. Further, Phoenix was able to outbid Incline directly on acquisitions and often came out on top when competing for the same investment opportunity.
>
> 11. Phoenix's success was met with hostility from Incline, specifically from Mr. Francis, Incline's Managing Partner.

---

[29] Certainly, Phoenix cannot challenge the Texas State Court's competence or jurisdiction.

[30] *See* Dkt. 1, ¶¶ 18; 20; 21; 22; 31-54.  Phoenix does not expressly plead that Incline's references to the felon controlling Phoenix are to Ferrari, but the emails Phoenix quotes demonstrates that Ferrari is the subject of these communications.  *See* Dkt. 1, ¶ 52.

\*\*\*

13. In response to Phoenix's success, Mr. Francis and Incline set out on an intentional, willful, and malicious campaign against Phoenix with the intention of damaging Phoenix's reputation and ability to compete in the marketplace.

\*\*\*

17. As a response to Mr. Ferrari's competition, Mr. Francis has always engaged in sharp business practices against Ferrari and his businesses, causing numerous lawsuits to be filed against Mr. Ferrari and those companies over the years.

18. Mr. Francis often tortiously interfered with Mr. Ferrari's business efforts — sending defamatory packets to Mr. Ferrari's business associates to try and derail Mr. Ferrari's transactions.

19. For example, on November 27, 2018, Bryan Hymer, an employee of Incline, sent to a landowner a link to an anonymous website disparaging Mr. Ferrari and his company, Ferrari Energy.

20. With respect to Phoenix, Mr. Francis latched onto the relationship between Phoenix's executives and Mr. Ferrari, an individual with whom Phoenix's executives had previously partnered.

21. Mr. Francis began emailing and sending anonymous packets to mineral rights sellers and industry executives, claiming that Mr. Ferrari was Phoenix's Chief Executive Officer and a convicted felon.

\*\*\*

23. As Phoenix became more successful in acquiring mineral rights and other investments, Mr. Francis became incensed and set out on a campaign to intentionally interfere with and damage Phoenix's business and reputation.

24. Upon information and belief, Mr. Francis set up a number of websites wherein he published information about various lawsuits filed against Mr. Ferrari and companies with which he was affiliated, including alleging that Mr. Ferrari was a convicted felon, which was and is false.

\*\*\*

26. Upon information and belief, Mr. Francis set up anonymous email accounts and sent, or had sent, packets of information to various industry players, . . . alleging, among other things, that Phoenix was violating SEC laws and was owned, financed, and managed by a convicted felon . . .

\*\*\*

31. Further, on June 17, 2021, Mr. Francis emailed Ms. Crystal Taylor, an individual with whom Phoenix was in the process of closing a real estate transaction. . . .

32. In the June 17, 2021, email, Mr. Francis stated: "I would love nothing more than to defend my company's track record versus the misdeeds that Phoenix/Ferrari has performed over the years. Namely, the fact that their CEO was arrested and convicted for forging a mineral owners signature in order to defraud her of hundreds of thousands of dollars." . . .

\*\*\*

36. In early May of 2022, Phoenix was moving to close on a $50,000,000 loan with its primary bank, First International Bank and Trust ("FIBT"), which closing was derailed, upon information and belief, by Francis's conduct.

\*\*\*

38. Phoenix later learned that someone had sent FIBT an anonymous packet regarding Mr. Ferrari, which caused FIBT to back out of the transaction.

39. Upon information and belief, Mr. Francis intentionally interfered with the transaction by defaming Phoenix."[31]

Phoenix has filed nearly identical claims here, premised on the same facts, while adding "local color" by substituting North Dakota mineral owners for Colorado mineral owners. While the Texas State Case also includes other time-barred allegations of defamation premised on the same core facts, those additional allegations demonstrate that the Texas State Case is more comprehensive than this one, and thus presents an even stronger basis for res judicata. A final judgment in the Texas State Case will preclude litigation of the claims asserted in this "whack-a-mole," third-bite at the apple, case. The cases are parallel.

### 3.    Exceptional Circumstances Justify Abstention

In evaluating the existence of exceptional circumstances justifying abstention, courts generally examine six non-exclusive factors: "(1) whether there is a res over which one court has

---

[31] Original Petition.

established jurisdiction, (2) the inconvenience of the federal forum, (3) whether maintaining separate actions may result in piecemeal litigation, unless the relevant law would require piecemeal litigation and the federal court issue is easily severed, (4) which case has priority—not necessarily which case was filed first but a greater emphasis on the relative progress made in the cases, (5) whether state or federal law controls, especially favoring the exercise of jurisdiction where federal law controls, and (6) the adequacy of the state forum to protect the federal plaintiff's rights." *Fru-Con Const. Corp.*, 574 F.3d at 534.  The factors are not applied as a "mechanical checklist," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), but instead are carefully balanced, with the importance afforded any one factor varying for each case.  *Bank of Okla., N.A.*, 671 F. Supp. 2d at 1064.  This Court previously considered "forum shopping" as an additional factor.  *Id.*

Here, only one factor weighs against abstention, with all others heavily supporting the doctrine.  There is no res involved and thus the first factor favors denying abstention. *But see Spectra Comm's Grp., LLC*, 806 F.3d at 1121 (treating first two issues as "irrelevant" where no res was in issue and the state and federal fora were "equally convenient").  However, as demonstrated above, North Dakota is a relatively inconvenient forum, particularly given that neither party resides or has an office in North Dakota and (1) Phoenix's prior selection of Texas as a convenient forum, and (2) Phoenix's recently opened Dallas office.  Further, given the identity between the claims and factual basis for them in the two lawsuits, maintaining separate actions will result in piecemeal litigation. *See id.* (risk of piecemeal litigation was "predominate factor" and of "significant concern" where "state and federal cases involve the same issues . . . [and thus] the federal and state courts could reach conflicting opinions on the same issues.").  The Texas State Case has "priority" since it has been pending for almost a year and a half, and an interlocutory appeal has already resolved 95% of the case, including the entirety of the FIBT claims.  As

discussed below, Texas law should govern both suits and no federal issues exist in either suit. Further, Phoenix has already conceded that Texas is an adequate forum, even for claims related to mineral owners who are not Texas residents by filing first in Texas.  And Phoenix is blatantly forum shopping, seeking to avoid the Texas limitations period and the Defamation Mitigation Act, as well as the impending res judicata bar that will result from a final judgment in that case. Thus, only the absence of a *res*, a potentially irrelevant factor, cautions against abstention.

This Court should accordingly decline to afford Phoenix an additional forum in which to relitigate claims the Texas State Court has already dismissed.  The cases are parallel and exceptional circumstances warrant abstention and dismissal.

**B.      In the Alternative, the Case Should be Transferred to the Northern District of Texas**

In the alternative, Inclines requests that the Court transfer this case to the Northern District of Texas where it can be consolidated with the Texas Federal Case.

**1.      Legal Standard for a Motion to Transfer Venue**

Motions to transfer venue are generally governed by (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice. 28 U.S.C. § 1404(a); *Terra Int'l, Inc. v. Mississippi Chem. Corp.,* 119 F.3d 688, 691 (8th Cir.1997).   A district court's analysis, however, is not limited to these factors, but instead requires a "case-by-case evaluation of the particular circumstances in the case and a consideration of all relevant factors." *R.D. Offutt Co. v. Lexington Ins. Co.*, 342 F. Supp. 2d 838, 841 (D.N.D. 2004); *Terra Int'l, Inc.*, 119 F.3d at 691. The "interests of justice," without regard to the convenience of the parties and witnesses may control.  *DataTreasury Corp. v. First Data Corp.*, 243 F. Supp. 2d 591, 595 (N.D. Tex. 2003).   !

i.      **Two Related Cases in Texas and Phoenix's Improper Effort to Circumvent Its Loss in Texas Mandate Transfer**

"Transfer is particularly appropriate where there is a prior pending lawsuit in the transferee district involving the same facts, transactions, or occurrences." *Levitt v. Maryland Deposit Insurance Fund Corp.,* 643 F.Supp. 1485, 1493 (E.D.N.Y.1986); *see also* 17 Moore's Federal Practice § 111.13[1][o]) ("Judicial economy is served by allowing related actions to proceed in the same district."); *see also Continental Grain Co. v. The FBL—585,* 364 U.S. 19, 26, 80 S.Ct. 1470, 1474, 4 L.Ed.2d 1540 (1960) (Section 1404 was designed to avoid the waste of time and resources resulting from two cases involving same issues pending in different forums); *Black & Decker Corp. v. Amirra, Inc.*, 909 F. Supp. 633, 641 (W.D. Ark. 1995) ("the pendency of the related action in the Central District of California when considered in conjunction with the location of the defendants and the absence of the presence of **any party** in Arkansas tips the scales in favor of a transfer.") (emphasis original)); *see also Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 55 (D.D.C. 2000) (transfer strongly favored because "the interest-of-justice factor encompasses the desire to avoid multiple litigation from a single transaction and *to try related litigation together*") (internal quote and alterations omitted) (emphasis original)).   Notably, the "related" case need not be identical, nor even involve identical parties. *See Steward v. Up N. Plastics, Inc.*, 177 F. Supp. 2d 953, 959 (D. Minn. 2001) (considering related case involving "same operative facts, the same antitrust claims and the same defendants"); *Kelly v. Lexxus Intern., Inc.*, No. 4:05CV3201, 2006 WL 436047, at *4 (D. Neb. Feb. 21, 2006) (considering transfer where related case pending in Texas involved "nearly identical" "facts, claims, and defendants"); *see also Hardwick v. Factor*, 2011 WL 1831706, at *3 (S.D. Tex. May 9, 2011) (transferring case when both cases "ar[ose] out of the same event," when both cases contained similar defendants, and when the case in the prospective transferee court "was filed first"); *The Whistler Grp., Inc. v. PNI Corp.*, 2003 WL

22939214, at *5 n.3 (N.D. Tex. Dec. 5, 2003) ("that actions be identical or duplicative is not a prerequisite to transfer. On the contrary, the court need only determine that 'the two actions involve closely related questions or common subject matter, or that the core issues substantially overlap.'") (quotation omitted)); *see also Sundance Leasing Co. v. Bingham*, 503 F. Supp. 139, 141 (N.D. Tex. 1980) (transferring case when both actions "appear[ed] to rest on [a] common foundation [of facts]," even though "the claims for relief [in both actions were] not identical").

Similarly, although a plaintiff's choice of forum generally receives significant deference, such deference disappears when a risk exists that the plaintiff chose the forum to "take advantage of favorable law or to harass the defendant. . ." *In re Apple, Inc.*, 602 F.3d 909, 913 (8th Cir. 2010). Accordingly, a foreign plaintiff's forum choice receives "'substantially less deference'" than a forum resident. *Id.* (quoting *De Melo v. Lederle Labs.*, 801 F.2d 1058, 1062 n. 4 (8th Cir.1986)). Here, neither party resides in North Dakota.

In filing the same claims in Texas, premised on the same and additional facts, Phoenix admitted Texas is a convenient and appropriate forum. Specifically, Phoenix filed the Texas State Case almost a year and a half ago, premised on the same allegations: that Incline and Francis defamed it and tortiously interfered with its existing and prospective contracts with FIBT and Colorado mineral owners by stating that Ferrari is a felon and controls Phoenix.[32] The same legal questions are—or were—in dispute, based on essentially the same facts. If Texas was a convenient forum for resolution of alleged interference with Phoenix's prospective contracts with FIBT and Colorado mineral owners, it is no less convenient for resolution of the same claims based on North Dakota mineral owners. Moreover, based on the Texas appellate court's recent opinion and judgment in which it dismissed virtually all of Incline's claims and remanded the only remaining

---

[32] Original Petition.

claim for further consideration under the TCPA, res judicata's preclusive effect is on the horizon.

Res judicata will bar Phoenix's entitlement to assert all claims it brought to this Court, as well as

the claims asserted by Ferrari in the Texas Federal Case.[33] *See EEOC v. Jefferson Dental Clinics,*

*PA*, 478 F.3d 690, 694 (5th Cir. 2007) (recognizing that res judicata bars claims that were or could

have been litigated by persons in privity with a party, which includes persons whose interests could

have been represented by the party); *Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1175 (5th

Cir. 1992) (privity for res judicata purposes exists if employer-employee or principal-agent

relationship exists).  Judicial economy supports transferring the case to Texas for consolidation

with the Texas Federal Case, for eventual dismissal there.

    Likewise, on the same day Phoenix filed its underwhelming appellee's brief in the Texas

State Case, Ferrari individually sued Francis.[34]  Ferrari, like Phoenix here, asserted  he was injured

through communications Francis allegedly made to FIBT[35] and many of the same communications

also pleaded in Phoenix's Texas State Case.[36]  The judge in the Texas Federal Case recognized the

relatedness between the Texas Federal Case and the Texas State Case, and stayed discovery while

waiting on a ruling from the Texas appellate court and while considering Francis's motion to

dismiss Ferrari's Amended Complaint.[37]

---

[33] When the mandate issues from the Texas appellate court, the Texas trial court will consider one remaining issue regarding one remaining claim; application of the defense of privilege regarding defamation per se premised solely on the Taylor Email, which addressed a sale that Incline had already closed when it sent the email. *See Appellant Opinion* at pp. 20-21.

[34] A true and correct copy of the docket from the appellate case is attached to the Koonce Dec. as Exhibit A-2.

[35] Amended Complaint, ¶ 25.

[36] For instance, both Ferrari and Phoenix allege they were respectively injured by news reports about Ferrari's arrest, felony charges filed against him, and his plea deal, emails sent by Incline employees regarding which the applicable statutes of limitations has long since run, and many other statements about Ferrari's fraudulent conduct.  Amended Complaint, ¶¶ 10-23; 25-27; 28-29.  Ferrari also alleges he has been injured by statements made in the context of an ongoing FINRA investigation about him.  A chart comparing the allegations in the two Texas cases and this one is attached to the Koonce Dec. as Exhibit A-8.

[37] Koonce Dec. ¶ 14.

Without regard to any other consideration, Phoenix and Ferrari's forum shopping and deliberate effort to obtain relief on the same claims the Texas state courts have already dismissed warrant transferring this case to the Northern District of Texas for assignment to the judge who is presiding over the related Texas Federal Case.

ii.     **Additional "Interests of Justice" Factors Weigh in Favor of Transfer**

Although the Court may rely solely on the existence of related litigation pending in two courts in Texas, other relevant considerations also support transfer. In addition to the pendency of related litigation, a court can consider "(1) judicial economy; (2) the plaintiff's choice of forum; (3) the comparative costs to the parties of litigating in each forum; (4) each party's ability to enforce a judgment; (5) obstacles to a fair trial; (6) conflict of law issues; and (7) the advantage of having a local court determine questions of local law." *R.D. Offutt Co.,* 342 F. Supp. 2d at 843.

a.     **Judicial Economy, Phoenix's Choice Of Forum, Comparative Costs, Enforcement And Obstacles To Fairness Weigh In Favor Of Transfer**

As discussed above, given the pendency of the Texas Federal Case, judicial economy supports transfer. *See Cosmetic Warriors Ltd. v. Abrahamson*, 723 F. Supp. 2d 1102, 1109–10 (D. Minn. 2010) ("It is in each party's interest, and it would conserve judicial resources, to have all of these related claims resolved in one forum."); *May Dept. Stores Co. v. Wilansky,* 900 F.Supp. 1154, 1166 (E.D.Mo.1995) ("Litigation of related claims in the same tribunal is strongly favored because it facilitates efficient, economical and expeditious pre-trial proceedings and discovery and avoids duplic[ative] litigation and inconsistent results.") (citation omitted)); *see also Kelly*, 2006 WL 436047, at *4 (judicial economy favored transfer where "[a]llowing both of these cases to proceed in separate jurisdictions would create a realistic possibility of inconsistent rulings, double recovery, judicial inefficiency, and wastefulness of time, energy and money that § 1404(a) was designed to prevent.") (internal quotation omitted)).

19

Further, the Texas Federal Case was first-filed, and the Texas Judge has already conducted a case management conference, set the case for trial, and denied (1) Ferrari's motion to seal his criminal record; and (2) Incline's motion to dismiss.[38]   The Texas State Case also sits on the res judicata goal-line.  Once judgment in the Texas State Case is final, it will bar Incline's claims here, as well as the claims in the Texas Federal Case.  *See Jefferson Dental Clinics, PA*, 478 F.3d at 694; *Russell*, 962 F.2d at 1175.  Judicial economy supports transferring the case to Texas for consolidation with the Texas Federal Case.

Likewise, Phoenix's choice of North Dakota for this lawsuit merits no weight, given Phoenix's Delaware origin and Colorado home, and Phoenix's prior choice of Texas for a nearly identical lawsuit in which its rights have already been adjudicated.  The comparative costs of litigating in Texas rather than North Dakota also support transfer, given both parties' presence in Texas and Phoenix's prior commitment to litigating in Texas. Admittedly no obstacles to a fair trial in North Dakota seem likely, but a Texas court will have more familiarity with Texas rules of res judicata that govern a final judgment in the Texas State Case.  *See Follette v. Wal-Mart Stores, Inc.*, 41 F.3d 1234, 1237 (8th Cir. 1994) ("When a federal court is sitting in diversity, the preclusive effect of a prior judgment is determined by the preclusion rules of the forum which provided the substantive law underlying that prior judgment.").  Ease of enforcement is likely a neutral factor given both parties' presumptive ownership of minerals in North Dakota.

> **b.    Conflicts of Law Issues and Having a Texas Court Determine Issues Controlled by Texas Law Also Weigh in Favor of Transfer.**

The final two factors, conflict of law issues and the advantage of having a local court determine questions of local law, also weigh heavily in favor of transfer.  First, but notably, under

---

[38] Texas Federal Case, Dkts. 31; 32.

Texas law Phoenix's clams are barred by the statute of limitations.  *See Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 370 (Tex. 2014) ("We now similarly conclude that if a tortious interference claim is based solely on defamatory statements, the one-year limitations period for defamation claims applies."); *Martinez v. Hardy*, 864 S.W.2d 767, 776 (Tex. App.—Houston [14th Dist.] 1993, no writ) ("[S]ince Martinez' claim for tortious interference with contract is inextricably intertwined with and dependent upon her claim for slander the one-year limitation period for slander applies."). Equally important, Phoenix's claim for punitive damages is also barred by Texas' Defamation Mitigation Act, a statute for which North Dakota appears to have no parallel.  *See* TEX. CIV. PRAC. & REM. CODE § 73.055(c) ("If not later than the 90th day after receiving knowledge of the publication, the person does not request a correction, clarification, or retraction, the person may not recover exemplary damages.").  Elements of Phoenix's tortious interference claims also differ significantly under Texas law.  For instance, under Texas law, Phoenix's tortious interference with existing contract claim, Count I, also requires independently tortious conduct.  *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001) ("Independently tortious" as needed to support a tortious interference claim means conduct that violates some recognized tort duty).

These conflicts between Texas and North Dakota law are not academic because utilizing the "most significant relationship" test applied by North Dakota, Texas law will govern the torts asserted by Phoenix.  *See Daley v. Am. States Preferred Ins. Co.*, 1998 ND 225, ¶ 14, 587 N.W.2d 159, 162 (choice of law requires analysis of which state has the "most significant relationship" to the parties and issues involved). The approach turns on evaluation of "specific contacts with the jurisdictions," followed by policy considerations outlined in section 6 of the Restatement.  *Id.*  All of the specific contacts relevant to tort cases favor Texas law: "the place where the injury

occurred,[39] the place where the conduct causing the injury occurred;[40] the domicile, nationality, residence, place of business, or place of incorporation of the parties;[41] and the place where the relationship, if any, between the parties is centered."[42]  *Id.* at n. 3 (citing Restatement (Second) of Conflict of Laws, § 145(2)(a)-(d) (1971)).   Similarly, the balance of policy considerations enumerated in section 6 also favor Texas,[43] particularly, Texas's relative interest in res judicata for judgments rendered by its courts, "certainty, predictability and uniformity of result" and "ease in the determination and application of the law to be applied."  *Id.* at n.4.  Certainly "protecting justifiable expectations" also favors Texas law, given Phoenix's "expectation" that Texas governed the dispute when it filed its Texas State Case.  Further, although Phoenix attempts to anchor its claims as important to North Dakota residents and thus this court, no North Dakota residents are or have sued Incline for *any* misrepresentations or inappropriate conduct, including the conduct underlying Phoenix's claims.  Texas law should govern this dispute and thus this Court should transfer the case to Texas for adjudication by a Texas judge.

Phoenix's choice to file a case based on the same facts and issues in Texas almost a year before it filed this lawsuit, followed by the closely related lawsuit filed by Phoenix's agent Ferrari

---

[39] Phoenix, a Delaware entity with Colorado and Texas offices, was "injured" in one of those states.  *See Birnstill v. Home Sav. of Am.*, 907 F.2d 795, 798 (8th Cir. 1990) (applying Missouri law to conclude injury occurred where injured plaintiff resides).

[40] Incline's "conduct" relative to Phoenix's claims occurred in Texas, where Francis resides and the location from which any of Incline's communications occurred.  *See* Francis Dec; *see also* Amended Complaint, ¶ 5, "a substantial part of the events or omissions giving rise to the action occurred within this judicial district [the Northern District of Texas]."

[41] Incline is a Texas entity, residing in Texas. Dkt. 1, ¶ 2; Francis Dec.; Phoenix is neither incorporated, domiciled, nor operating a principal place of business in North Dakota.

[42] The parties do not have a relationship and thus the final factor has no relevance.

[43] The policy considerations are: "the needs of the interstate and international systems; the relevant policies of the forum; the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue; the protection of the justified expectations; the basic policies underlying the particular field of law; certainty, predictability and uniformity of result; and ease in the determination and application of the law to be applied."  *Daley*, 1998 ND 225, 587 N.W.2d 159, 162, n. 4, citing Restatement (Second) of Conflict of Laws, § 6(2)(a)-(g) (1971)).

in a Texas federal court, without consideration of any other factor warrants transferring this case

to Texas for consolidation with the Texas Federal Case.  Nonetheless, the additional factors that

inform the "interests of justice," including a choice of law analysis that requires application of

Texas law, weigh *heavily* in favor of transfer.

### iii.    The Interests of the Parties and the Witnesses Also Support Transfer

### a.    The Interests of the Parties Point to Texas

In addition to the interests of justice, courts also consider the interests of the parties and

the witnesses in evaluating a motion to transfer venue.  With respect to the parties, courts generally

consider "the "accessibility to records and documents, location where conduct occurred, [and]

applicability of [a] state's substantive law." *Bhd. of Maint. of Way Employes Div./IBT v. Union

Pac. R.R. Co.*, 485 F. Supp. 3d 1048, 1061 (D. Neb. 2020) (quoting *Melichar v. Blue Cross and

Blue Shield of Kansas, Inc.*, 309 F. Supp. 3d 719, 726 (D. Neb. 2018)).  Courts also consider the

parties' "ease of travel." *In re Apple, Inc.*, 602 F.3d at 913.

Here, Incline's records and relevant documents are located in Texas.[44]  Phoenix's records

are presumably located in Colorado or its new Dallas office, and in this case and the Texas Federal

Case, its counsel is located in Chicago.  While FIBT and some relevant mineral owners are located

in North Dakota, all relevant documents should be as easily accessed from Texas as from North

Dakota.  Similarly, any of Incline's conduct underlying Phoenix's claims occurred in Texas,[45] and

as discussed above, Texas law should govern this dispute.  The "ease of travel" also suggests Texas

is a more convenient forum with more than 50 flights per day available for travel to and from

---

[44] Francis Dec. ¶ 6.

[45] *Id.*

Denver to Dallas, but only six from Denver to Bismark, with the flights to Dallas also at a far lower cost.[46]  The convenience of the parties heavily favors Texas.

        **b.**        **Phoenix Already Conceded Texas Is Convenient for Witnesses**

Generally, in evaluating the convenience of the witnesses, the Court examines each witnesses' materiality and the importance of his or her anticipated testimony, and then examines the accessibility and convenience to the forum. *Reid–Walen v. Hansen,* 933 F.2d 1390, 1396 (8th Cir.1991).  Although this factor generally receives the most weight, it is not dispositive "and must still be weighed against the other relevant factors." *Dakota W. Bank of N. Dakota v. N. Am. Nutrition Companies, Inc.*, 284 F. Supp. 2d 1232, 1235 (D.N.D. 2003).  In filing a very similar lawsuit in Texas, which notably includes the same alleged interference with Phoenix's FIBT transaction, Phoenix waived any potential inconvenience related to FIBT employees' North Dakota location.  Similarly, in the Texas State Case, Phoenix was undeterred by the Colorado location of other mineral owners.

In the event this case survives the res judicata bar, the most critical witnesses will be (1) Phoenix's corporate representative, located in Denver; (2) Incline's corporate representative, located in Dallas, (3) a representative of the "Bakke Family," whose location is not specified; (4) a FIBT representative, presumably located in Waterford City, North Dakota; and potentially, (5) unspecified North Dakota mineral owners.  Phoenix's disclosure of Incline's email to FIBT, Phoenix's email to FIBT, and FIBT's discretion to terminate the transaction, suggests live testimony from FIBT may have far less importance than the documents evidencing the communications and the contract, if any, between FIBT and Phoenix.  And given Phoenix's failure to identify any mineral owners with whom it had a reasonable business expectancy at the time

---

[46] Denver to Dallas – Approximately 52 flights per day - $53 to $395; <u>Google - Denver to Dallas</u>
Denver to Bismarck – Approximately 6 flights per day - $413 to $1,071;  <u>Google - Denver to Bismarck</u>

Incline allegedly communicated with those owners, as well as Incline's general practice of communicating with such mineral owners by email,[47] live testimony from the mineral owners may also have far less importance that Phoenix's and Incline's live testimony.  Thus, even the interests of the witnesses do not support retaining the case in North Dakota. *See R.D. Offutt Co.*, 342 F. Supp. 2d at 842 (determining that testimony of fact witnesses would not be critical to the court's determination of the issues in dispute and thus did not warrant transfer).

Neither the convenience of the parties nor the witnesses support retaining the case in North Dakota.  For all the reasons discussed above, if the Court does not dismiss the case based on abstention, the Court should transfer the case to the Northern District of Texas.

## IV.   CONCLUSION

This Court should not reward Phoenix's efforts to relitigate claims the Texas State Court has already dismissed.  Retaining the case promises a waste of judicial resources, sought by a plaintiff that does not reside in North Dakota, for claims that the same plaintiff already litigated in Texas against the same defendant, and lost.  Not one single fact weighs in favor of retaining this case in North Dakota, and this Court should not hesitate to dismiss, or alternatively, to transfer it.

WHEREFORE, PREMISES CONSIDERED, Incline respectfully requests that the Court abstain from exercising jurisdiction and dismiss or stay the case, or alternatively, transfer this case to the District of Northern Texas.  Incline requests such other and further relief to which it may show itself entitled.

---

[47] *See* Francis Dec. ¶ 4.

Respectfully submitted,

By: _/s/ Charlene C. Koonce_
    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com

    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001


    Joshua A. Swanson
    North Dakota Bar No. 06788

    VOGEL LAW FIRM
    218 NP Avenue
    PO Box 1389
    Fargo, ND 58107-1389
    701.237.6983
    jswanson@vogellaw.com

    *Attorneys for Defendant Incline Energy Partners, L.P.*

## **CERTIFICATE OF CONFERENCE**

The undersigned certifies that counsel for Incline conferred with counsel for Plaintiff and this Motion is opposed.

*/s/ Charlene C. Koonce*
Charlene C. Koonce

## **CERTIFICATE OF SERVICE**

Pursuant to Rule 5(d)(1)(B) of the Federal Rules of Civil Procedure, as amended, no certificate of service is necessary because this document is being filed with the Court's electronic-filing system.