**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT COURT OF NORTH DAKOTA**

PHOENIX CAPITAL GROUP                )
HOLDINGS, LLC,                       )
                                     )
          Plaintiff,          )
                                     )
        v.                 )          Case No. 1:23-cv-00209
                                     )
INCLINE ENERGY PARTNERS, L.P.,       )
                                     )
        Defendant.         )


**RESPONSE TO 12(b)(6) MOTION TO DISMISS**


Respectfully Submitted,

Alexander Loftus, Esq.
Illinois Bar No. 6303484

LOFTUS & EISENBERG, LTD.
161 N. Clark St., Suite 1600
Chicago, Illinois 60601
T: 312.899.6625
alex@loftusandeisenberg.com

*Attorney for Phoenix Capital Group Holdings, LLC*

**TABLE OF CONTENTS**

I. INTRODUCTION................................................................................1

II. LEGAL STANDARD........................................................................2

III. FACTUAL BACKGROUND ............................................................3

IV. ARGUMENT ....................................................................................8

A. North Dakota Law Applies Because the Dispute Has No
Relationship with Texas ........................................................................8

1. Relevant Contacts ...............................................................................9

2. Choice-Influencing Considerations ..................................................10

B. Rule 9(b) Does Not Apply and if it Does, Phoenix Fulfilled the
Pleading Requirements. ........................................................................12

C. Plaintiff States a Claim for Tortious Interference with Contract.........14

D. Plaintiff States a Claim for Tortious Interference with Business
Expectancy ...........................................................................................18

E. Plaintiff States a Claim for Unfair Competition .................................23

F. Plaintiff States a Claim for Unjust Enrichment...................................27

CONCLUSION .....................................................................................28

# TABLE OF AUTHORITIES

## Cases

*Apollo Sprinkler Co. v. Fire Sprinkler Suppliers & Design, Inc.*,
382 N.W.2d 386 (N.D. 1986) ................................................................................. 9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................... 1

*Beech--Nut, Inc. v. Warner--Lambert Co.*,
480 F.2d 801, 1973 U.S. App. LEXIS 9317 (2d Cir. 1973) .................................... 24

*Bekken v. Equitable Life Assur. Soc.*,
70 N.D. 122, 293 N.W. 200 (1940) ....................................................................... 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................... 2

*Broten v. Broten*,
2017 ND 47, ¶ 9, 890 N.W.2d 847, 849 .................................................................. 27

*Burris Carpet Plus, Inc. v. Burris*,
2010 ND 118 .......................................................................................................... 25

*Daley v. Am. States Preferred Ins. Co.*,
1998 ND 225, 587 N.W.2d 159 (N.D. 1998) ........................................................... 9

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003) ................................................................................................. 24

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
11 Cal. 4th 376, 902 P.2d 740 (Cal. 1995) ........................................................... 14, 15

*Empresa Cubana Del Tabaco v. Culbro Corp.*,
399 F.3d 462 (2d Cir. 2005) .................................................................................. 24

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
314 F.3d 48, (2d Cir. 2002) ................................................................................... 26

*Gnesys, Inc. v. Greene*,
437 F.3d 482 (6th Cir. 2005) ................................................................................. 24

*Hilton v. North Dakota Educ. Ass'n.*,
2002 ND 209, 655 N.W.2d 60 ................................................................................ 15

*International Order of Job's Daughters v. Lindeburg & Co*.,
633 F.2d 912 (9th Cir. 1980) ................................................................. 23

*Jack Russell Terrier Network v. Am. Kennel Club, Inc*.,
407 F.3d 1027 (9th Cir. 2005) ............................................................... 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc*.,
572 U.S. 118 (2014) .............................................................................. 23

*Marci's Fun Food, LLC v. Shearer's Foods, Inc*.,
2010 U.S. Dist. LEXIS 107866 (W.D. Pa. Oct. 8, 2010) ...................... 24

*Nodak Mut. Ins. Co. v. Wamsley*,
2004 ND 174, 687 N.W.2d 226 (N.D. 2004) ..................................... 9-12

*Northern Bottling Co. v. PepsiCo, Inc*.,
427 F. Supp. 3d 1106 (D.N.D. 2019) .................................................... 25

*Neuros Co. v. Kturbo, Inc*.,
698 F.3d 514 (7th Cir. 2012) ................................................................. 26

*OmegaGenesis Corp. v. Mayo Foundation for Medical Education
& Research*, 851 F.3d 800 (8th Cir. 2017) ........................................... 13

*ProductiveMD, LLC v. 4UMD, LLC*,
821 F. Supp. 2d 955 (M. TN 2011) ....................................................... 24

*P&G Co. v. Haugen*,
222 F.3d 1262 (10th Cir. 2000) ............................................................. 26

*Schlotzky's, Ltd. v. Sterling Purchasing and National Distribution
Co*., 520 F.3d 393, 2008 U.S. App. LEXIS 4801 (5th Cir. 2008) ........... 24

*Scarves by Vera, Inc. v. United Merchants & Mfrs., Inc*.,
173 F. Supp. 625, 1959 U.S. Dist. LEXIS 3136 (D.N.Y. 1959) .............. 23

*Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc.,*
2001 ND 116, ¶ 33, 628 N.W.2d 707 (2001) .......................... 14, 15, 18

*Ulrich v. Pop Cnty*,
715 F.3d 1054 (8th Cir. 2013) ................................................................. 2

*Zyla v. Wadsworth, Div. of Thomson Corp*.,
360 F.3d 243 (1st Cir. 2004) ................................................................. 24

**Rules and Statutes**

Fed. R. Civ. P. 12(b)(6) ............................................................................1

Fed. R. Civ. P. Rule 8(a)(2) ......................................................................1

Fed. R. Civ. P. Rule 9(b) ..........................................................................12

15 USCS § 1125(a)............................................................................*Passim*

Plaintiff, Phoenix Capital Group Holdings, through its undersigned counsel, in response to Defendant Incline Energy Partners, L.P.'s Motion to Dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) states as follows:

## I.     INTRODUCTION

Plaintiff and Defendant are competitors in acquiring and leasing North Dakota mineral rights. This dispute centers around a phone call and email by Defendant's principal to the bank – with which Plaintiff was doing business in order to acquire debt financing and a $50,000,000 loan – promoting a false narrative. The loan, if successful, would have been a huge setback to Defendant and would have hindered a business that was modeled not on fair competition but on better financing and a general stranglehold of the region. Defendant intentionally interfered with an existing contract with the sole purpose being to undercut its competition. These actions are not only unfair, they are illegal and establish claims for tortious interference and unfair competition.

## II.    LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there has been a failure to state a claim upon which relief can be granted. In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must show that success on the merits is more than a "sheer possibility." *Id*. A complaint is sufficient if its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The court must accept all factual allegations as true, except for legal conclusions or "formulaic recitation of the elements of

1

a cause of action." *Id*. at 681. Detailed factual allegations are not necessary under the Rule 8 pleading standard, rather a plaintiff must set forth grounds of its entitlement to relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders a naked assertion devoid of further factual enhancement." *Ashcroft*, 556 U.S. at 678 (2009). The determination of whether a complaint states a claim upon which relief can be granted is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Dismissal will not be granted unless it appears beyond doubt the plaintiff can prove no set of facts entitling plaintiff to relief. *Ulrich v. Pop Cnty*, 715 F.3d 1054, 1058 (8th Cir. 2013).

## III.   FACTUAL BACKGROUND

Plaintiff, Phoenix Capital Group Holdings, LLC ("Phoenix") is a Delaware limited liability company with its headquarters located in Littleton, Colorado whose members are all domiciled in Illinois.   (Complaint, ¶ 1.) Defendant Incline Energy Partners, L.P. ("Incline") is a Texas limited partnership with its principal place of business in Dallas County, Texas whose partners are domiciled in Texas.  (Complaint, ¶ 2.)

In the last four years, Phoenix has become the leading mineral and lease acquisition company in the Williston Basin region of North Dakota.  (Complaint, ¶ 8.) Phoenix has transacted in over 1,000 unique deals in the Williston Basin since 2019.  (Complaint, ¶ 9.) In September 2023, Phoenix launched its operating company that drills wells in the Williston Basin and employs many North Dakotans. (Complaint, ¶ 10.) Phoenix brought together industry experts with decades of experience in their fields to build an industry leader in mineral rights.   (Complaint, ¶ 11.)

At the time Phoenix was founded, the industry was dominated by Incline and very few firms were able to compete.   (Complaint, ¶ 12.) Incline operates in the oil and gas industry, where it operates and acquires mineral rights, and is a direct competitor to Plaintiff for mineral rights in North Dakota.  (Complaint, ¶ 13.)

Phoenix competes with Incline by deploying its proprietary technology and decades of industry experience.  (Complaint, ¶ 14.) Phoenix's rapid success in North Dakota was met with hostility from Incline, specifically from William Francis, Incline's Managing Partner.  (Complaint, ¶ 15.) Phoenix is successful because it offers the best price to mineral rights owners. (Complaint, ¶ 16.) Incline's success is because it can fund deals faster than Phoenix and because it tortiously interferes with Phoenix's potential acquisition.  (Complaint, ¶ 17.)

Incline's principal, William Francis ("Francis") has lashed out at Phoenix in every way possible hoping to  corner the mineral rights market in North Dakota, including making defamatory statements to customers, lenders, investors, regulators both directly and via pseudonyms online.  (Complaint, ¶ 18.) Incline and Phoenix routinely compete to purchase the same interests being sold throughout North Dakota. For example, in one area of Williams and Divide Counties, North Dakota, Incline was Phoenix's only competition for leases. (Complaint, ¶ 19.)

Incline disparaged Phoenix to multiple lessors in North Dakota between 2021 and 2023 who Incline knew were considering offers from both Incline and Phoenix to obtain the leases. (Complaint, ¶ 20.) Several mineral owners, including but not limited to the Bakke Family in Williams County, chose Incline because of Incline's disparagement campaign, even though Phoenix was offering more money. In doing so, they were intentionally misled through underhanded bullying tactics, denying them and other North Dakotans a fair opportunity to maximize the returns they deserved for their rights. (Complaint, ¶ 21.)

As part of its campaign to take advantage of North Dakota mineral rights holders, Incline's agents told potential lessors, including but not limited to the Bakke Family, that Phoenix was operated by criminals, among other false statements, to scare North Dakota mineral owners into paying more to Incline rather than selling or leasing to Phoenix. (Complaint, ¶ 22.)

Phoenix's business model, like most oil and gas companies in the industry, requires debt financing.  (Complaint, ¶ 25.) Phoenix had a debt financing relationship with First International Bank and Trust ("FIBT") in Watford City, North Dakota at all times relevant this complaint. (Complaint, ¶ 26.) Phoenix began its relationship with FIBT in October of 2020 with its first bank loan, a credit facility of $1,000,000, to finance acquisitions in North Dakota. (Complaint, ¶ 27.) FIBT and Phoenix mutually agreed to expand that facility frequently for the next year, growing to as large as $9,000,000 at its peak.  (Complaint, ¶ 28.) Phoenix and FIBT knew each other well and enjoyed their mutually beneficial relationship. (Complaint, ¶ 29.) FIBT was intimately familiar with Phoenix's business, its principals, and its owners. (Complaint, ¶ 30.)

On April 27, 2022, Phoenix committed to borrow $50,000,000 from FIBT and paid a $50,000 non-refundable commitment fee in consideration of FIBT's mutual promises. (Complaint, ¶ 31.) FIBT had sole discretion to complete the transaction but was obligated to exercise that discretion in good faith. (Complaint, ¶ 32.) Phoenix and FIBT worked quickly throughout the spring of 2022 to complete the due diligence process and Phoenix provided all the information required of it. (Complaint, ¶ 33.) Phoenix's senior leaders, consultants, and owners engaged in multiple Zoom meetings with FIBT. (Complaint, ¶ 34.) As of May 4, 2022, the deal was full steam ahead and set to close within 10 days. (Complaint, ¶ 35.) FIBT President, Justin Voll emailed Phoenix on May 4, 2022, "We will do our best to hit the date [end of May 2022], but there is still

a lot of work and negotiation to do on the final loan documents. I hope to have the first draft for your review this week." (Complaint, ¶ 36.)

During the due diligence process, whether via the shared banking relationship or through other connections in the small world of the North Dakota oil and gas industry, Incline became aware that their competitor Phoenix was about to secure significant financing from FIBT. (Complaint, ¶ 37.) Phoenix is the fastest growing mineral and lease acquisition company in the Williston Basin where Incline has enjoyed a competitive stranglehold over for years thanks to its advantage in financing.  (Complaint, ¶ 38.)

Incline's only competitive advantage over Phoenix in North Dakota is its ability to close deals quickly with immediately available funds.  (Complaint, ¶ 39.) Incline persuades sellers and lessors to accept less money than offered by Phoenix by promising funding the deal faster than Phoenix can.  (Complaint, ¶ 40.) Phoenix would dominate the North Dakota marketplace if it could match Incline's speed of closing. North Dakotans would naturally benefit from a more fair, competitive market because sellers and lessors would receive more money than they would if one company had a stranglehold on the business. (Complaint, ¶ 41.)

In the spring of 2022, FIBT offered the solution for Phoenix to surpass Incline's closing speed with a $50,000,000 credit facility. (Complaint, ¶ 42.) Incline needed to eliminate Phoenix's financing to maintain its competitive advantage of closing speed. (Complaint, ¶ 43.)

On May 5, 2022, Francis emailed Joel Brown ("Brown") "I was wondering if you're free later today or tomorrow to hop on a call to discuss a potential loan with my group, as well as another issue that I'd like to pick your brain about." (Complaint, ¶ 44.) The other issue Francis wanted to discuss with Brown was FIBT's agreement with Phoenix to provide a $50,000,000 credit facility. (Complaint, ¶ 45.)

After the call, at 5:07 PM on May 5, 2022, Brown emailed Francis, "I appreciate you bringing my attention to the concerns surrounding Phoenix Capital, and I will wait with anticipation for the additional information you mentioned. Once received, I would like to circulate it among some key personnel within our bank." (Complaint, ¶ 46.) Francis had no justification for bringing "his concerns" about Phoenix to Brown other than to kneecap a competitor's financing.  (Complaint, ¶ 47.)

At 10:17 p.m. on May 5, 2022, Francis emailed Brown, "I've attached what I put together on Adam's association with Phoenix. While some claims in here might be brushed off as hearsay and conjecture, the entirety of the body of evidence points to a convicted criminal who pleaded guilty to defrauding mineral owners in Colorado as the controlling force that's actually running Phoenix. After digesting all of the instruments which have been filed with the SEC and elsewhere, for someone to consume those and still believe Adam is not actually running Phoenix would be akin to believing his paralyzed father has been one of the most active mineral buyers in the Williston since Adam was arrested." (Complaint, ¶ 48.)

The attachments to the 10:17 p.m. email made numerous false accusations about Phoenix's current Vice President of Engineering, Adam Ferrari, accused him of committing various crimes while omitting the fact that the charges were dropped and the matter vacated, and lying to investors about Ferrari's role in the business.  (Complaint, ¶ 49.) The only purpose for the May 5, 2022, communication was to harm Phoenix and improve Incline's position in the North Dakota marketplace thus unfairly exploiting North Dakotans holding mineral rights. (Complaint, ¶ 50.)

On Monday, May 9, 2022, Justin Voll asked Phoenix's deal team a series of questions about our public debt program that was previously discussed at length. Voll's newfound interest in that program was a direct result of Francis's May 5 communication.  (Complaint, ¶ 51.) On May

10, 2022, counsel for Phoenix tried to correct the misperceptions induced by Incline's smear campaign as follows:

> The only legal relationship that Mr. Ferrari has with the Company is an at-will consulting agreement which specifies that he provide engineering support and other advice specific to oil and mineral drilling and leaseholds.

> To our knowledge, Mr. Ferrari has no legal authority to bind the Company contractually, set policy for the Company or direct the actions of ANY employee of the Company.

> I understand that you have expressed some concern that not including Mr. Ferrari in the Offering Statement could constitute a material omission based upon Mr. Ferrari's "influence" with the Company. I disagree.

> Form 1-A speaks to disclosure specifically of directors, executive officers and "significant employees". Directors and executive officers are self-explanatory. "Significant employees" includes "persons such as production managers, sales managers and research scientists, who are not executive officers, but who make significant contributions to the business of the issuer." Again, Mr. Ferrari is neither an employee, nor does he have ANY authority to direct any employees or operations of the Company.

> Beyond the specific language of Form 1-A, without the ability or power to bind the Company or direct the Company's actions or policies, "influence" is, at best, a subjective assessment. Indeed, the SEC has never adopted such a subjective standard. In various other contexts, the SEC has routinely adopted the language around the power to bind a company or direct the policies/actions/business of the Company, rather than a more subjective standard. Mr. Ferrari possesses no such power, and it strains credulity to determine when "influence" could equate to such power….

> We analyzed all of this in the preparation of the disclosure. We further examined this with the managing broker-dealer for the offering, including their in-house counsel and compliance personnel, and reached the same conclusion. I have spent more than 26 years practicing securities law and, in fact, was very involved in lobbying Congress and SEC on "Regulation A+." I have dealt with companies at all stages of development, as well as advising on establishing advisory boards and working with their consultants. I have never had to try to assess the level of respect or esteem that an

individual may enjoy with a company's management from the standpoint of materiality when that person has no ACTUAL management authority. (Complaint, ¶ 52.)

On or about May 11, 2022, FIBT terminated the agreement in bad faith exercise of its discretion. (Complaint, ¶ 53.) FIBT terminated the agreement to provide $50,000,000 in financing to Phoenix in bad faith based on the statements made by Francis on behalf of Incline.  (Complaint, ¶ 54.)

As a result of the breach Phoenix was unable to obtain the $50,000,000 loan from FIBT that would have been invested in North Dakota and yielded tens of millions in profits for Phoenix and enabled more competitive pricing for North Dakotans selling and leasing land rights.  (Complaint, ¶ 55.) To date Phoenix has not been able to secure a more advantageous first lien loan despite reasonable efforts to mitigate its damages.  (Complaint, ¶ 56.)

In June of 2022, Phoenix began discussions with DelMorgan & Co., a highly reputable brokerage service that connects capital with opportunity. Phoenix formally hired DelMorgan on August 10, 2022, with a $150,000 non-refundable commitment fee to replace the financing lost because of Incline's interference.  (Complaint, ¶ 57.)

Many other lenders were interested in lending to Phoenix, but none came close to the favorable terms FIBT offered and there were no viable alternatives for this sort of financing. (Complaint, ¶ 58.) FIBT could offer more favorable terms based on its familiarity with how the funds were being deployed (FIBT's president leased his land to Phoenix) and their deep relationship with Phoenix prior to Incline's interference. (Complaint, ¶ 59.)

Phoenix has been forced to borrow extremely expensive money from lenders in order to continue to compete and replace the funds it lost as a result of Incline's interference actions. Since

May 2022, Phoenix has taken $17,500,000 in hard money loans, costing $188,695 in origination fees and another $3,925,203 in interest. (Complaint, ¶ 60.)

## IV.    ARGUMENT

### A.    North Dakota Law Applies Because the Dispute Has No Relationship with Texas

Incline's argument that Texas law applies is novel but unavailing where the entirety of the dispute centers around business activities in North Dakota and the connections to Texas are almost nonexistent.

North Dakota employs a two-prong test in its choice of law analysis. "With the adoption of the Leflar choice-influencing factors our significant contacts test became something of a hybrid, and effectively became a two-pronged analysis." *Daley v. Am. States Preferred Ins. Co.*, 1998 ND 225, 587 N.W.2d 159, 162 (N.D. 1998). First, the court must "determine all of the relevant contacts which might logically influence the decision of which law to apply." *Id.* "Secondly, we apply Leflar's choice-influencing considerations 'to determine which jurisdiction has the more significant interest with the issues in the case.'" *Nodak Mut. Ins. Co. v. Wamsley*, 2004 ND 174, 687 N.W.2d 226, 231 (N.D. 2004). The five factors to be considered under the second prong are predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law. *Apollo Sprinkler Co. v. Fire Sprinkler Suppliers & Design, Inc.*, 382 N.W.2d 386, 389 (N.D. 1986).

#### 1. *Relevant Contacts*

The relevant contacts are straightforward. Phoenix is a Delaware limited liability company with its headquarters located in Littleton, Colorado whose members are all domiciled in Illinois. (Complaint, ¶ 1.) Phoenix does significant business in North Dakota and, in the last four years, has

become the leading mineral and lease acquisition company in the Williston Basin region of North Dakota. (Complaint, ¶ 8.)

Incline is a Texas limited partnership with its principal place of business in Dallas County, Texas whose partners are domiciled in Texas. (Complaint, ¶ 2.) Incline does business in North Dakota, operating in the oil and gas industry where it operates and acquires mineral rights. (Complaint, ¶ 13.)[1]

Phoenix and Incline compete in North Dakota to lease and acquire mineral rights. (Complaint, ¶¶ 10-15.) Incline is successful, in part, is because it can fund deals faster than Phoenix. (Complaint, ¶ 17.) Phoenix is successful because it deploys proprietary technology and offers the best price to mineral rights owners. (Complaint, ¶¶ 14, 16.)

FIBT is a bank in Watford City, North Dakota and does business with Phoenix providing debt financing to allow Phoenix to better compete for leases. (Complaint, ¶ 26.)

The relevant statements by Incline's principal William Francis were likely made from his home or office in Texas to Joel Brown of FIBT in North Dakota with the goal of interfering with a contract in North Dakota for the funding of purchasing mineral rights in North Dakota. (Complaint, ¶¶ 44-50.)

2. *Choice-Influencing Considerations*

a. **Predictability of Results**

The objective of the predictability factor is to fulfill the parties' justified expectations. *Nodak*, 2004 ND 174, ¶ 16. Here, the parties should expect that a competitive relationship that involves mineral rights in North Dakota, a debt financing relationship between a North Dakota

---

[1] Incline provides an affidavit speciously claiming it does no business in North Dakota. Incline operates via several wholly owned subsidiaries in this jurisdiction including Incline Bakken, LLC, Incline Bakken II, LLC, Incline Bakken Minerals, LLC, Incline Bakken Minerals II, LLC. After some discovery confirming Francis's relationship with the subsidiaries it may be prudent to name the North Dakota subsidiaries as defendants.

bank and its customers to finance the purchase of mineral rights in North Dakota, and a dispute regarding tortious interference with that North Dakota contract would be governed by North Dakota law. All of Phoenix's actions (acquiring North Dakota mineral rights, acquiring debt financing) occurred in North Dakota; nothing it did occurred in Texas. Similarly, Francis called a banker in North Dakota and Incline's agents contacted mineral owners in North Dakota to affect Phoenix's business and relationships in North Dakota. This consideration favors application of North Dakota law.

### b. Maintenance of Interstate Order

Choice-of-law rules should further harmonious relations between states, facilitate commerce between states, and avoid interstate friction. *Nodak*, 2004 ND 174, ¶ 20. Where North Dakota has a significant interest in disputes centered around competition for its mineral rights, this consideration favors application of North Dakota law.

### c. Simplification of the Judicial Task

In certain instances, it will be easier for the forum court to apply its own law than any other. *Nodak*, 2004 ND 174, ¶ 21. However, where law of either state could be applied without difficulty, simplification of the judicial task is not a relevant factor. Where this Court could apply either North Dakota law or Texas law without difficulty, this factor does not apply.

### d. Advancement of the Forum's Governmental Interests

A state's governmental interest in a choice-of-law case is discoverable by (a) identifying the factual contacts which the litigated transaction had with that state, then (b) determining whether those contacts give rise to real reasons (socioeconomic or political justifications) for applying the state's law to litigated issues in the case. *Nodak*, 2004 ND 174, ¶ 21.

This dispute centers around competition for North Dakota's and its residents' mineral

rights, fair competition and fair prices for those rights, acquisition of North Dakota land rights, business being done within North Dakota related to its land rights, and employment of North Dakota residents. North Dakota undoubtedly has a significant interest in dispute this dispute whereas Texas has no legitimate interest.

Given the rights and interests involved in this case, this is the factor that should have the most weight and heavily favors application of North Dakota law.

### e.   Application of the Better Rule of Law

The final consideration is whether North Dakota or Texas has, in an objective sense, the better rule of law. *Nodak*, 2004 ND 174, ¶ 22. Sometimes different laws are neither better nor worse in an objective way, just different. *Id*. In this case, neither state can be said to have the better rule of law to govern the dispute.

However, applying the choice-influencing considerations, it is clear that North Dakota law should govern the dispute. North Dakota has the most significant contacts to the dispute and the factors all favor applying North Dakota law.

### B.   Rule 9(b) Does Not Apply and if it Does, Phoenix Fulfilled the Pleading Requirements.

Incline begins this section with the inaccurate suggestion that Phoenix's claims are based upon fraud. Phoenix's first claim is one for tortious interference with contract. As discussed below, tortious interference with contract does not require a wrongful act by the defendant. A plaintiff must merely show that the defendant instigated the breach without justification. There is no need for wrongful actions by the defendant.

In the alternative, Phoenix pleads tortious interference with business expectancy. As discussed below, tortious interference with business expectancy does require an independently tortious or otherwise unlawful act of interference by the interferer. Phoenix's allegations are more

akin to defamation than fraud. However, even assuming that Phoenix must allege with particularity the circumstances surrounding the defamation, Phoenix easily accomplishes that in its Complaint. Essentially, Rule 9(b) requires facts that include the who, what, when, where and how surrounding the alleged fraud, as well as what was obtained as a result. *OmegaGenesis Corp. v. Mayo Foundation for Medical Education & Research*, 851 F.3d 800, 804 (8th Cir. 2017).

Here, Phoenix fulfills these pleading requirements:

- Who: Incline's principal William Francis; (Complaint, ¶ 44.)

- What: The entirety of Francis' email to Joel Brown at FIBT is recited in paragraph 48;

- When: 10:17 p.m. on May 5, 2022; (Complaint, ¶ 48.)

- Where/How: Francis first had a phone call with Brown and then responded to Brown's follow up email with another email at 10:17 p.m. on May 5, 2022; (Complaint, ¶¶ 44-49.)

- Result obtained: Francis began a false narrative that made FIBT illegitimately suspicious of Phoenix, which directly led to termination of the agreement between Phoenix and FIBT by which FIBT would have provided $50,000,000 in financing to Phoenix. (Complaint, ¶¶ 53-54.)

The who, what, when, where, and how of FIBT tortious interference with business expectancy are detailed with the full text of emails in paragraphs 44 through 54 of the Complaint. This is not a complaint for fraud, but Phoenix nevertheless fulfilled the heightened pleading requirements with precise and detailed allegations.

**C.      Plaintiff States a Claim for Tortious Interference with Contract**

North Dakota recognizes torts for both tortious interference with contract and tortious interference with business expectancy. The landmark case of *Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc*. explored the history of the two torts and how other jurisdictions define them in establishing a framework to differentiate the two. 2001 ND 116, 628 N.W.2d 707.

In *Trade 'N Post*, the North Dakota Supreme Court defined tortious interference with contract as "wrongful interference with contractual rights, whether such interference induces or prevents a third person to refrain from forming a contract, or induces such person to break an existing contract, will render the person whose wrongful conduct is responsible for these results liable in damages to the party injured. *Trade 'N Post, L.L.C.*, 2001 ND 116, ¶ 33, 628 N.W.2d 707 quoting *Bekken v. Equitable Life Assur. Soc*., 70 N.D. 122, 153, 293 N.W. 200, 217 (1940). But the Court recognized an important distinction between the two causes of action explaining that there is a "need to draw and enforce a sharpened distinction between claims for the tortious disruption of an *existing* contract and claims that a *prospective* contractual or economic relationship has been interfered with by the defendant. *Id.* at ¶ 40, quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc*., 11 Cal. 4th 376, 902 P.2d 740, 750-51 (Cal. 1995) (Emphasis in original). The Court stressed that existing contractual relationships are "deemed worthy of protection from interference by a stranger to the agreement." *Id*.

Conversely, "[e]conomic relationships short of contractual…should stand on a different legal footing as far as the potential for tort liability is reckoned." *Id.* Where two parties are competitors, "the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties." *Id.* In differentiating the two causes of action, the Court recognized that "[i]n an economic system founded upon the principle of free competition,

competitors should not be liable in tort for seeking a legitimate business advantage." *Id.* at ¶ 41, quoting Gary Myers, *The Differing Treatment of Efficiency and Competition in Antitrust and Tortious Interference Law*, 77 Minn. L. Rev. 1097, 1121-22 (1993)

Thus, the Court required that "in order to recover for wrongful interference with business [expectancy], the plaintiff must prove the defendant's conduct was independently tortious or otherwise unlawful." *Trade 'N Post, L.L.C.*, 2001 ND 116, ¶ 42.

With that framework in mind, we turn to the present case where Phoenix alleges both tortious interference with contract and tortious interference with business expectancy.

To establish a prima facie case of tortious interference with a contract, the plaintiff must prove (1) a contract existed, (2) the contract was breached, (3) the defendant instigated the breach, and (4) the defendant instigated the breach without justification. *Hilton v. North Dakota Educ. Ass'n.*, 2002 ND 209, ¶ 24, 655 N.W.2d 60. Wrongful interference with contractual rights, whether such interference induces or prevents a third person to refrain from forming a contract, or induces such person to break an existing contract, will render the person whose wrongful conduct is responsible for these results liable in damages to the party injured. *Trade 'N Post, L.L.C.*, 2001 ND 116, ¶ 33, 628 N.W.2d 707. Phoenix easily establishes the four elements in its Complaint.

In the Complaint, Phoenix focuses on its debt financing relationship with First International Bank and Trust ("FIBT") and the way in which Incline interfered with that existing contractual relationship. (Complaint, ¶¶ 26-54.) Phoenix explains that beginning in October 2020, Phoenix obtained a credit facility of $1,000,000 from FIBT to finance acquisitions in North Dakota. (Complaint, ¶ 27.) That credit facility between Phoenix and FIBT grew to as large as $9,000,000. (Complaint, ¶ 28.) Crucially, Phoenix alleges that on April 27, 2022, it committed to borrow $50,000,000 from FIBT and paid a $50,000 non-refundable commitment fee in consideration of

15

FIBT's mutual promises. (Complaint, ¶ 31.) It was this relationship – and more specifically the April 27, 2022 agreement between Phoenix and FIBT – that establishes the first element; that a contract existed.

Next, Phoenix must allege that the contract was breached. In that regard, Phoenix alleges that FIBT had sole discretion to complete the transaction but was obligated to exercise that discretion in good faith. (Complaint, ¶ 32.) Phoenix and FIBT worked together diligently to complete the due diligence process and, as of May 4, 2022, the deal was set to close in 10 days. (Complaint, ¶¶ 33-35.) But on May 11, 2022, mere days after Incline's provocation, FIBT terminated the agreement to provide $50,000,000 in financing to Phoenix in bad faith exercise of its discretion. (Complaint, ¶¶ 53-54.) FIBT's termination of the agreement was in bad faith because it had terminated the agreement based upon the false pretense (established by Incline) that Adam Ferrari was an officer of Phoenix and that Phoenix had not disclosed that. (Complaint, ¶¶ 51-52.) FIBT undoubtedly terminated the contract and, by doing so in bad faith, Phoenix establishes the second element.

Finally, Phoenix easily establishes that Incline instigated the breach and did so without justification. Phoenix alleges that on May 5, 2022, after inviting a call by email, Incline's principal Joe Francis ("Francis") spoke to Joel Brown ("Brown") of FIBT to discuss FIBT's agreement with Phoenix to provide a $50,000,000 credit facility. (Complaint, ¶ 45.) Of course, there is no transcript of the call, but at 5:07 p.m. that same evening, Brown replied to Francis stating, "I appreciate you bringing my attention to the concerns surrounding Phoenix Capital, and I will wait with anticipation for the additional information you mentioned. Once received, I would like to circulate it among some key personnel within our bank." (Complaint, ¶ 46.) Francis had no justification for bringing "his concerns" about Phoenix to Brown other than to kneecap a competitor's financing.

(Complaint, ¶ 47.)

Later that night, at 10:17 p.m., Francis emailed Brown, "I've attached what I put together on Adam's association with Phoenix. While some claims in here might be brushed off as hearsay and conjecture, the entirety of the body of evidence points to a convicted criminal who pleaded guilty to defrauding mineral owners in Colorado as the controlling force that's actually running Phoenix. After digesting all of the instruments which have been filed with the SEC and elsewhere, for someone to consume those and still believe Adam is not actually running Phoenix would be akin to believing his paralyzed father has been one of the most active mineral buyers in the Williston since Adam was arrested." (Complaint, ¶ 48.) The "Adam" referred to in the email is Phoenix's Vice President of Engineering Adam Ferrari. (Complaint, ¶ 49.)

Beyond the email itself, Francis included attachments in which are made numerous false accusations about Ferrari, accusing him of committing various crimes while omitting the fact that the charges were dropped and the matter vacated, and lying to investors about his role in the business. (Complaint, ¶ 49.) The only purpose for the May 5, 2022, communication was to harm Phoenix and improve Incline's position in the North Dakota marketplace. (Complaint, ¶ 50.)

After receiving this information on Thursday night, the following Monday, May 9, 2022 FIBT reached back out to Phoenix with questions about Phoenix's public debt program that had already been discussed at length. (Complaint, ¶ 51.) FIBT's newfound interest in that program was a direct result of Francis's May 5 communication. (Complaint, ¶ 51.) The misperceptions induced by Incline's smear campaign quickly led to FIBT's termination of the agreement on May 11, 2022. (Complaint, ¶ 52-53.)

The allegations clearly establish the third and fourth elements that Incline instigated the breach and did so without justification. Simply stated, Incline's only excuse in sending the email

was to undercut its competitor to ensure that its competitor did not receive funding; this is not justification for the improper action. Incline suggests that it was justified in making the statements because it was in competition with Phoenix for the business. But the citation in support of this point relates to claims for tortious interference with *business expectancy*; not with existing contracts. As the *Trade 'N Post, L.L.C.* Court stressed, the two causes of action must be differentiated because existing contractual relationships are "deemed worthy of protection from interference by a stranger to the agreement." *Trade 'N Post, L.L.C.*, 2001 ND 116, ¶ 40, quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc*., 11 Cal. 4th 376, 902 P.2d 740, 750-51 (Cal. 1995). Incline is entitled to seek a legitimate business advantage up until the moment its competitor enters into a contract. At that point it cannot meddle in the relationship. Incline acknowledges, as it must, that it interfered in the FIBT/Phoenix contractual relationship and that its only "justification" was to undercut its competitor. This is illegal and establishes a claim for tortious interference with contract.

As such, Phoenix has stated a claim for tortious interference with contract and the motion must be dismissed.

**D.    Plaintiff States a Claim for Tortious Interference with Business Expectancy**

As discussed in the prior section, when a contract is not involved and a competitor interferes with a mere business expectancy a plaintiff must establish a higher bar for the tortious activity. Namely, the plaintiff must show an independently tortious or otherwise unlawful act of interference by the interferer. *Trade 'N Post, L.L.C.*, 2001 ND 116, ¶ 42, 628 N.W.2d 707. Phoenix makes a claim for tortious interference with business expectancy in the alternative to its tortious interference with contract claim.

In order to prevail on a claim for unlawful interference with business expectancy, a plaintiff

must prove the following essential elements: (1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful act of interference by the interferer; (4) proof that the interference caused the harm sustained; and (5) actual damages to the party whose relationship or expectancy was disrupted. *Trade 'N Post, L.L.C.*, 2001 ND 116, ¶ 36, 628 N.W.2d 707.

Phoenix easily establishes elements (1), (2), (4), and (5). Phoenix had a debt financing relationship with FIBT dating back to October 2020 and had entered into an agreement with FIBT to borrow $50,000,000. (Complaint, ¶ 26-31.) Incline's principal Francis knew of the relationship between Phoenix and FIBT and initiated a phone call with Brown of FIBT on May 5, 2022 to raise concerns about FIBT loaning money to Phoenix. (Complaint, ¶¶ 44-46.)

The interference undoubtedly caused the harm as (1) Brown thanked Francis for Francis "bringing my attention to [Francis's] concerns surrounding Phoenix" (Complaint, ¶ 46); (2) Brown acknowledged he was "wait[ing] with anticipation for the additional information [Francis] mentioned" (Complaint, ¶ 46); then (3) the Monday after Brown received the disparaging material, FIBT began reinvestigating a previously established topic (Complaint, ¶ 51); and then (4) less than a week after receiving the disparaging material FIBT terminated the financing agreement (Complaint, ¶ 53).

Similarly, damages are easily established where Phoenix alleges that "[a]s a result of the breach, Phoenix was unable to obtain the $50,000,000 loan from FIBT that would have been invested in North Dakota and yielded tens of millions in profits for Phoenix." (Complaint, ¶ 55.) Phoenix has been unable to secure a more advantageous first lien loan despite reasonable efforts to mitigate its damages, has been forced to borrow extremely expensive money from other lenders, and has been forced to forego dozens of opportunities that could have been obtained with FIBT

financing during an extraordinarily profitable period in the oil and gas industry. (Complaint, ¶¶ 56-62.) These elements should all be relatively uncontested.

Incline focuses, instead, on whether Francis's comments were tortious or otherwise unlawful. To be sure, they were undoubtedly tortious in that they were fraudulent and defamatory. Incline defends its statements by suggesting that some of the content was true and some was opinion. The statements were not opinions at all and, although partially true, were partially false as well.

In the email at issue, Francis states "I've attached what I put together on Adam's association with Phoenix. While some claims in here might be brushed off as hearsay and conjecture, the entirety of the body of evidence points to a convicted criminal who pleaded guilty to defrauding mineral owners in Colorado as the controlling force that's actually running Phoenix. After digesting all of the instruments which have been filed with the SEC and elsewhere, for someone to consume those and still believe Adam is not actually running Phoenix would be akin to believing his paralyzed father has been one of the most active mineral buyers in the Williston since Adam was arrested." (Complaint, ¶ 48.)

Francis's goal was clear: to paint Adam Ferrari, who had pleaded guilty to felony theft in Colorado, as the "controlling force that's actually running Phoenix." Phoenix had not included Ferrari in the offering statement with FIBT because Ferrari "has no legal authority to bind [Phoenix] contractually, set policy for [Phoenix] or direct the actions of ANY employee of [Phoenix]." (Complaint, ¶ 52.) Francis's goal was to raise concerns within FIBT that Ferrari was a more crucial member of the Phoenix team than he actually was. The crucial falsity in Francis's statement is, thus, not that Ferrari is a "convicted criminal who pleaded guilty to defrauding mineral owners in Colorado;" it is that Ferrari is "the controlling force that's actually running

Phoenix."

Incline defends this crucial statement as an opinion. Incline suggests that Francis can make this statement – that Ferrari is the controlling force running Phoenix – because it is his opinion. The failure in that argument is that the statement in not one of opinion, but rather a false statement of something he believes to be factual. The distinction between whether a comment is opinion or factual is simple. An opinion is (1) a personal view, attitude, or appraisal or (2) a belief or judgment that rests on grounds insufficient to produce complete certainty. For example, Francis could have said he likes Brussels sprouts. That would be a personal view and is inapplicable to this case. The real question is whether Francis's statement could be considered a belief or judgment that rests on grounds insufficient to produce complete certainty. For the reasons explained by Phoenix's attorney in an email, the question of whether Ferrari was running Phoenix is readily determinable; and he was not.

On May 10, 2022, counsel for Phoenix tried to correct the misperceptions induced by Incline's smear campaign. (Complaint, ¶ 52.) The purpose of the email to FIBT was to explain why Phoenix had not listed Ferrari on a form disclosing its directors, officers, and significant employees. Counsel explained that "[t]he only legal relationship that Mr. Ferrari has with the Company is an at-will consulting agreement which specifies that he provide engineering support and other advice specific to oil and mineral drilling and leaseholds." Counsel stressed that "Mr. Ferrari has no legal authority to bind the Company contractually, set policy for the Company or direct the actions of ANY employee of the Company." (Complaint, ¶ 52.) Counsel explains that they "analyzed all of this in the preparation of the disclosure" and reached the conclusion that Ferrari was not a director, an officer, or even a significant employee. (Complaint, ¶ 52.) Counsel even explained that "the SEC has routinely adopted the language around the power to bind a

company or direct the policies/actions/business of the Company." (Complaint, ¶ 52.) Counsel concluded by stressing that Ferrari "has no ACTUAL management authority." (Complaint, ¶ 52.) (Emphasis in original).

Francis may have believed that Ferrari was "the controlling force that's actually running Phoenix." But it was a verifiable fact that Ferrari had no management authority within the company and merely had an at-will consulting agreement to provide advice and support. (Complaint, ¶ 52.) Francis simply did not take the steps to learn the grounds that would have been sufficient to produce complete certainty around the matter. And the likelihood is that he took no steps whatsoever as he merely desired his allegation to be true. Simply stated, whether Ferrari was "the controlling force that's actually running Phoenix" was verifiable and, indeed, false. It can, thus, be the basis of the tortious or otherwise unlawful act of interference by the interferer needed for a tortious interference with business expectancy claim.

Even beyond that, Phoenix alleges in its Complaint that the attachments to Francis's late-night email made numerous false accusations about Ferrari, accusing him of committing various crimes while omitting the fact that the charges were dropped and the matter vacated, and lying to investors about his role in the business. (Complaint, ¶ 49.) Again, even assuming that Ferrari was "a convicted criminal who pleaded guilty to defrauding mineral owners in Colorado" as Francis asserted, Phoenix alleges that the attachments made numerous false accusations about crimes that Ferrari did not commit while leaving out the critical fact that the charges in these other matters were dropped. Incline's assertion that one statement was true ignores the other falsities. Simply because Ferrari pleaded guilty to one crime does not open the door to Francis promoting falsities about other charges that were ultimately dropped.

Again, by suggesting that part of the statement was true ignores all the portions of the

statement was false. By promoting a false narrative, Incline can be liable for tortious interference with business expectancy.

### E.        Plaintiff States a Claim for Unfair Competition

Common-law trademark infringement claims may be brought under 15 USCS § 1125(a). *Beech--Nut, Inc. v. Warner--Lambert Co.*, 480 F.2d 801, 178 U.S.P.Q. (BNA) 385, 1973 U.S. App. LEXIS 9317 (2d Cir. 1973). Claim for infringement of common law trademark not specifying substantive state law is treated as false designation claim under 15 USCS § 1125. *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 208 U.S.P.Q. (BNA) 718, 1980 U.S. App. LEXIS 11576 (9th Cir. 1980). Section 43(a) of Lanham Act (15 USCS § 1125(a)) is cumulative of common-law remedies for unfair competition. *Scarves by Vera, Inc. v. United Merchants & Mfrs., Inc.*, 173 F. Supp. 625 (D.N.Y. 1959).

To have standing under the Lanham Act, a plaintiff must show 1) that its interests fall within the zone of interests protected by the statute, and 2) that the plaintiff's injury was proximately caused by the defendant's violations of the statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-33 (2014). To fall within the zone of interest, "a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id*. at 131-32. The Supreme Court has made clear that diversion of sales "is not the only type of injury cognizable under § 1125(a)." *Lexmark*, 572 U.S. at 138. For example, a plaintiff's injury might "flow[] directly from the audience's belief in the disparaging statements"—such as statements that "equat[e] [a plaintiff's product] with an inferior product." *Id*.

Section 43(a) of the Lanham Act creates a civil action for unfair competition:

> Any person who, on **or in connection with any goods or services**, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, **false or misleading description of fact, or false or misleading representation of fact**, which-- (A) **is**

23

**likely to cause confusion, or to cause mistake**, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, **or commercial activities by another person, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act**. (B) in commercial advertising or promotion, **misrepresents the nature, characteristics**, qualities, or geographic origin of his or her or another person's goods, services, **or commercial activities**, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (emphasis added).

"Section 43(a) of the Lanham Act prohibits actions *like* trademark infringement that deceive consumers and impair a producer's goodwill." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32 (2003) (emphasis added). The Supreme Court indicated in *Dastar* that § 43(a) is "one of the few provisions that goes *beyond* trademark protection," 539 U.S. at 29. After *Dastar*, "other courts have followed the Supreme Court's directive that Section 43(a) may be applied to situations in which a registered trademark is not involved." *Schlotzky's, Ltd. v. Sterling Purchasing and National Distribution Co*., 520 F.3d 393, 2008 U.S. App. LEXIS 4801, at *12 (5th Cir. 2008) (*citing Gnesys, Inc. v. Greene*, 437 F.3d 482, 488-89 (6th Cir. 2005); *Empresa Cubana Del Tabaco v. Culbro Corp*., 399 F.3d 462, 478 (2d Cir. 2005); *Zyla v. Wadsworth, Div. of Thomson Corp*., 360 F.3d 243, 251 (1st Cir. 2004).) *Dastar*, *Schlotzky*, and the cases cited in *Schlotzky* demonstrate that § 43(a) covers claims of false or misleading discretion or representation of *fact. See also Jack Russell Terrier Network v. Am. Kennel Club, Inc*., 407 F.3d 1027, 1037 (9th Cir. 2005) (under false association prong, "a plaintiff need only allege commercial injury based upon the deceptive use of a trademark or its equivalent to satisfy standing requirements") (*citing Barrus v. Sylvania*, 55 F.3d 468, 469-70 (9th Cir. 1995)); *ProductiveMD, LLC v. 4UMD, LLC*, 821 F. Supp. 2d 955, 966 (M. TN 2011)( "[t]he Lanham Act does not require a plaintiff to plead that it owns a trademark to state a claim for a violation of 15 U.S.C. § 1125(a)". *Marci's Fun Food, LLC*

*v. Shearer's Foods, Inc.*, 2010 U.S. Dist. LEXIS 107866, 2010 WL 3982290 at \*5 (W.D. Pa. Oct. 8, 2010))

*Dastar* is controlling here. Supreme Court precedent and the plain language of the Statute make clear that the Lanham Act applies to this case and Plaintiff states a claim. The North Dakota cases cited by Defendant do not support its position. First, in *Northern Bottling Co. v. PepsiCo, Inc.*, 427 F. Supp. 3d 1106, 1122 (D.N.D. 2019) Plaintiff abandoned the unfair completion claim so it was not addressed by the court. Second, in *Burris Carpet Plus, Inc. v. Burris*, 2010 ND 118, P37 the Plaintiff alleged trademark infringement and the case was dismissed because those allegations were not well pled.  The North Dakota Supreme Court explained:

> The Lanham Act false designation of origin provision goes beyond  trademark protection, but is not a federal codification of all unfair competition law and only applies to the trade practices prohibited in its text. *See Dastar Corp. v. Twentieth Century Fox Film Corp*., 539 U.S. 23, 28-29, 123 S. Ct. 2041, 156 L. Ed. 2d 18 (2003). A mark does not have to be federally registered for this provision of the Lanham Act to apply. *See Two Pesos*, 505 U.S. at 768. However, when trademark infringement is alleged, the plaintiff must be able to show it has a prior right to the mark. *Id.; see also Planetary Motion, Inc. v. Techsplosion, Inc*., 261 F.3d 1188, 1193 (11th Cir. 2001).

*Burris Carpet Plus, Inc. v. Burris*, 2010 ND 118, P37. Since Burris alleged trademark infringement but didn't have a trademark, the claim was correctly dismissed. There is no allegation of trademark here to be dismissed and the Lanham Act applies to this claim.

In order for representations to constitute "commercial advertising or promotion" under 15 USCS § 1125(a)(1)(B), they must be commercial speech, by defendant who is in commercial competition with plaintiff, for purpose of influencing consumers to buy defendant's goods or services; while representations need not be made in classic advertising campaign, representations must be disseminated sufficiently to relevant purchasing public to constitute advertising or promotion within that industry. *P&G Co. v. Haugen*, 222 F.3d 1262 (10th Cir. 2000); *Fashion*

*Boutique of Short Hills, Inc. v. Fendi USA, Inc*., 314 F.3d 48, (2d Cir. 2002).

15 USCS § 1125 is not limited to advertising or promotion directed to general public, and competitor's "negative" communications denigrating Phoenix are form of commercial advertising. *Neuros Co. v. Kturbo, Inc*., 698 F.3d 514 (7th Cir. 2012).

As to the FIBT interaction the facts supporting unfair competition are discussed at length above. *See supra.* Further, Incline disparaged Phoenix to multiple lessors in North Dakota between 2021 and 2023 who Incline knew were considering offers from both Incline and Phoenix to obtain the leases. (Complaint ¶ 20) 21.  Several mineral owners, including but not limited to the Bakke Family in Williams County, chose Incline because of Incline's disparagement campaign, despite the fact that Phoenix was offering more money. (Complaint ¶ 21) In doing so, they were intentionally misled through underhanded bullying tactics, denying them and other North Dakotans a fair opportunity to maximize the returns they deserved for their rights. (Complaint ¶ 21) As part of its campaign to take advantage of North Dakota mineral rights holders, Incline's agents told potential lessors, including but not limited to the Bakke Family, that Phoenix was operated by criminals, among other false statements, in order to scare North Dakota mineral owners into paying more to Incline rather than selling or leasing to Phoenix. (Complaint ¶ 22)

After Incline obtained thousands of acres of leases in Williams and Divide Counties, Incline approached Phoenix's Chief of Land attempting to sell those leases to Phoenix for a profit. (Complaint ¶ 23) One of the leases Incline tried to sell to Phoenix was with the Bakke Family in Williams County. (Complaint ¶ 24) Remarkably, Incline first told the Bakke Family not to do business with Phoenix because it was operated by criminals then turned around and offered to sell the Bakke Family's lease to Phoenix so Incline could profit from the deal without doing the drilling! (Complaint ¶ 24).

26

The Bakke incident is despicable and hits ever element of the claim. In connection with the sale of goods and services, Incline misrepresented facts about Phoenix and its commercial activities which lead the Bakke's to be confused about who Phoenix was and the work it did. Phoenix was damaged because it missed out on doing business with the Bakke's and the Bakke's were harmed because they sold their land rights for less based on a lie.

**F.     Plaintiff States a Claim for Unjust Enrichment**

A prima facie case of unjust enrichment requires the plaintiff to prove: (1) the defendant was enriched; (2) the plaintiff was impoverished; (3) there is a nexus between the defendant's enrichment and the plaintiff's impoverishment; (4) there was no justification for the enrichment and impoverishment; and (5) the law fails to provide a remedy for the alleged harm. *Broten v. Broten*, 2017 ND 47, ¶ 9, 890 N.W.2d 847, 849.

The allegations easily establish a claim for unjust enrichment. First, Phoenix alleges that Incline was enriched as a result of Phoenix losing its loan from FIBT because Incline was able to directly reduce funds available to its most direct competitor. (Complaint, ¶ 84.) Incline's one competitive advantage is its funding and ability to close quickly. (Complaint, ¶ 85.) Incline knew that damaging its competition's capital position would allow it to continue to make lowball offers to mineral sellers and lessors in North Dakota without fear of adequate competition. (Complaint, ¶ 85.) Second, Phoenix alleges that Incline's enrichment came at the expense of Phoenix because would have succeeded in closing deals that Incline was able to obtain with its competition crippled with no access to capital. (Complaint, ¶¶ 86-87.) Third, there is a clear nexus between the defendant's enrichment and the plaintiff's impoverishment: Incline could beat its sole competition – Phoenix – out for deals with Phoenix lacking the funding from the FIBT loan. (Complaint, ¶ 88.) Fourth, and as discussed above, there was no justification for the enrichment other than Incline

wanting to unfairly undercut its competition. Finally, fifth, Phoenix only pleads unjust enrichment in the alternative to its tortious interference counts. If those counts fail and Incline is able to escape liability, there will be no other adequate remedy at law for the harm Incline caused to Phoenix.

## CONCLUSION

WHEREFORE, Plaintiff prays for an order denying Defendants' First Motion to Dismiss and awarding such other and further relief as the Court deems just.

Dated: December 22, 2023                    Respectfully submitted,

**PHOENIX CAPITAL GROUP, LLC,**
Defendant

By:   _Alexander Loftus_

One of Its Attorneys

Alexander Loftus, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark St., Suite 1600
Chicago, Illinois 60601
T: 312.899.6625
alex@loftusandeisenberg.com