## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| PHOENIX CAPITAL GROUP HOLDINGS, LLC, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-00209 |
| INCLINE ENERGY PARTNERS, L.P.; INCLINE BAKKEN MINERALS II, LLC; INCLINE BAKKEN, LLC; INCLINE BAKKEN II, LLC; and DOES 1-10, inclusive, | AMENDED COMPLAINT AND JURY DEMAND |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiff Phoenix Capital Group Holdings, LLC ("Plaintiff" or "Phoenix"), for its Amended Complaint against Defendants Incline Energy Partners, L.P ("Incline Energy"), Incline Bakken Minerals, LLC ("Incline Bakken Minerals"); Incline Bakken Minerals II, LLC ("Incline Bakken Minerals II"), Incline Bakken, LLC ("Incline Bakken"); Incline Bakken II, LLC ("Incline Bakken II") (collectively, the "Incline Entities"), and Does 1-10, alleges and states as follows:

### I.    THE PARTIES

1.    Plaintiff Phoenix is a Delaware limited liability company with its headquarters located in Denver, Colorado.

2.    Defendant Incline Energy is a Delaware limited partnership with its principal place of business in Dallas, Texas.

3.    Defendant Incline Bakken Minerals is a Delaware limited liability company formed on or around October 16, 2018, with its principal place of business in Dallas, Texas.  On or around January 27, 2020, Incline Bakken Minerals submitted an application for a certificate of authority to do business in the State of North Dakota.  The application identified William Francis

1

as "Manager" of Incline Bakken Minerals, and was signed by Mr. Francis.

4.      Defendant Incline Bakken Minerals II is a Delaware limited liability company formed on or around December 9, 2021, with its principal place of business in Dallas, Texas.  On or around December 29, 2021, Incline Bakken Minerals II submitted an application for a certificate of authority to do business in the State of North Dakota.  The application identified William Francis as "Manager" of Incline Bakken Minerals II, and was signed by Mr. Francis.

5.      Defendant Incline Bakken is a Delaware limited liability company formed on or around October 16, 2018, with its principal place of business in Fort Worth, Texas.  On or around January 27, 2020, Incline Bakken submitted an application for a certificate of authority to do business in the State of North Dakota.  The application identified William Francis as "Manager" of Incline Bakken Minerals II, and was signed by Mr. Francis.

6.      Defendant Incline Bakken II is a Delaware limited liability company formed on or around December 9, 2021, with its principal place of business in Fort Worth, Texas.  On or around August 1, 2023, Incline Bakken II submitted an application for a certificate of authority to do business in the State of North Dakota.  The application identified William Francis as "Manager" of Incline Bakken II.

7.      Does 1-10 are persons or entities responsible in whole or in part for the wrongdoing alleged herein ("Doe Defendants").  Phoenix is informed and believes, and based thereon, alleges that each of the Doe Defendants participated in, ratified, endorsed, or was otherwise involved in the acts complained of, and that they have liability for such acts.  Phoenix will take steps to amend this Complaint if and when the identities of such persons or entities and/or the scope of their actions become known.

## II.    JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; Plaintiff brings claims for violations of federal antitrust laws, brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.  This Court has supplemental jurisdiction over Plaintiff's

related state law claims pursuant to 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over Defendants because they have purposefully directed activities at North Dakota and intentionally aimed their tortious conduct at the forum, including by purposefully and intentionally directing correspondence to a bank located in North Dakota for the purposes of interfering with Plaintiff's actual and prospective contractual relationship with that bank and hampering Plaintiff's business activities within the State of North Dakota, by directing correspondence to other persons located in North Dakota that disparaged Plaintiff and attempted to dissuade those persons from doing business with Plaintiff in North Dakota, among other activities that occurred in and/or were purposefully directed into the State of North Dakota.

10.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants systematically and continuously conduct business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

III.    ALLEGATIONS COMMON TO ALL COUNTS

A.    **The Market for Acquiring Mineral Rights in North Dakota and the Williston Basin**

11.     North Dakota's importance to our nation's energy security cannot be understated. The state has grown into the nation's third-largest crude oil producer, according to the U.S. Energy Information Administration, with the state estimating that energy supports 75,000 jobs and generates more than $3.2 billion annually.

12.     It is critical to achieving our nation's goal of energy independence, not to mention North Dakota's economic growth, that oil and gas reserves in the state be efficiently developed by those with the best expertise rather than those motivated solely by greed. North Dakotans also deserve fair treatment in developing their mineral rights to maximize their returns.



*Source: https://www.bakkenshale.com/maps (Last Visited July 11, 2024)*

13.     North Dakota's oil and gas industry centers around the Bakken Formation, comprising 200,000 square miles of oil-rich rock covering a triangle between eastern Montana, western North Dakota, and southern Canada (Saskatchewan and Manitoba). The formation is located entirely within the Williston Basin, which covers a similar geography. The vast majority of United States Bakken Formation oil and gas drilling occurs in western North Dakota.

14.     Generally, an oil and gas company must own, or otherwise be entitled to, the mineral rights for a given piece of land prior to drilling such land for oil or gas.

15.     Mineral rights consist of the legal rights to explore for and extract sub-surface natural resources from a given geographical region. Mineral rights can be, and frequently are, bought, leased, and sold separately from surface rights, which consist of the ownership of the

surface land.

16.     Mineral rights are frequently negotiated and bought from local landowners, who rely on competition between companies interested in their mineral rights to receive the highest possible price for their mineral rights.

17.     Mineral rights investors are focused on mineral rights acquisition and development operate in the Bakken Shale, contacting, negotiating, and acquiring mineral rights from landowners in the Bakken Shale. These investors then sell (or otherwise transfer) their acquired mineral rights to oil and gas companies looking to drill in the Bakken Formation. This process increases the efficiency of the Bakken Shale oil and gas industry, allowing oil and gas drilling companies to deal with a limited number of professional mineral rights brokers for all their mineral rights needs instead of interfacing with hundreds, if not thousands, of local landowners in addition to the state of North Dakota for state-owned rights.

18.     Due to high regulatory, financial, reputational, technical, and operational barriers, there are only a limited number of premium mineral rights investors currently competing in the Bakken Shale.

19.     First, mineral rights acquisition is heavily regulated by the state of North Dakota and the United States federal government, requiring acquirers to navigate a complex web of environmental, land use (including local zoning laws), and mineral extraction regulations before a parcel of land's mineral rights can be acquired and cleared for oil and gas drilling activities.

20.     Second, mineral rights investing is inherently a capital-intensive business, with reams of cash frequently locked up in land purchases. Financial liquidity is at a premium; in addition to purchasing the rights themselves (which can cost up to $15,000 per net mineral acre), premium mineral rights investors also have to commit significant resources to validating and activating purchased mineral rights, including confirming title, performing due diligence, and receiving regulatory clearance for drilling activities. These ancillary mineral rights-related activities can cost up to $20,000 per tract of land. And companies only realize returns once

mineral rights are sold to the end user (i.e., an oil or gas drilling company), which can take years, including weathering oil-and-gas market downturns. Thus, access to a large amount of liquid capital allowing for continuous purchase, activation, and downstream sale of mineral rights is critical to success in of premium mineral rights investors.

21.     Third, because mineral rights investing requires contacting, negotiating, and acquiring mineral rights from thousands of disparate landowners, mineral rights investing is an intensely reputational business. Established and trusted brand names enjoy significant incumbency advantages in negotiating with local landowners. New entrants must rapidly build a reputation for trustworthiness if they are to succeed in competing for mineral rights.

22.     Fourth, successfully identifying oil-rich tracts of land for mineral rights acquisition requires technical and specialized knowledge. Established premium mineral rights investors must develop years of local geographic knowledge allowing them to identify and purchase prime parcels of land for acquisition quicker and with more accuracy than newcomers. This technical knowledge is also useful in obtaining regulatory clearance for the acquired parcel of land and advising later purchases on ideal drilling techniques.

23.     Fifth, established premium mineral rights investing also benefit from efficiencies flowing from a well-established and robust supply chain, including the ability to source qualified workers. The market for qualified oil and gas employees in North Dakota is limited, and newcomers are faced with limited workforce and supply options, reducing their efficiency and impacting their ability to compete.

24.     Accordingly, competition between premium mineral rights investors is limited to a handful of experienced entities, with new entrants being rare.

25.     Compounding these dynamics is the fact that the Bakken Formation can be further subdivided into specific geographies and plays, each presenting its own unique environmental, drilling, and economic conditions. Due to these geographic factors, competition between mineral rights investors in the Bakken Formation is intensely local. Premium mineral rights investors bid

for certain parcels of land that they are familiar with, have confidence in, and/or are contiguous with or connected to existing holdings.

26.     Buyers are then further stratified by their capability to finance mineral rights purchases. Well-capitalized buyers can access purchase opportunities that are not otherwise available to less-capitalized buyers. Mineral-rights owners are frequently not amenable to selling contiguous tracts piecemeal due to logistical complexity and transactional risk. Thus, large, high-value tracts of mineral rights for sale attract only those buyers that can afford to purchase it.

27.     Thus, due to all the aforementioned factors, there frequently are only a limited number of premium mineral rights investors interested in and capable of purchasing a given parcel of land for any given seller, with rights holders heavily relying on competition between the limited set of bidders they can attract to reach the best price possible for their land.

28.     This is particularly true for mineral rights for parcels of greater than 40 acres with active or known near-term drilling in North Dakota's Divide, Dunn, McKenzie, Montrail, and Williams Counties, which are routinely sold or leased for between $500,000 and $8,000,000 ("High Value Tracts").  Sellers of High Value Tracts in particular value well-reputed premium mineral rights investors, like Incline and Phoenix, that have sufficient capital, can close deals quickly, are capable of leveraging the acquired mineral reserves as soon as possible (thus providing landowners with royalty income sooner), and are capable of navigating North Dakota's labyrinth regulatory framework governing mineral rights.

29.     Sellers of High Value Tract mineral rights do not consider small mineral-rights intermediaries to be substitutable for premium mineral-rights investors because small intermediaries frequently cannot meet High Value Tract asking prices, are incapable of closing deals quickly (thus exposing the seller to transactional risk), are less knowledgeable about the locality's geography, are inexperienced in navigating North Dakota's regulatory frameworks, and carry reputational and counterparty risk.  Thus, sellers of High Value Tract mineral rights do not consider small intermediaries to be part of their buyer pool.

30.     High Value Tract mineral rights sellers also do not view large oil and gas companies as meaningful alternatives for their properties.  These large oil and gas companies both move slowly in closing deals and primarily transact in huge chunks of land far larger than High Value Tracts.  Large oil and gas companies also frequently fail to immediately access the acquired mineral reserves as soon as possible, delaying delivery of royalties to the rights' sellers. Accordingly, High Value Tract mineral rights sellers also do not consider large oil and gas companies to be substitutes for premium mineral-rights investors.

31.     High Value Tract mineral rights sellers do not consider mineral rights intermediaries outside of North Dakota to be substitutes for buyers without a presence in North Dakota. This is because these buyers are less knowledgeable about the geography of these counties, the regulatory frameworks applicable to these counties, and other local issues.

**B.    The Incline Entities, Their Activities in the Williston Basin, and Their Anticompetitive Acts**

32.     Incline Energy is a premium mineral rights investor—and competitor to Phoenix for mineral rights of High Value Tracts—founded in 2010.  William Francis serves as the Managing Partner of Incline Energy and the other Incline Entities, including Incline Bakken Minerals II and Incline Bakken II.

33.      The Incline Entities have been extremely active in acquiring mineral rights interests for High Value Tracts in North Dakota since at least 2018.  In public-facing marketing and promotional materials, the Incline Entities are often lumped together, without differentiation, under the umbrella of "Incline Energy Partners" or simply "Incline."  Such materials repeatedly tout the extent to which the Incline Entities have done, and continue to do, business within the State of North Dakota generally, and within the Williston Basin more specifically.

34.     For example, the website at <https://inclinelp.com> (the "Incline Website"), which identifies "Incline Energy Partners, LP" as the copyright owner in the site's footer, states that "Incline is the most active private company acquiring oil and gas interests in the Denver-Julesberg Basin in Colorado and the Williston Basin in North Dakota."

35.     The Incline Website further includes the following graphic visually illustrating the extent to which (a) Incline considers North Dakota one of its core "Areas of Interest," and (b) Incline has "expan[ded] into the Williston Basin" in North Dakota beginning in "4Q18."



*Source:  https://inclinelp.com (last visited July 11, 2024)*

36.     Thousands of instruments recorded in counties throughout the State of North Dakota corroborate the claims on the Incline Website by identifying the Incline Entities as owners, grantors, grantees, lessors, lessees, assignors, or assignees of oil, gas, and mineral rights connected to properties located throughout the State of North Dakota.

37.     In addition to acquiring mineral rights, the Incline Entities also advertise and provide advisement services to mineral rights owners in North Dakota.  For example, on the

"What We Do" page of the Incline Website, the Incline Entities list their services as: "Acquire," "Operate," and "Advise." *See* https://inclinelp.com/what-we-do/#advise. Incline touts itself as the "Premier Market Maker" for oil and gas rights in the Williston Basin.

38.     Elsewhere on the Incline Website, the Incline Entities describe the "advisory services" that they provide as including financial analyses, "[e]ducation regarding the benefits of managing your asset in a tax efficient manner," and providing advice regarding "regulatory processes and statutes governing oil and gas operations in the state." *See* https://inclinelp.com/what-we-do/#advise.

39.     Since inception, the Incline Entities and Mr. Francis have demonstrated a strong aversion to healthy competition.

40.     For example, during the mid-2010s, a company named Ferrari Energy—founded by Phoenix's current CEO, Adam Ferrari—surfaced as a direct competitor to Incline Energy. Mr. Francis colluded with others (using his "william@inclineresources.com" email address) to unlawfully "bid up" the price of an acquisition that Ferrari Energy was seeking to finalize. According to Mr. Francis' fellow conspirator, the purpose of Mr. Francis' actions were to solely "Fuck Ferrari."

41.     On another occasion, in November 2018, Mr. Francis wrote on behalf of Incline Energy to a brokerage firm named Eagle River Holdings, LLC ("ERH"). In that communication, Mr. Francis threatened to withhold its business from ERH unless ERH stopped doing business with Ferrari Energy. Mr. Francis told ERH that "Incline and our over $325 million in AUM [i.e., assets under management] directed specifically towards mineral acquisitions in the DJ & Williston Basins, will not be participating" in the purchase of assets offered for sale by ERH located in "the Williston Basin of North Dakota" as long as ERH was doing business with Ferrari Energy.

C.   **The Emergence of Phoenix as Competitive Threat to the Incline Entities' Dominance of the Market for Acquiring Mineral Rights in the Bakken Formation.**

42.     Premium mineral rights investor Phoenix Energy was founded in 2019 and started competing directly with the Incline Entities for the acquisition of mineral rights in the Bakken Formation.

43.     Phoenix competed against the Incline Entities by deploying proprietary technology and decades of industry experience, and by generally offering higher prices to mineral rights owners than the prices offered by the Incline Entities.

44.     Phoenix's arrival in the Bakken Formation brought much-needed competition and increased options for local rights owners of High Value Tracts eager for alternatives to the Incline Entities who, until then, was the only premium mineral rights investor interested in their holdings.  As a result of Phoenix's competition, North Dakotans enjoyed higher prices for their High Value Tracts than they did absent competition.

45.     Sellers of mineral rights for High Value Tracts usually sell large tracts of land valued far above what smaller mineral-rights intermediaries can afford (i.e., in excess of $500,000). These sellers also strongly value the reputation and financial trustworthiness of their counterparties, looking to limit transactional risk to the greatest extent possible. Last, these sellers also place a premium on the purchaser's ability to accurately value their rights and close the transaction quickly.

46.     For years the Incline Entities were the only premium mineral rights investors capable of meeting these stringent, table-stakes criterion for High Value Tracts, allowing the Incline Entities to achieve a dominant position in the acquisition of mineral rights for High Value Tracts. Upon information and belief, in Divide, Dunn, McKenzie, Montrail, and Williams Counties, the Incline Entities' share of purchased or leased mineral rights for High Value Tracts was well above 50% until at least 2021.

47.     However, after years of work, Phoenix has successfully grown into a company newly capable of competing with the Incline Entities for High Value Tracts, challenging the

Incline Entities' hitherto-unquestioned market dominance in the Bakken Formation. Even in the face of this competition, Incline continues to exercise strong market influence (in part due to its anticompetitive conduct), and upon information and belief the Incline Entities market share in the acquisition of mineral rights High Value Tracts is still approximately 50%. The Incline Entities have responded to this loss of market share due to competition from Phoenix by redoubling their efforts to drive Phoenix out of North Dakota. In 2022, Mr. Francis and the management of the Incline Entities founded a new entity, Incline Energy Partners II LP, to "continue consolidating in [Incline's] legacy basins," including the Williston Basin in North Dakota. If allowed to continue its anticompetitive conduct unchecked, Incline will succeed in its plan to consolidate the market for the acquisition of mineral rights for High Value Tracts in North Dakota.

### D.   The Incline Entities' Multi-Faceted Anticompetitive Campaign in Response to Phoenix's Competition

48.     Since its founding, Phoenix has transacted in over 100 deals involving High Value Tracts, and launched its operating company (Phoenix Operating LLC) in September 2023 to drill wells in the Williston Basin and employ many North Dakotans.

49.     Phoenix's success in North Dakota can be attributed to its practice of generally offering mineral rights holders more money than other competitors for their mineral rights, its team of industry experts, innovative proprietary technologies, highly successful capital markets program, and commitment to offering fair prices to rights owners.

50.     Phoenix's success in North Dakota has been met with hostility from the Incline Entities and, more specifically, from their shared manager Mr. Francis.

51.     Mr. Francis has, on behalf of and in furtherance of his interests in each of the Incline Entities, resorted to unlawful means to attempt to stop or slow Phoenix's progress and its practice of paying fair prices to North Dakota mineral rights holders for their rights, including by turning to his well-worn exclusionary playbook that he has used to great effect in the past to demolish undesired competition in other areas in the United States.

52.     For example, upon information and belief, Mr. Francis and the Incline Entities currently enjoy close to 80% of the mineral-rights market in Weld County, Colorado.  Mr. Francis and Incline successfully reached market power in this county by excluding competitors, including Phoenix, via a multi-faceted anticompetitive campaign that involved (among other things) making strategic donations to entities with influence on the market and mailing prospective mineral-rights sellers packets containing false and misleading information about competitors.  Over time, their anticompetitive campaign succeeded, kicking out competitors, demolishing the market for mineral rights, and reaching a position of dominance in Weld County.

53.     Here, Mr. Francis and the Incline Entities (collectively, with the Doe Defendants, "Defendants") are again applying the same playbook and have engaged in a multi-faceted anticompetitive campaign against Phoenix's operations in North Dakota, including attempts to cut off Phoenix's access to bids for mineral rights on government land, preventing Phoenix from accessing capital on favorable terms, and spreading disparaging and defamatory misstatements about Phoenix to various industry participants and mineral rights holders in North Dakota.

54.     For example, in June 2020, Mr. Francis—from his "william@inclinelp.com" email address, and identifying himself as the "Managing Partner" of Incline Energy—attempted to persuade EnergyNet to stop doing business with Phoenix.

55.     EnergyNet is the leading online marketplace for mineral rights transactions, particularly in North Dakota. EnergyNet is the exclusive platform for purchasing mineral rights owned by the State of North Dakota, comprising 2.5 million mineral acres' worth of transferrable rights, including several High Value Tract parcels. Accordingly, access to EnergyNet—and access to North Dakota's state-owned land—is critical to mineral rights intermediaries' success in the Bakken Formation.

56.     When EnergyNet did not immediately capitulate to Mr. Francis' persuasions, Mr. Francis convinced one of Incline Energy's investors—Petrus Asset Management d/b/a Perot

Investments—to apply more pressure to EnergyNet.  When doing so, the Incline Energy investor frankly stated his belief that Mr. Francis' goal was "to make it more difficult for Ferrari to continue doing business."

57.     Further, in June 2021, the Incline Entities secretly conspired with a disgraced former broker, Peter Tosto, who had already been convicted in two separate securities fraud cases, leading the SEC to describe him as a "securities-fraud addict."  Though Mr. Francis falsely denied any involvement, documents provided by Mr. Tosto's company, FindIt Inc. ("FindIt"), demonstrate that the Incline Entities hired and directed Mr. Tosto to carry out an "Online AF Campaign" against Phoenix and its current CEO, Mr. Ferrari.

58.     The scope of the campaign included creating and maintaining two websites dedicated to disparaging Mr. Ferrari and Phoenix.  On June 18, 2021, FindIt received payment from "Incline Energy Partners LP" for the campaign.  In the process of arranging the payment, Mr. Francis asked an employee if they could "set up this wire for web services related to Incline Bakken Minerals, LLC."

59.     While the full scope of Defendants' online activities aimed at preventing competition is presently unknown to Phoenix, they appear to have extended beyond the creation and maintenance of the two disparaging websites.  For example, upon information and belief, Defendants or their agents also manipulated keyword search results via Search Engine Optimization so that those websites and other disparaging online content would appear at or near the top of the search results if people searched for Mr. Ferrari or Phoenix through Google or other search engines.  This manipulation has also resulted in periodic spikes in activity corresponding with the proliferation of false and defamatory articles or postings on third-party websites—many of which appear to be AI-generated—that mimic the disparaging content regarding Mr. Ferrari and Phoenix that Defendants have been spreading for years or that characterize lawsuits filed against Defendants as affecting Phoenix's credibility.  The most recent spike occurred from December 1 to December 9, 2023, when the search term "Phoenix

Capital Group lawsuit," which previously resulted in almost no activity, spiked to more than 245,000 impressions—a result that strongly suggests artificial manipulation.

60.     Indeed, echoes of Defendants' disparagement campaign continue to be heard by Phoenix in contexts suggesting that Defendants' attempts to impede Phoenix's ability to compete go well beyond what is presently-known by Phoenix.  For example, in or around August 2023, an individual named Barclay Leib contacted various Phoenix employees, offering Amazon gift cards in exchange for answers to targeted questions about Phoenix and Mr. Ferrari related to the types of misinformation spread by Defendants.  The striking similarities between the subject matter of Mr. Leib's inquiries and Defendants' years-long campaign against Mr. Ferrari and Phoenix suggest that Mr. Leib may have been engaged, directly or indirectly, by Defendants (including, potentially, a Doe Defendant whose identity is currently unknown to Phoenix).

61.     Defendants have also prevented competition by deceptively making disparaging and defamatory statements about Phoenix directly to North Dakotans from whom Phoenix and the Incline Entities were competing to purchase mineral rights, and to whom they were advertising their related services.

62.     The campaign harmed the market for the acquisition of mineral rights for High Value Tracts because, as a result of the campaign, certain mineral rights owners for High Value Tracts were unwilling to sell their rights to Phoenix, despite Phoenix's intention to pay more for those rights than Incline.

63.     On a number of occasions, Phoenix has learned that mineral rights owners were convinced by the Defendants' disparagement campaign to transact with the Incline Entities and sell their rights to the Incline Entities for less money than what Phoenix was offering and what they would have obtained in a competitive market.  While the total number of High Value Tracts obtained by Incline Entities through this anticompetitive disparagement campaign is currently unknown to Phoenix, upon information and belief, Incline's unlawful and anticompetitive campaign has cost North Dakota mineral rights owners millions of dollars in decreased sale

values.

64.     The direct cost to North Dakota mineral rights owners is aptly demonstrated by the Incline Entities behavior after obtaining the mineral rights at depressed prices.  On certain occasions, the Incline Entities have obtained at lower prices by disparaging Phoenix and later attempted to sell the same properties to Phoenix for a profit.

65.     Thus, after the Incline Entities convinced North Dakota mineral rights owners not to do business with Phoenix because it was purportedly operated by criminals, the Incline Entities turned around and offered to sell the same interest to Phoenix so Defendants could profit from the anticompetitively depressed price they paid for the mineral rights.

66.     Incline's treatment of the Bakke Family in Williams County, North Dakota, is illustrative.  Due to Incline's anticompetitive disparagement campaign, deceitfully painting Phoenix as a criminal operation, Incline convinced the Bakke family to sell their holdings to Incline at a price far lower than Phoenix's bid.  Then, after closing their deal with the Bakke family, Incline immediately turned around and attempted to sell the Bakke Family's mineral rights to Phoenix at Phoenix's original (and higher) bid price, aiming to profit off the arbitrage between the sub-competitive acquisition price of the Bakke Family's rights and the actual value of such rights in a competitive market.

67.     Upon information and belief, similar occurrences have taken place in many deals involving High Value Tracts.  As one example, siblings who owned a High Value Tract consisting of approximately 100 mineral acres in McKenzie County, North Dakota recently rejected Phoenix's very high offer for their mineral rights.  Instead, the siblings sold their mineral rights to Incline, even though upon information and belief Incline's bid was much lower than Phoenix's.  The siblings' acceptance of Incline's lower bid, even in the face of a much higher competing bid, demonstrates that Incline's unlawful and anticompetitive campaign has harmed Phoenix and High Value Tract mineral rights owners in the Relevant Market.

68.     Moreover, the Incline Entities have also taken advantage of North Dakota's judicial and administrative resources to slow or stop competitors (including Phoenix) from

conducting their business and drilling on North Dakota lands adjacent to those in which the Incline Entities have ownership or leasehold interests.

69.     For example, on or around January 12, 2024, Incline filed an application to the North Dakota Industrial Commission, Oil and Gas Division, seeking an order prohibiting Phoenix's North Dakota operating company from proceeding with permitted drilling on certain lands in Divide County, North Dakota.

### E.    The Incline Entities' Intentional Interference with Phoenix's Relationship with a North Dakota Bank

70.     The Incline Entities' attempt to avoid healthy competition went beyond the online disinformation campaign and the disparaging and defamatory comments made directly to North Dakota rights owners.

71.     The Incline Entities also intentionally interfered with Phoenix's relationship with First International Bank and Trust ("FIBT")—a North Dakota bank based in Watford City—by using disparaging and defamatory misstatements to convince FIBT to break an agreement with Phoenix and to refrain from finalizing a contemplated contract for a loan facility whereby FIBT would provide Phoenix up to $50 million in financing.

72.     The contemplated financing from FIBT was crucially important to Phoenix, since its business model and ability to compete for mineral rights for High Value Tracts—requires a high amount of liquidity, including via debt financing.

73.     Phoenix's relationship with FIBT dates back to October of 2020, when FIBT provided Phoenix with its first bank loan, a credit facility of $1,000,000, to finance acquisitions in North Dakota.

74.     FIBT and Phoenix mutually agreed to expand that facility frequently for the next year, growing to as large as $9,000,000 at its peak.

75.     Phoenix and FIBT knew each other well and enjoyed their mutually beneficial relationship.

76.    FIBT was intimately familiar with Phoenix's business, its principals, and its owners.

77.    In early 2022, Phoenix was looking to expand its financing arrangement to better enable it to compete with the Incline Entities and others for acquiring mineral rights for High Value Tracts.

78.    Phoenix and FIBT worked together to develop a mutually agreeable loan structure, and both parties signed a written agreement on April 27, 2022, that memorialized the proposed terms, committing Phoenix to borrow $50,000,000 from FIBT and pay a $50,000 non-refundable commitment fee in consideration of FIBT's mutual promises.

79.    Phoenix and FIBT worked quickly throughout the spring of 2022 to complete the due diligence process and Phoenix provided all the information required of it.

80.    Phoenix's senior leaders, consultants, and owners engaged in multiple Zoom meetings with FIBT.

81.    As of May 4, 2022, the deal was progressing toward closing within the next 10 days or so.

82.    FIBT President, Justin Voll emailed Phoenix on May 4, 2022, "We will do our best to hit the date [in May 2022], but there is still a lot of work and negotiation to do on the final loan documents. I hope to have the first draft for your review this week."

83.    During the due diligence process, whether via the shared banking relationship or through other connections in the small world of the North Dakota oil and gas industry, Defendants became aware that their competitor Phoenix was about to secure significant financing from FIBT.  This financing would allow Phoenix to continue to offer High Value Tract mineral rights holders a competitive price for their rights, instead of the subcompetitive prices offered by Incline.

84.    Phoenix is the fastest growing mineral and lease acquisition company for High Value Tracts in the Williston Basin where the Incline Entities have enjoyed a competitive

stranglehold over for years.

85.     In the spring of 2022, FIBT offered the solution for Phoenix to match or surpass the Incline Entities' closing speed with a $50,000,000 credit facility.

86.     Defendants resorted to unlawful interference to prevent Phoenix from obtaining its financing from FIBT, in an effort to prevent Phoenix from competing with Incline to acquire mineral rights for High Value Tracts.

87.     On May 5, 2022, Mr. Francis—on behalf of and in furtherance of his interests in each of the Incline Entities—emailed Joel Brown of FIBT in North Dakota: "I was wondering if you're free later today or tomorrow to hop on a call to discuss a potential loan with my group, as well as another issue that I'd like to pick your brain about."

88.     In reality, the only issue Mr. Francis wanted to discuss with Mr. Brown was revealed to be FIBT's agreement with Phoenix to provide a $50,000,000 credit facility.

89.     After the call, at 5:07 PM on May 5, 2022, Mr. Brown emailed Mr. Francis: "I appreciate you bringing my attention to the concerns surrounding Phoenix Capital, and I will wait with anticipation for the additional information you mentioned. Once received, I would like to circulate it among some key personnel within our bank."

90.     Mr. Francis had no justification for bringing his purported "concerns" about Phoenix to Mr. Brown other than to intentionally interfere with a competitor's financing and to harm competition for the acquisition of mineral rights for High Value Tracts.

91.     At 10:17 p.m. on May 5, 2022, Mr. Francis emailed Mr. Brown: "I've attached what I put together on Adam's association with Phoenix. While some claims in here might be brushed off as hearsay and conjecture, the entirety of the body of evidence points to a convicted criminal who pleaded guilty to defrauding mineral owners in Colorado as the controlling force that's actually running Phoenix. After digesting all of the instruments which have been filed with the SEC and elsewhere, for someone to consume those and still believe Adam is not actually running Phoenix would be akin to believing his paralyzed father has been one of the most active

mineral buyers in the Williston since Adam [Ferrari] was arrested."

92.     The attachments to the 10:17 p.m. email made numerous false accusations about Mr. Ferrari—who, at that time, was advising Phoenix as an independent contractor—misrepresenting him as a convicted criminal (in reality, the charges were dismissed), and lying to investors about his role in the business at that time.

93.     The only purpose for the May 5, 2022, communication was to harm Phoenix and improve the Incline Entities' position in the North Dakota marketplace, thus unfairly exploiting North Dakotans holding mineral rights.

94.     On Monday, May 9, 2022, just days after receipt of the false and misleading materials from Mr. Francis, Mr. Voll of FIBT asked Phoenix's deal team a series of questions about Phoenix's public debt program that was previously discussed at length, Mr. Ferrari's role at Phoenix, and related issues.  Mr. Voll's newfound interest in these issues was a direct result of Mr. Francis's May 5 communication.

95.     On or about May 11, 2022, FIBT reneged on its agreement to provide the negotiated financing to Phoenix, breaking the April 27, 2021 agreement and refraining from forming the final contract whereby Phoenix would receive the negotiated loans.

96.     FIBT broke the April 27, 2021 agreement and refrained from forming the further contract to provide $50,000,000 in financing to Phoenix as a direct result of on the intentional misstatements made by Mr. Francis to FIBT on behalf of the Incline Entities.

97.     As a result of the Defendants' intentional interference, Phoenix was unable to obtain the negotiated financing from FIBT that would have been invested in North Dakota and yielded tens of millions in profits for Phoenix and enabled more competitive pricing for North Dakotans selling and leasing land rights for High Value Tracts.

98.     To date, Phoenix has not been able to secure a more advantageous first lien loan despite reasonable efforts to mitigate its damages.

99.     In June of 2022, Phoenix began discussions with DelMorgan & Co., a highly

reputable brokerage service that connects capital with opportunity. Phoenix formally hired DelMorgan on August 10, 2022, with a $150,000 non-refundable commitment fee to replace the financing lost because of the Defendants' interference.

100.    Other lenders were interested in lending to Phoenix, but none offered terms as favorable as those that Phoenix and FIBT had negotiated and were finalizing prior to Defendants' unlawful interference.  And, in fact, some potential lenders backed away from potential lending relationships with Phoenix based on misleading information they heard regarding Mr. Ferrari, which, on information and belief, originated from Defendants and/or resulted from Defendants' manipulative online disparagement campaign described above.

101.    FIBT could offer more favorable terms based on its familiarity with how the funds were being deployed (FIBT's president leased his land to Phoenix) and their deep relationship with Phoenix prior to the Defendants' interference.

102.    Phoenix has been forced to borrow money from other, substantially more expensive, lenders in order to continue to compete and replace the funds it lost as a result of the Defendants' intentional interference with the FIBT relationship. Since May 2022, Phoenix has taken $17,500,000 in hard money loans, costing $188,695 in origination fees and another $3,925,203 in interest.

103.    As a result of Defendants' intentional interference with Phoenix's actual and prospective contractual relationship with FIBT, Phoenix has been burdened with hundreds of hours of unnecessary distractions, expensive fees, high interest rate loans, and inadequate funds to compete in the oil and gas space.

104.    Phoenix has been forced to forego dozens of mineral and lease opportunities due to the higher cost of capital that Phoenix has been forced to bear as a result of losing the FIBT relationship.

105.    Phoenix has also been forced to forego dozens of mineral and lease opportunities that could have been obtained with FIBT financing during an extraordinarily profitable period in

the oil and gas industry.

106.    Additionally, the Incline Entities' anticompetitive conduct has led to North Dakotan mineral rights owners where Phoenix would have been a bidder having, instead, solely Incline as a buyer for their rights, and, therefore, being paid significantly less for their rights.

## IV.    CLAIMS

### COUNT ONE

### TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT / BUSINESS EXPECTANCY

107.    Phoenix incorporates the allegations in all of the preceding Paragraphs as if set forth fully herein.

108.    After Phoenix and FIBT worked together to develop a mutually agreeable loan structure memorialized in their April 27, 2021 agreement, they were on the cusp of executing a subsequent contract through which Phoenix would obtain the negotiated financing.

109.    Phoenix had a reasonable expectation of economic advantage or benefit that would result from the contemplated contract that it was poised to execute with FIBT in or around May 2021, which would allow Phoenix to enter into more leases with mineral rights owners in North Dakota.

110.    The Defendants learned of Phoenix's contemplated contract with FIBT and its resulting expectations of economic advantage and business expectancy.

111.    To thwart Phoenix's funding and prevent it from forming the contemplated contract with FIBT, Mr. Francis—on behalf of and in furtherance of the interests of the Incline Entities—made false and defamatory statements about Mr. Ferrari and/or Phoenix to FIBT, falsely stating that Mr. Ferrari was a convicted felon, the CEO of Phoenix, and defrauding mineral owners and investors.

112.    The Defendants' communication to FIBT of false statements of purported fact regarding Phoenix and/or its current CEO and affiliate Mr. Ferrari, which caused FIBT to refrain

from forming the contemplated financing contract with Phoenix was otherwise tortious.

113.    In the absence of the Defendants' wrongful acts, it is reasonably probable that Phoenix would have formed its contemplated contract with FIBT and realized its economic advantage or benefit by obtaining financing up to $50,000,000 from FIBT, allowing Phoenix to enter into more leases with mineral rights owners in North Dakota.

114.    Phoenix has sustained actual damages as a result of the Defendants' actions, including, but not limited to, lost profits and lost goodwill.

**COUNT TWO**

**DECEPTIVE ACTS AND PRACTICES (N.D.C.C. § 51-15-01 ET SEQ.)**

115.    Phoenix incorporates the allegations in all of the preceding Paragraphs as if set forth fully herein.

116.    The statements made by the Incline Entities attempting to persuade North Dakota mineral rights holders to transact with the Incline Entities rather than Phoenix, were "advertisement[s]" within the meaning of the North Dakota's Unlawful Sales or Advertising Practices statute, N.D.C.C. § 51-15-01 *et seq*.

117.    The acquisition and advisement services marketed by the Incline Entities to North Dakota mineral rights holders were "merchandise" within the meaning of the North Dakota's Unlawful Sales or Advertising Practices statute, N.D.C.C. § 51-15-01 *et seq*.

118.    Defendants engaged in deceptive acts or practices with the intent that North Dakota mineral rights holders would rely on such acts or practices to transact with the Incline Entities to obtain the advertised acquisition and advisement services.

119.    Defendants' deceptive acts and practices in connection with the advertisement of their acquisition and advisement services were unconscionable, and caused, and were likely to cause, substantial injury to Phoenix, as well as to North Dakota mineral rights holders, that could not reasonably be avoided by Phoenix or the injured rights holders and that were not outweighed by countervailing benefits to consumers or to competition.

120.    Defendants knowingly engaged in the deceptive acts or practices in connection with the advertisement of their acquisition and advisement services.

121.    As a result of Defendants' deceptive acts and practices, Phoenix has sustained damages—including both reputational harm and lost profits—in amounts to be proven at trial.

## COUNT THREE

## MONOPOLIZATION

122.    Phoenix incorporates the allegations in all of the preceding Paragraphs as if set forth fully herein.

123.    The relevant market is the purchase or lease of mineral rights in High Value Tracts in North Dakota, particularly the Divide, Dunn, McKenzie, Mountrail, and Williams Counties (the "Relevant Market").

124.    The Incline Entities' conduct constitutes unlawful monopolization of the Relevant Market under Section 2 of the Sherman Act, 15 U.S.C. § 2.

125.    Defendants' unlawful conduct has occurred in, and has had a substantial effect upon, interstate commerce.

126.    Defendants enjoy monopsony power in the Relevant Market.

127.    Defendants have maintained their monopsony power via exclusionary conduct, using unfair and deceptive acts and practices to exclude Phoenix from being able to fairly compete in the Relevant Market.

128.    Defendants' conduct has resulted in mineral rights holders' revenues from the sale of their rights being lower than they would be in a competitive market.

129.    Defendants' exclusionary conduct has resulted in an antitrust injury to Phoenix, who has lost profits and sustained other damage to its business as a result of Defendants' unlawful conduct.

130.    Phoenix has suffered and is threatened with continued loss or damage to its business as a result of Defendants' unlawful conduct.

131.    Defendants' unlawful conduct will continue unless enjoined.

## COUNT FOUR

## ATTEMPTED MONOPOLIZATION

132.    Phoenix incorporates the allegations in all of the preceding Paragraphs as if set forth fully herein.

133.    The Incline Entities' conduct constitutes unlawful attempted monopolization of the Relevant Market under Section 2 of the Sherman Act, 15 U.S.C. § 2.

134.    Defendants' have engaged in predatory and anticompetitive conduct by using unfair and deceptive acts to attempt to exclude Phoenix from competing in the Relevant Market.

135.    Defendants' unlawful conduct has occurred in, and has had a substantial effect upon, interstate commerce.

136.    Defendants have undertaken their course of conduct with a specific intent to monopsonize the relevant market.

137.     Defendants' conduct has a dangerous probability of resulting in monopsony power: Defendants are poised to possess 100% of the Relevant Market if Phoenix is eliminated from the market.

138.     Defendants' conduct has resulted in an antitrust injury to Phoenix, who has lost profits and sustained other damage to its business as a result of Defendants' unlawful conduct.

139.    Phoenix has suffered and is threatened with continued loss or damage to its business as a result of Defendants' unlawful conduct.

140.    Defendants' unlawful conduct will continue unless enjoined.

## COUNT FIVE

## CONSPIRACY IN RESTRAINT OF TRADE

141.    Phoenix incorporates the allegations in all of the preceding Paragraphs as if set forth fully herein.

142.    The Incline Entities' conduct constitutes an unlawful conspiracy to restrain trade

in the Relevant Market under Section 1 of the Sherman Act, 15 U.S.C. § 1.

143.    Defendants knowingly combined and conspired with Peter Tosto, a disgraced stockbroker, to engage in an anti-competitive campaign against Phoenix designed to prevent Phoenix from competing with Defendants in the Relevant Market.

144.    Defendants' unlawful conduct has occurred in, and has had a substantial effect upon, interstate commerce.

145.    Defendants' conspiracy has unreasonably and unlawfully restrained trade, resulting in in mineral rights holders' revenues from the sale of their rights being lower than they would be in a competitive market.

146.    The anticompetitive effects of Defendants' conspiracy outweigh any procompetitive benefits.

147.    Defendants' conspiracy has caused has resulted in antitrust injury to Phoenix, who has lost profits and sustained other damage to its business as a result of Defendants' unlawful conduct.

148.    Phoenix has suffered and is threatened with continued loss or damage to its business as a result of Defendants' unlawful conduct.

149.    Defendants' unlawful conduct will continue unless enjoined.

**COUNT SIX**

**UNJUST ENRICHMENT**

150.    Phoenix incorporates the allegations in all of the preceding Paragraphs as if set forth fully herein.

151.    The Defendants were enriched as a result of Phoenix losing its loan from FIBT because Incline was able to reduce funds available to a key competitor, thereby forcing Phoenix to forego bidding on many opportunities to acquire mineral rights from rights holder in North Dakota.

152.    Incline knew that interfering with its competitor Phoenix's funding would result

in the Incline Entities being the only bidder for certain mineral rights, thereby allowing Incline to enrich itself by continuing to pay unfairly low prices to mineral rights sellers and lessors in North Dakota.

153.    The Defendants' enrichment came at the expense of Phoenix.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff Phoenix Capital Group Holdings, LLC, respectfully requests the following relief:

A.    Judgment finding that Defendants' unlawful conduct constitutes tortious interference with Plaintiff's prospective contract and/or business expectancy.

B.    Judgment finding that Defendants' unlawful conduct constitutes a violation of North Dakota's Unlawful Sales or Advertising Practices statute, N.D.C.C. § 51-15-01 *et seq*.

C.    Judgment finding that Defendants' unlawful conduct constitutes a violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

D.    Judgment finding that Defendants' unlawful conduct resulted in their unjust enrichment at the expense of Plaintiff.

E.    An injunction whereby Defendants, and their officers, agents, servants, employees, attorneys, and all other persons who are in active concert or participation with any of them, are permanently enjoined from engaging in their unlawful conduct, or any conduct with the same or similar purpose and effect, and requiring Defendants to take affirmative steps to dissipate the continuing effects of their prior unlawful conduct.

F.    Judgment awarding Plaintiff damages in an amount to be determined, comprising all lost profits, reputational harm, and other losses (including, but not limited to, attorneys' fees and costs of suit) caused by Defendants' unlawful conduct, and multiplied to the extent provided by law, including under Section 4 of the Clayton

Act, 15 U.S.C. § 15 and N.D.C.C. 51-15-09.

G.   An order awarding Plaintiff its expenses and costs of suit, including reasonable attorneys' fees, to the extent provided by law.

H.   Such additional relief as the Court may deem proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues triable by jury.

Dated: July 12, 2024           By:   <u>/s/ Ronald H. McLean</u>

Ronald H. McLean (ND #03260)
Ian R. McLean (ND #07320)
SERKLAND LAW FIRM
10 Roberts Street North
Fargo, ND 58102-4982
Phone: 701.232.8957
Fax: 701.237.4049
imclean@serklandlaw.com
rmclean@serklandlaw.com

and

John T. Ryan *(admitted Pro Hac Vice)*
Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130
Phone: 858.523.5400
jake.ryan@lw.com

Andrew R. Gray *(admitted Pro Hac Vice)*
Latham & Watkins LLP
650 Town Center Dr. 20th Fl.
Costa Mesa, CA 92626
Phone: 714.540.1235
andrew.gray@lw.com

***Attorneys for Plaintiff***
***Phoenix Capital Group Holdings, LLC***