**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| PHOENIX CAPITAL GROUP HOLDINGS, LLC<br><br>                                   Plaintiff,<br>      v.<br><br>INCLINE ENERGY PARTNERS, L.P.<br><br>                                   Defendant. | Case No. 1:23-cv-00209 |

**PLAINTIFF'S COMBINED SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
PENDING MOTIONS TO DISMISS AND MEMORANDUM IN SUPPORT OF
<u>MOTION FOR LEAVE TO FILE AMENDED COMPLAINT</u>**

Pursuant to the Court's order (Dkt. No. 27) granting Plaintiff Phoenix Capital Group

Holdings, LLC ("<u>Phoenix</u>") leave to submit additional filings relating to Defendant Incline

Energy Partners, L.P.'s ("<u>Incline Energy</u>") pending motions to dismiss/transfer (Dkt. Nos. 6, 8,

10; the "<u>Motions to Dismiss</u>"), and in accordance with Federal Rules of Civil Procedure 15(a)(2)

and 21, Phoenix respectfully submits this combined brief in supplemental opposition to the

Motions to Dismiss and in support of Phoenix's motion for leave to file an amended complaint

(the "<u>Motion for Leave</u>"), submitted concurrently herewith.  Pursuant to D.N.D. Civ. L.R.

5.1(C), a copy of the proposed First Amended Complaint (the "<u>Amended Complaint</u>" or "<u>AC</u>")

is attached to the Motion for Leave.

## I.     INTRODUCTION

This is a North Dakota case that plainly belongs in front of this Court.  Defendant Incline

Energy—operating on its own and through a collection of entities registered to do business in

North Dakota (collectively, with Incline Energy, the "Incline Entities")[1]—has intentionally interfered with Plaintiff Phoenix's business activities in North Dakota, deceptively advertised its services to North Dakota mineral rights holders to harm Phoenix, and engaged in other anticompetitive conduct to unlawfully depress the compensation North Dakota residents receive for their valuable mineral rights.  The Incline Entities directed their activities into the State of North Dakota to intentionally interfere with the financing relationship between Phoenix—a key competitor in the North Dakota mineral rights acquisition market—and a North Dakota bank. The Incline Entities also communicated directly with North Dakota mineral rights owners to disparage Phoenix and attempt to eliminate Phoenix as a competitive threat to the Incline Entities' business and monopsony.  The Incline Entities' anticompetitive campaign not only interfered with and harmed Phoenix, but it also worked to the ultimate detriment of North Dakotans.

Accordingly, Phoenix brought this North Dakota action against Incline Energy seeking damages and injunctive relief, stating tortious interference, unfair competition, and unjust enrichment claims.  *See* Dkt. No. 1.  Incline Energy moved to dismiss or transfer this case based on a variety of grounds, including the existence of a distinguishable case in Texas involving different causes of action and harms that are distinct from the North Dakota-specific harms at issue here.  *See* Dkt. No. 9.  Incline Energy's arguments for dismissal or transfer lack merit and should be denied, for all of the reasons previously briefed.  *See* Dkt. Nos. 13, 14.  In addition to the grounds previously briefed, Incline Energy's motion to dismiss or transfer (Dkt. No. 9) should also be denied because it relies in significant part on a demonstrably false and misleading

---

[1] Along with Incline Energy, the "Incline Entities" include Incline Bakken Minerals, LLC ("Incline Bakken Minerals"); Incline Bakken Minerals II, LLC ("Incline Bakken Minerals II"), Incline Bakken, LLC ("Incline Bakken"); and Incline Bakken II, LLC ("Incline Bakken II").

declaration of William Francis, the Managing Partner of Incline Energy and driving force behind all of the Incline Entities. *See* Dkt. No. 9-10. Mr. Francis' declaration would have the Court believe that Incline Energy has virtually no ties to, or business activities in, North Dakota. Further investigation into these statements demonstrate Incline Energy's deep and significant ties to North Dakota—including through the other Incline Entities—and the blatantly misleading nature of Mr. Francis' sworn declaration he filed with this Court.

As a result of Phoenix's investigation and Incline Energy's misleading attempt to evade liability by disclaiming any connection to acts ostensibly taken by other Incline Entities, the most just and efficient path forward at this early stage of the action is for Phoenix to file its Amended Complaint. The Amended Complaint would (a) include all of the Incline Entities as named defendants; (b) add Doe Defendants to encompass the presently unknown individuals and entities with whom the Incline Entities have conspired and collaborated to harm Phoenix and attempt to obtain and maintain the Incline Entities' monopsony power in the relevant North Dakota market; (c) make additional factual allegations, including recently discovered facts regarding the extent of the Incline Entities' unlawful and anticompetitive campaign against Phoenix and others; and (d) assert new claims based on the Incline Entities' violations of the federal antitrust laws and North Dakota law.[2] Particularly under the liberal Rule 15(a)(2) standard, Phoenix should be permitted to file the Amended Complaint to ensure that this action is decided on the merits based on all relevant facts and applicable legal doctrines, rather than disposed of prematurely based on alleged deficiencies in the original complaint or technicalities regarding which member of a

---

[2] Purely in a good faith attempt to narrow the dispute and focus the Court's and parties' efforts in the event Phoenix is granted leave to file it, the Amended Complaint would also drop certain causes of action that are asserted in the currently operative complaint. Such changes are not intended to, and should not, be construed as an admission or concession as the merits of those causes of action in the event leave to amend is not granted.

group of related entities was named in the complaint.  *See* Fed. R. Civ. P. 15(a)(2) (courts should

"freely give leave [to amend] when justice so requires").

Accordingly, to ensure that this North Dakota-specific case aimed at protecting

competition within a North Dakota market serving North Dakota residents is—as it should be—

decided on the merits in a North Dakota court, Phoenix respectfully requests that the Court grant

its Motion for Leave and deny the Motions to Dismiss as moot.

## II.    FACTUAL BACKGROUND

### A.    <u>The Incline Entities Develop Strong Ties to North Dakota, Actively Acquire Mineral Rights in the Williston Basin, and Exhibit Hostility to Healthy Competition.</u>

Incline Energy is a mineral rights acquisition business founded in 2010.  Declaration of

John T. Ryan ("<u>Ryan Decl.</u>"), Ex. 1; *see also* AC ¶ 33.  Incline Energy has been acquiring

mineral rights interests in North Dakota since at least as early as 2018 and describes itself on its

website as "the most active private company acquiring oil and gas interests in … the Williston



Basin in North Dakota."  Ryan Decl, Ex. 1; AC ¶¶ 34-35.  Incline Energy's website further depicts the extent to which Incline Energy's assets are concentrated in North Dakota in the following graphic:

 *See* AC ¶ 35.

The Managing Partner of Incline Energy is William Francis.  *See* Dkt. No. 9-10, ¶ 2.  Mr. Francis also manages each of the other Incline Entities.  *See, e.g.,* Ryan Decl., Ex. 2 (application for Incline Bakken Minerals to do business in North Dakota, identifying Mr. Francis as "Manager"); Ex. 3 (same for Incline Bakken Minerals II); Ex. 4 (same for Incline Bakken); Ex. 5 (same for Incline Bakken II).  The Incline Entities are, as the Incline Energy website touts, extremely active in the acquisition of mineral rights in North Dakota.  Publicly available records demonstrate that the Incline Entities own or lease the oil, gas, and mineral rights for many hundreds of properties located in North Dakota.  *See* Ryan Decl., Exs 6, 7.

For many years, the Incline Entities—as managed and directed by Mr. Francis—have demonstrated a strong aversion to healthy competition.  For example, when a company named Ferrari Energy emerged as a direct competitor to Incline Energy in the mid-2010's, Mr. Francis conspired with others (including from his "william@inclineresources.com" email address) to unlawfully "bid up" the price of an acquisition that Ferrari Energy was attempting to close, the purpose of which was characterized by the co-conspirator as being solely to "Fuck Ferrari."  AC ¶ 41.

In another instance, Mr. Francis wrote on behalf of Incline Energy to a broker called Eagle River Holdings, LLC ("ERH") in November 2018.  *Id.,* ¶ 42.  In that correspondence, Incline threatened to withhold its business from ERH unless ERH stopped doing business with Ferrari Energy.  *Id.*  Mr. Francis told ERH that "Incline and our over $325mm in AUM directed

specifically towards mineral acquisitions in the DJ & Williston Basins, will not be participating"
in the purchase of assets offered for sale by ERH located in "the Willison Basin of North
Dakota" so long as ERH was doing business with Ferrari Energy.  *Id.*

**B.     Phoenix Emerges as Competitive Threat to the Incline Entities' Dominance
of the Market for Acquiring High Value Tract Mineral Rights in the Bakken
Formation.**

Phoenix was founded in 2019, and became a direct competitive threat to Incline as a
buyer of High Value Tract mineral rights in the Bakken Formation. *Id.*, ¶ 43.  As a result, North
Dakotans selling High Value Tracts in the Bakken Formation enjoyed higher prices for their
mineral rights than they did absent competition.  *Id.*, ¶ 45.

As discussed in the Amended Complaint, North Dakota is the nation's third-largest oil
and gas producer, with production activities centered around the subterranean Bakken
Formation.  *Id.*, ¶¶ 12-14.  Production activities within this area is governed by a complex
scheme of governmental regulations and private mineral rights.  *Id.*, ¶¶ 14-28.  Mineral rights
consist of the legal rights to explore for and extract sub-surface minerals from a given plot of
land.  *Id.*, ¶ 16.  Mineral rights are sold or leased out by both private and governmental
landowners.  *Id.*, ¶ 17.  Before oil and gas drilling may commence, an oil and gas company must
first own or otherwise be entitled to the land's mineral rights.  *Id.*, ¶¶ 15-16.

The Incline Entities and Phoenix both compete in the *purchase* of these mineral rights in
the Bakken Formation for later usage or resale to downstream consumers (e.g., oil and gas
drillers).  *Id.*, ¶¶ 29-32, 47-48.  Specifically, they compete for tracts of land that cost more than
$500,000 and less than $8,000,000 in North Dakota's Divide, Dunn, McKenzie, Montrail, and
Williams Counties (the "High Value Tracts").  *Id.*, ¶¶ 29-32.  High Value Tracts are unique
because smaller mineral rights purchasers do not have the necessary regulatory expertise, liquid
capital, reputation, geographic knowledge, and supply chains to allow them to compete for these

High Value Tracts.  *Id.*  Conversely, large oil-and-gas producers prefer to bid on even more valuable contiguous tracts of land, viewing these High Value Tracts as being too small to be worth their time and effort to bid on.  *Id.*  Last, for reasons similar to the difficulties that smaller mineral rights purchasers face in competing for High Value Tracts, entry (including entry from out-of-state entities) is rare and extremely difficult; entrants will have to spend years navigating North Dakota's complex web of regulations, rounding up sufficient capital, developing relationships with local landowners, deepening their understanding of the Bakken Formation, and establishing ironclad supply chains in a low-supply environment, before they can even hope to compete.  *Id.*

Thus, in this middle-market area, there are only two entities (i.e., competitors) with all the qualifications that smaller purchasers lack, the desire to compete that larger purchasers lack, and the established footprint that entrants lack: Incline and Phoenix.  *Id.*, ¶¶ 29-32, 47-48.  Incline is the incumbent in the High Value Tract mineral rights market and Phoenix, after years of continuous work, has risen as Incline's challenger.  *Id.*, ¶ 47-48.  Due to the time Incline spent as the sole buyer in this market, Incline has gained monopsony power over the purchase price of High Value Tract mineral rights and is currently determined to maintain this monopsony power at all costs, including leveraging it against Phoenix.  *Id.*

### C.   The Incline Entities React to Phoenix's Emergence as Competitive Threat with Multi-Pronged Anticompetitive Campaign.

When Phoenix emerged as a legitimate threat to the Incline Entities' monopsony power in the North Dakota mineral rights market, the Incline Entities reacted with a multipronged anticompetitive campaign against Phoenix, that included attempts to cut off Phoenix's access to bids for mineral rights on government land, preventing Phoenix from accessing capital on favorable terms, and disparaging and defamatory statements about its current CEO, Mr. Ferrari.

For example, in June 2020, Mr. Francis—from his "william@inclinelp.com" email address, and identifying himself as the "Managing Partner" of Incline Energy attempted to convince EnergyNet[3], a premier mineral rights listing platform that is the sole platform for acquiring mineral rights owned by the State of North Dakota—a major and dispositive source of mineral rights in North Dakota—to stop doing business with Phoenix.  *See id.*, ¶¶ 55-57.  When EnergyNet did not immediately capitulate, Mr. Francis convinced one of the largest sources of financing for mineral rights investing that was also one of Incline Energy's investors—Petrus Asset Management d/b/a Perot Investments—to apply more pressure to EnergyNet.  *Id.*  When doing so, the Incline Energy investor frankly stated his belief that Mr. Francis' goal was "to make it more difficult for Ferrari to continue doing business."  *Id.*

In June 2021, the Incline Entities conspired with a disgraced former broker who had already been convicted in two separate securities fraud cases, leading the SEC to describe him as a "securities-fraud addict."  *Id.*, ¶ 58.  The Incline Entities and Mr. Tosto carried out an "Online AF Campaign" against Phoenix and its current CEO, Mr. Ferrari.  *Id.*.  The scope of the campaign included creating and maintaining two websites and various blog posts dedicated to disparaging Mr. Ferrari and Phoenix through a company called FindIt, Inc. ("<u>FindIt</u>").  *Id.*, ¶¶ 58-59.  On June 18, 2021, FindIt received payment from "Incline Energy Partners LP" for the campaign.  *Id.*.  When directing an employee to make the payment, Mr. Francis asked if they could "set up this wire for web services related to Incline Bakken Minerals, LLC."  *Id.*

The Incline Entities have also prevented competition by making deceptive, disparaging, and defamatory statements about Phoenix directly to North Dakotans to whom the Incline

---

[3] EnergyNet is the leading online marketplace for oil, gas, and mineral transactions, offering a wide range of services—including sealed bids, and access to state and federal government sales. *See* https://www.energynet.com/page/About_Us.

Entities were advertising their services in an attempt to out-compete Phoenix for the acquisition of their mineral rights.  *Id.*, ¶¶ 62-68.  Several mineral owners, including but not limited to the Bakke Family in Williams County, North Dakota, were convinced by the deceptive disparagement campaign to transact with the Incline Entities, rather than Phoenix, ultimately receiving far less money for their rights than they would have in a competitive market.  *Id.*, ¶¶ 62-68.

        **D.**       **<u>The Incline Entities Tortiously Interfere with Phoenix's Relationship with a North Dakota Bank as Part of Anticompetitive Campaign.</u>**

The Incline Entities' anticompetitive campaign against Phoenix includes the intentional interference with Phoenix's attempt, in early 2022, to obtain approximately $50 million in business-critical financing from First International Bank & Trust ("<u>FIBT</u>"), a North Dakota bank based in Watford City.

In early 2022, Phoenix was looking to obtain financing that would better enable it to compete for the purchase of High Value Tract mineral rights.  *Id.*, ¶ 78.  Phoenix and FIBT worked together to develop a mutually agreeable loan structure, and both parties signed an agreement on April 27, 2022, that memorialized the proposed terms and required Phoenix to pay FIBT a non-refundable $50,000 commitment fee.  *Id.,* ¶ 79.  The Incline Entities apparently caught wind of Phoenix's imminent funding and, in an effort to sabotage it and avoid having to pay higher prices for High Value Tract mineral rights, reached out to FIBT shortly after Phoenix and FIBT executed the April 27 agreement but before Phoenix obtained the proposed financing.  *Id.*, ¶ 84.  To thwart Phoenix's funding, Mr. Francis, on behalf of the Incline Entities, made false and defamatory statements about Phoenix and Mr. Ferrari to FIBT, falsely stating that (1) Mr. Ferrari was a convicted criminal; (2) Mr. Ferrari was, at that time, the CEO of Phoenix; and (3) Mr. Ferrari and Phoenix were defrauding mineral owners and investors.  *Id.*, ¶¶ 87-94.

Shortly thereafter, FIBT reneged on its financing proposal to Phoenix.  *Id.*, ¶¶ 95-97.  As a result, hundreds of North Dakota High Value Tract mineral rights owners have fewer buyers competing to purchase their rights, and will be paid less for those rights than they would have absent the Incline Entities' unlawful conduct.

> E.   **Phoenix Files this Action, in Response to Which Incline Energy Moves to Dismiss or Transfer Based, in Part, on False and Misleading Declaration.**

In October 2023, Phoenix filed this diversity action against Incline Energy, asserting tortious interference, unfair competition, and unjust enrichment claims under North Dakota law. Dkt. No. 1.  Incline Energy moved to dismiss based on purported failure to state a claim (Dkt. No. 7) and to dismiss or transfer based on the existence of a separate case in Texas and Incline Energy's alleged lack of connection to North Dakota (Dkt. No. 9).

In purported support of Incline Energy's motion to dismiss or transfer, Mr. Francis submitted a sworn declaration (the "Francis Declaration") that, under penalty of perjury, presented to the Court a false and misleading picture of Incline Energy's ties to North Dakota. *See* Dkt. No. 9-10.  For example, the Francis Declaration states, among other things, that "Incline has no employees or agents in North Dakota."  *Id.*, ¶ 4.  And further, that "Incline has not purchased or taken control over ownership of any asset and/or oil and gas interest in North Dakota effective as of December 31, 2021."  *Id.*, ¶ 5.

Shortly after Mr. Francis submitted this sworn declaration attesting to Incline Energy's supposed lack of any "assets" or "agents" in North Dakota, Incline Energy initiated proceedings against Phoenix before the North Dakota Industrial Commission (the "Commission").  *See* Ryan Decl., Ex. 8.  In that proceeding, Incline Energy's agent—a North Dakota attorney located in Bismarck—asked the Commission to protect Incline Energy's ownership interest in land located in Divide County, North Dakota.  *See id.*, ¶¶ 1, 8.

Given the blatant inconsistencies between the Francis Declaration, on the one hand, and Phoenix's own experiences vis-à-vis Incline Energy (including in the January 2024 Commission proceeding), on the other hand, Phoenix sought leave to submit additional filings related to the Motions to Dismiss to ensure that the Court did not rule based on a false and misleading declaration.  As detailed above, Phoenix's investigation indicated that Incline Energy—whether on its own behalf of through its sister/subsidiary entities—not only owned assets in North Dakota, but were the major player in the market for High Value Tract mineral rights and were engaging in anticompetitive conduct (including its tortious interference with Phoenix's relationship with FIBT) to unlawfully lower the prices paid to North Dakotans for their High Value Tract mineral rights.

The Court granted Phoenix leave to submit additional filings related to the Motions to Dismiss.  *See* Dkt. No. 27.  Accordingly, Phoenix files this brief and the accompanying Motion for Leave.

## III.    ARGUMENT

### A.    <u>The Motions to Dismiss are Meritless, Based in Part on a False and Misleading Declaration, and Should be Denied.</u>

For all of the reasons set forth in Phoenix's briefs in opposition to the Motions to Dismiss (Dkt. Nos. 13, 14), Phoenix has met the applicable pleading standard for the claims asserted in its original Complaint, and neither the existence nor status of separate and distinct litigation pending in Texas warrants the dismissal or transfer of this action.  Accordingly, the Motions to Dismiss should be denied.

The lack of merit in the motion to dismiss/transfer (Dkt. No. 9), in particular, is underscored by Incline Energy's reliance on the demonstrably misleading—if not outright false and perjurious—declaration signed by Mr. Francis.  *See supra* Section II.E.  Incline Energy's

submission of the misleading Francis Declaration is itself further grounds to deny the motion.

*See, e.g., Berger v. Burl*, 2017 U.S. Dist. LEXIS 28760, at *5 (E.D. Ark. Jan. 19, 2017) (denying

defendants' motion for summary judgment where "at least one assertion in the sworn declaration

supporting the motion was false" because "the Court cannot rely on any part of a declaration

containing unexplained, false statements"); *Breadmore v. Jacobson*, 2014 U.S. Dist. LEXIS

97332, at *2 (S.D. Tex. July 14, 2014) (denying motion to dismiss due, in part, to plaintiff's

argument that "[d]efendant's declaration is false and relies on impeached evidence").

The Motions to Dismiss lack merit and should be denied.  Phoenix recognizes, however,

that if the Court grants the Motion to Leave, the Amended Complaint would immediately

supersede the original Complaint and moot the Motions to Dismiss.  Accordingly, in the interest

of efficiency, Phoenix requests that the Court grant the Motion for Leave and deny the Motions

to Dismiss as moot.

**B.**     **Plaintiff Should be Granted Leave to Amend its Complaint to Add New
Parties and Assert Additional Claims Supported by the Facts Currently
Known to Plaintiff.**

When a plaintiff seeks to amend its complaint, "the court should freely give leave when

justice so requires."  Fed. R. Civ. P. 15(a)(2).  Courts throughout the Eighth Circuit have long

applied this rule to liberally permit amendments.  *See, e.g., Chesnut v. St. Louis County*, 656 F.2d

343, 349 (8th Cir. 1981) ("Amendments should be allowed with liberality."); *First Int'l Bank &*

*Trust v. Oasis Petroleum N. Am. LLC*, 587 F. Supp. 3d 896, 898-99 (D.N.D. 2020) (granting

leave to amend and recognizing that "[a]mendments should be permitted liberally"); *Running*

*Horse, LLC v. Rodenbough Trucking & Excavating, Inc.*, 2016 U.S. Dist. LEXIS 191604

(D.N.D. June 29, 2016) (Hovland, J.) (granting leave to file Second Amended Complaint adding

new claims and defendants); *see also Dakota Provisions v. Hillshire Brands*, 226 F. Supp. 3d

945, 951 (D.S.D. 2016) (observing that the "Eighth Circuit Court of Appeals takes a liberal

viewpoint towards leave to amend and leave should be granted absent good reason for denial"
and granting motion for leave) (internal quotation marks and citations omitted).  The policy
towards liberally allowing amendments is intended to "afford[] parties an opportunity to test
their claim on the merits" as opposed to disposing of claims at the pleading stage, based on
technicalities or otherwise.  *First Int'l Bank & Trust*, 587 F. Supp. 3d at 899 (citing *Ash v.
Anderson Merchandisers, LLC*, 799 F.3d 957, 962-63 (8th Cir. 2015) and *Foman v. Davis*, 371
U.S. 178, 181 (1962)); *see also Fasttrac Transp., LLC v. Pedigree Techs., LLC*, 2023 U.S. Dist.
LEXIS 79243, at *37 (D.N.D. Mar. 7, 2023) (granting motion for leave, finding that "the
prejudice to [defendant] that may result … is outweighed by the court's preference for
determination of the action on its merits").

  Denial of a motion for leave is appropriate only in the rare, "limited circumstances in
which delay, bad faith on the part of the moving party, futility of the amendment, or unfair
prejudice to the non-moving party can be demonstrated."  *Hillesheim v. Myron's Cards & Gifts,
Inc.*, 897 F.3d 953, 955 (8th Cir. 2018).  The "[l]ikelihood of success on the new claim or
defenses is not a consideration for denying leave to amend unless the claim is clearly frivolous."
*Becker v. Univ. of Neb.*, 191 F.3d 904, 908 (8th Cir. 1999).

   1. <u>Justice Requires Adding the New Parties Named in the Amended
Complaint—the Incline Entities and Doe Defendants—to the Action.</u>

  The Eighth Circuit's policy of liberally allowing amended pleadings under Rule 15
applies to the additional of parties as well as claims.  *See, e.g., Running Horse*, 2016 U.S. Dist.
LEXIS 191604, at *5-6 (granting leave to add new parties and claims); *Multi-Chem Grp., LLC v.
3Chem, LLC*, 2013 U.S. Dist. LEXIS 196575 (D.N.D. Aug. 7, 2013) (same).  This is particularly
true where, as here, the named Defendant is attempting to avoid a determination of the merits
based on an alleged technicality.  *See, e.g., Stone v. Olderbak Georgetown/Willows LLC*, 2024

U.S. Dist. LEXIS 35947, at *10 (D. Neb. Mar. 1, 2024) ("[T]he underlying purpose of Rule 15 [is] to facilitate a decision on the merits rather than on the pleadings or technicalities.") (internal quotation marks and citation omitted; collecting cases).

The Amended Complaint would add four new named defendants: Incline Bakken Minerals, Incline Bakken Minerals II, Incline Bakken, and Incline Bakken II. These entities are all related to, and share the same Managing Partner as, the current named Defendant, Incline Energy. *See supra* Section II.A. As alleged in the Amended Complaint, these entities are all registered to do business in North Dakota and appear to be the entities used by Incline Energy to conduct certain of its business in North Dakota. AC ¶¶ 3-6, 33-42. Phoenix should be granted leave to add these entities to the action, as well as Doe Defendants representing the additional persons—whose identities are currently unknown to Phoenix—who participated in the unlawful and anticompetitive campaign against Phoenix alleged in the Amended Complaint.

Incline Energy, the sole named Defendant in the original Complaint, has surreptitiously sought to dispose of this case, at least in part, on the grounds that Phoenix purportedly identified the wrong Incline Entity in the original Complaint and that some of the relevant contacts to North Dakota and wrongdoing may be attributable to one or more of Incline Energy's sister or subsidiary companies. *See* Dkt. No. 9-10 (attempting to justify motion to dismiss/transfer based on alleged lack of ties between Incline Energy and North Dakota); *see also* Ryan Decl., Exs. 1-7; AC ¶¶ 33-42 (extensive ties between the Incline Entities—including Incline Energy—and North Dakota). Putting aside, for now, the evidence demonstrating that Incline Energy is, in fact, the entity at heart of the unlawful conduct alleged in the Complaint, this attempt to avoid the merits of Phoenix's claim based on a "technicality" should be rejected. Moreover, there has been no undue delay, nor would Incline Energy be prejudiced by adding the new parties given the very

early stage of the case.  The Court has not yet entered a scheduling order, nor has discovery even started.

Phoenix should be granted leave to file the Amended Complaint adding the Incline Entities and Doe Defendants to this action.

        2.        <u>Justice Requires Adding the Antitrust Claims and North Dakota Statutory Claim to the Action.</u>

Phoenix's ongoing investigation into the details and impact of the Incline Entities' misconduct vis-à-vis Phoenix has confirmed the applicability of additional causes of action, beyond those alleged in the original Complaint.  Accordingly, in the Amended Complaint, Phoenix states plausible claims for relief under the federal antitrust laws, as well as North Dakota statutory law.  To ensure that this action is decided on the merits, justice requires that Phoenix be granted leave to file the Amended Complaint asserting these new claims.

***First***, the Incline Entities conduct, as alleged in the Amended Complaint, constitutes actual monopsonization[4] of the purchase of High Value Tract mineral rights market in North Dakota's Divide, Dunn, McKenzie, Mountrail, and Williams Counties within the Bakken Formation (the "Relevant Market").  The Sherman Act prohibits the possession of monopsony power—defined as the power to control purchase prices or exclude competing buyers from a given market—via "willful acquisition or maintenance of that power."  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 480 (1992); *Todd v Exxon Corp.,* 275 F.3d 191 (2d Cir. 2001) (explaining that inquiry for measuring market power in a monopsony case is the market not of competing sellers but competing buyers); 15 U.S.C. § 2.  Conduct designed to exclude

---

[4] A monopoly describes control of sellers in a market; a monopsony describes control of buyers in a market.  The alleged relevant market here is the purchase of High Value Tract mineral rights.  Legally, the monopoly and monopsony analyses are largely identical. *See Todd v Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001).

potential competitors from a market equates willful maintenance of monopsony power. *Eastman Kodak*, 504 U.S. at 483. Incline currently possesses monopsony power and has willfully maintained that power via waging a long-running exclusionary strategy against Phoenix.

Incline currently enjoys monopsony power over the Relevant Market. *See, e.g.,* AC ¶¶ 47-48, 123-132. Incline has maintained this monopsony power via waging a long-running and patently anticompetitive campaign against Phoenix. *See, e.g., id.* at ¶¶ 49-107; *Int'l Travel Arrangers, Inc. v. W. Airlines, Inc.*, 623 F.2d 1255, 1270 (8th Cir. 1980) (finding that a campaign aimed at preventing a competitor from becoming a competitive threat can be exclusionary conduct violative of antitrust law). And Incline's conduct has directly impacted hundreds of North Dakota High Value Tract mineral rights owners, who suffer lower prices for their High Value Tracts than if Phoenix was allowed to compete in these markets. *Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec.* Corp., 908 F Supp. 1180 (W.D.N.Y. 1995) (preventing a competitor from competing in a given market reduces competition and constitutes antitrust injury under a monopsony theory).

***Second***, in addition to actual monopsonization, the Incline Entities' conduct constitutes unlawful attempted monopsonization of the relevant market. 15 U.S.C. § 2. Attempted monopsonization requires an intent to monopsonize a market in conjunction with exclusionary conduct and a dangerous probability of success. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454-56 (1993). Incline's conduct, as alleged in the Amended Complaint, satisfies these elements. Incline has waged a years-long anticompetitive campaign against Phoenix that has involved lies, deceit, disparagement, pressure tactics, and outright interference with business and contractual relationships, all to prevent Phoenix from competing in the Relevant Market. *See, e.g.,* AC ¶¶ 49-107. Further, Incline's conduct has a dangerous probability of success—Incline

has already succeeded in deceitfully raising Phoenix's cost of capital, preventing Phoenix from competing as extensively in the Relevant Market as it otherwise would have.  *See, e.g.,* AC ¶¶ 69-107.  If Incline's campaign continues, Incline would ultimately enjoy monopsony power in the Relevant Market.

 **Third**, the Incline Entities' conduct also constitutes a conspiracy in unreasonable restraint of trade that violates Section 1 of the Sherman Act.  15 U.S.C. § 1; *Int'l Travel Arrangers*, 623 F.2d at 1268.  Section 1 violations require that (1) a contract, combination, or conspiracy exist, and (2) that such contract, combination, or conspiracy unreasonably restrains trade.  *Int'l Travel Arrangers*, 623 F.2d at 1266-67.  Incline's conduct is analogous to those alleged in *International Travel Arrangers*, and satisfies all given elements.  *See id.*  Incline, who as discussed *supra* possesses (or has a dangerous probability of possessing) significant market power in the Relevant Market, conspired with Peter Totso, a disgraced stock broker, to undertake a disparaging and underhanded internet campaign against Phoenix designed to interfere with Phoenix's ability to compete in the Relevant Market. *See e.g.,* AC ¶¶ 58-59; *Int'l Travel Arrangers*, 623 F.2d at 1268 (finding Section 1 violation where competitor conspired with marketing agency to undertake anticompetitive and deceitful marketing campaign against entrant).

 **Fourth**, the Incline Entities' conduct, as alleged in the Amended Complaint, violates Chapter 51-15 of the North Dakota Century Code, entitled "Unlawful Sales or Advertising Practices."  N.D.C.C. § 51-15-01 *et seq*.  That statute makes it unlawful for "any person" to use or employ "any deceptive act or practice … or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."  N.D.C.C. § 51-15-02.  The

statute defines "advertisement" broadly to include any attempt, oral or written, to induce any person to transact for any "merchandise."  N.D.C.C. § 51-15-01.  The term "merchandise" is also defined broadly to include any goods "or services."  *Id.*  Thus, one violates this North Dakota statute by making deceptive statements or misrepresentations to convince another person to transact with them for any goods or services.

The statute authorizes a private cause of action by "***any person*** against any person who has acquired any moneys or property" through a violation of the statute.  N.D.C.C. § 51-15-09 (emphasis added).  Further, "[t]he North Dakota Supreme Court has concluded that the plain language of section 51-15-09 allows an action against a business competitor for alleged unlawful practices under the Act" where the conduct "caused some threatened or actual injury to his or her legal rights and interests."  *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 2015 WL 11156906, at *4 (D.N.D. July 7, 2015) (Erickson, C.J.) (citing *Ackre v. Chapman & Chapman, P.C.*, 2010 ND 167, ¶ 23, 788 N.W.2d 344 (2010)).

Here, the Incline Entities communicated with North Dakota mineral rights holders with the intent of persuading such North Dakotans to transact with the Incline Entities for their advisement and acquisition services.  *See, e.g.,* AC ¶¶ 58-68.  During such communications, the Incline Entities made deceptive statements about their direct competitor, Phoenix, including misrepresentations about Phoenix's current CEO, Mr. Ferrari.  *See id.*  Those deceptive statements and misrepresentations caused Phoenix harm, including both reputational harm and lost profits.  *See id.* at ¶¶ 62-68.

Because the alleged facts support a claim under North Dakota's Unlawful Sales or Advertising Practices statute, Phoenix should be granted leave to assert this claim at this early stage of the action.  *See, e.g., Chesnut*, 656 F.2d at 349 ("Amendments should be allowed with

liberality."); *Running Horse*, 2016 U.S. Dist. LEXIS 191604 (granting leave to file Second

Amended Complaint).  Incline cannot meet its burden of proving that the addition of this claim

would be futile or that it would result in any unfair prejudice.  *Hillesheim*, 897 F.3d at 955.

## IV.    CONCLUSION

For all of the foregoing reasons, Phoenix respectfully requests that the Court grant the

Motion to Leave and deny the Motions to Dismiss as moot.

Dated: July 12, 2024                    By:      /s/ Ronald H. McLean

Ronald H. McLean (ND #03260)
Ian R. McLean (ND #07320)
SERKLAND LAW FIRM
10 Roberts Street North
Fargo, ND 58102-4982
Phone: 701.232.8957
Fax: 701.237.4049
imclean@serklandlaw.com
rmclean@serklandlaw.com

and

John T. Ryan *(admitted Pro Hac Vice)*
Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130
Phone: 858.523.5400
jake.ryan@lw.com

Andrew R. Gray *(admitted Pro Hac Vice)*
Latham & Watkins LLP
650 Town Center Dr. 20th Fl.
Costa Mesa, CA 92626
Phone: 714.540.1235
andrew.gray@lw.com

***Attorneys for Plaintiff***
***Phoenix Capital Group Holdings, LLC***