IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| PHOENIX CAPITAL GROUP HOLDINGS, LLC, § § § | |
| Plaintiff, § § § | C.A. NO. 1:23-cv-00209 |
| v. § § § | |
| INCLINE ENERGY PARTNERS, L.P. § | |
| Defendant. | |

### DEFENDANT'S REPLY TO SUPPLEMENTAL
### MEMORANDUM IN OPPOSITION TO PENDING MOTIONS TO DISMISS

Incline Energy Partners, LP ("Incline") files this Reply to Phoenix's Supplemental Memorandum in Opposition to Pending Motions to Dismiss ("Brief," Dkt. 31, and "Supplemental Materials," Dkt. 32) and in support, respectfully shows the Court as follows.

### SUMMARY

Immediately after Plaintiff filed this lawsuit, Defendant moved to dismiss, based on Rule 12(b)(6) and *Colorado River* abstention.[1] More than a month after those motions to dismiss were fully briefed, Plaintiff retained new counsel and sought leave to file "supplemental materials."[2] On May 30, the Court granted Plaintiff's motion for leave to supplement,[3] but Plaintiff waited until July 21, 2024 to file its "Supplemental Materials" and Brief.[4]

Through its "supplemental" materials, however, Phoenix fails to provide any evidence or raise any argument that rebuts the propriety of staying this lawsuit in favor of the one Phoenix initiated in a Texas State Court more than two years ago. In that lawsuit, Phoenix also alleged that

---

[1] *See* Defendant's Motion to Dismiss Based on Abstention, Etc. [Dkt. Nos. 8, 9, 16] (the "Abstention Motion") and Defendant's Rule 12(b)(6) Motion to Dismiss [Dkt.6, 7, 15] (the "12(b)(6) Motion"),

[2] Doc. 23, 24, 25. Defendant opposed the motion for leave. Doc. 26.

[3] Doc. 27.

[4] Doc. 30, 31, 32. Incline responds separately to Phoenix's Motion for Leave to Amend and the portion of the Brief that supports the Motion for Leave.

1

Incline had purportedly interfered with a transaction between Phoenix and First International Bank and Trust ("FIBT"), and with the sale of North Dakota minerals which had closed *months* before Phoenix sought to induce the seller to breach its completed sale with Incline.[5]  In both, with regard to FIBT and the mineral sale, the alleged interference was based on true statements regarding Ferrari's role as a felon and the person in control of Phoenix.[6]  Rather than "supplemental materials" addressing the merits of the Motions to Dismiss, Phoenix filed a Motion for Leave to Amend and arguments supporting that motion. Only four paragraphs of the Brief address the Abstention Motion,[7] and those limited arguments depend on two wholly unsupported and incorrect conclusions: (1) that the "Motion to Dismiss lacks merit" and, (2) that Incline submitted a "demonstrably false" declaration in support of the Abstention Motion.  The first assertion is a bald conclusion lacking any supporting facts or legal argument and is refuted by the Abstention Motion and supporting Reply.[8]  The second assertion is simply untrue.

## ARGUMENT

### A. "Wise Judicial Administration"[9] Warrants Staying or Dismissing This Lawsuit

The merit of the Abstention Motion is evident in the arguments and authorities cited in the Motion and Reply. More specifically, a final judgment in the Texas State Case will be res judicata here, and will bar this piecemeal, forum shopping excursion.[10] Notably, Phoenix does not dispute that this was an exercise in forum shopping, and although it labels the Texas State Case as "distinguishable," it provides no factual or legal basis for any distinction and thus fails to explain

---

[5] *See* Doc. 9-6, pp. 16-17 of 23. In the Abstention Motion and the Rule 12(b)(6) Motion, Incline also referenced the minerals that were at issue in the Texas State Case as "Colorado minerals." That was incorrect.  The minerals at issue in the transaction underlying the Texas State Case are North Dakota minerals, as evidenced by the deed for those minerals by which they were sold to Incline.  A true and correct copy of the deed for the minerals at issue is attached to the Koonce Declaration as **Exhibit A-3,** submitted contemporaneously with this Reply.

[6] *Compare* Dkt. 1, ¶¶ 27–55, and Dkt. 9-2, p. 4, 9–10 of 22.

[7] Brief, Dkt. 31, p. 11.

[8] *See* Doc. 8, 9, and 16.

[9] *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 2 (1983).

[10] *See* Abstention Motion, Doc. 9 pp. 17–19.

why a final judgment in the Texas State Case would not be res judicata here.[11] Phoenix's unapologetic forum shopping, the presence of res judicata, and virtually every other relevant factor weigh heavily in favor of a stay until a final judgment is issued in the Texas State Case. *See Moses H. Cone*, 460 U.S. at 17, n.20 (appellate court's reasoning that "vexatious or reflexive" nature of either case "may influence the abstention decision" had "considerable merit."); *Federated Rural Elec. Ins. Corp. v. Ark. Elec. Cooperatives, Inc.*, 48 F.3d 294, 299 (8th Cir. 1995).

**B.      The Francis Declaration is Neither False Nor Misleading**

To distract the Court from the merits of the Abstention Motion, Phoenix claims the Court should deny that Motion because of a "demonstrably misleading—if not outright false and perjurious—declaration signed by Mr. Francis."[12] In support, Phoenix claims Incline presented a "false and misleading picture" of Incline's ties to North Dakota, in (a) stating it has no employees or agents in North Dakota and (b) had not purchased or taken control of any assets, including oil and gas interests in North Dakota, since December 31, 2021. Phoenix also suggests "Incline would have the Court believe" it has "virtually no ties to, or business activities in," North Dakota.[13] The Court should reject these facially incorrect assertions.

Both statements are true from every perspective. In providing the challenged testimony, Phoenix fails to identify anything remotely false about Mr. Francis's statement that Incline Energy, LP, the only defendant Phoenix initially sued in this case, has not purchased or taken control of any assets in the state since December 31, 2021.[14] Phoenix does not dispute that Incline's affiliates (like Phoenix's own affiliates, including Phoenix Operating LLC)[15] are separate entities or that

---

[11] Although Phoenix does not expressly reference this goal in its Motion for Leave, through the antitrust claims over which a federal court possesses exclusive jurisdiction, Phoenix's goal is undoubtedly to eliminate the res judicata effect of the Texas State Case—nearly two years after filing it—and to destroy parallelism, a necessary predicate to *Colorado River* abstention,

[12] *Id.*

[13] Doc. 31, p. 3.

[14] Doc. 9-10.

[15] *See* Doc. 32-8.

3

purchases and acquisitions made by Incline Bakken Minerals II, LLC, Incline Bakken, LLC or Incline Bakken II, LLC, each of which Phoenix seeks to name in its Amended Complaint and through which Phoenix contends Incline conspired,[16] are not purchases made by Incline Energy Partners, LP. Nor does Phoenix point to any transaction reflected in in Supplemental Materials which contradict Mr. Francis's statement that Incline Energy Partners, LP has not purchased or taken control of any assets, including oil and gas interests in North Dakota since December 31, 2021.[17]

Francis's Declaration spoke to the location of Incline's witnesses relevant to Incline's alternative motion to transfer venue,[18] but in support of its arguments Phoenix points to Incline's filing with North Dakota's Industrial Commission as evidence of an undisclosed agent.[19] That filing, however was made more than a month after Mr. Francis submitted his Declaration and does not contradict (or even call into question) Mr. Francis's testimony that Incline had not purchased or taken control or ownership of assets in North Dakota since December 31, 2021.[20] Similarly, nothing in the filing suggests Mr. Francis's testimony regarding the location of agents or employees, which was the purpose and context of the Declaration about which Phoenix complains, was false or misleading.[21] Thus, Phoenix asserts only vaguely and without any specific basis that

---

[16] *See* Dkt. 30-1.

[17] *See* Doc. 32-6, listing instruments recorded in certain North Dakota counties by or regarding various Incline entities. Notably, Exhibit 6 in the Supplemental Materials includes transactions in which Incline Entities were both buyers *and sellers*, lessees *and lessors,* as well as records of mortgages, none of which speak demonstrate that Incline purchased or assumed control over any assets in the State after December 31, 2021. *See Id.*

[18] Doc. 9, pp. 23–25 (discussing request for § 1404 transfer and citing Mr. Francis's declaration regarding the location of Incline's witnesses and agents).

[19] Brief, pp. 10–11, and Doc 32-8.

[20] Doc 32-8.

[21] In relevant part, Mr. Francis's Declaration provides:

    2.   I am the Managing Partner of Incline Energy Partners, LP ("Incline"), and have held that position since 2018. Since 2010, Incline and other entities to which [sic] I have managed have specialized in the professional acquisition, management, and development of working, mineral, and overriding royalty interests.
    3.   Incline maintains its principal office in Dallas, Texas with satellite offices in Fort Worth, Texas and Denver, Colorado. . .

Mr. Francis's testimony was false, but does not and cannot contend that an attorney hired to handle a dispute with the Industrial Commission is an employee or agent within the State who would be inconvenienced by transferring the suit out of North Dakota.[22]  Indeed, Mr. Francis did not disclose the (obvious) location of his local counsel in this case, but that omission also had no bearing on the truth and accuracy of his testimony in support of Incline's motion to transfer venue quoted above.  Neither attorney is an "agent" within the meaning of 28 U.S.C. 1404(a).[23]

Similarly, in its Motion for Leave to Submit Additional Filings ("Motion to Supplement"),[24] as its Brief, Phoenix characterized this testimony as seeking to minimize Incline's jurisdictional "ties" to the state.[25]  But Incline did not challenge personal jurisdiction or contend it has never purchased or did not own significant minerals in the State.  Nor were any of the representations about its presence in the state inaccurate.  Phoenix's complaints about the Francis Declaration are smoke and mirrors intended to cast aspersions on Mr. Francis, because as discussed below, Phoenix has a habit of calling the truth a lie.

C.  **The Facts Underlying Phoenix's Claims, all of Which Depend on Falsity, Are True**

Although the truth is unflattering and detrimental to Phoenix, no matter how many times Phoenix calls certain true facts "false or misleading," it cannot change true facts into false ones. Adam Ferrari pleaded guilty to one out of fourteen felony charges, characterized by a former

---

4. Likewise, Incline has no employees or agents in North Dakota.  It has not contracted any independent contractors to work in the state, or who have lived in the state at any point in at least the past two years.  Thus, while Incline denies the legal conclusions and any wrongful conduct related to its communications and transactions with North Dakota mineral owners, any such communications by Incline have been made from Dallas, Fort Worth or Denver.  Moreover, Incline generally communicates with prospective mineral owners who are interested in selling by email or otherwise in writing.
5. Incline has not purchased or taken control over ownership of any asset and/or oil and gas interest in North Dakota effective as of December 31, 2021. All of Incline's books and records, including materials that could be relevant to this lawsuit, are located in Dallas, Texas." Doc. 9-10.

[22] Brief, pp. 10–11.  Notably, in the filing with the Industrial Commission, Incline requested that its witnesses be permitted to testify telephonically.  Doc. 32-8.

[23] *See Reid–Walen v. Hansen*, 933 F.2d 1390, 1396 (8th Cir. 1991).

[24] Doc. 24.

[25] Doc. 23; *See also* Opposition, pp. 2–3 ("Mr. Francis's declaration would have the Court believe that Incline Energy has virtually no tis to, or business activities in, North Dakota."); pp. 10–11.

Phoenix employee, an experienced landman, as a "death knell" for an industry participant.[26] After he completed a period of deferred adjudication, Ferrari's plea agreement resulted in a subsequent dismissal of the charges to which he pleaded guilty. But dismissal after the plea does not change history or change true statements about Ferrari's felony status into false ones.[27] *See G.D. v. Kenny*, 15 A.3d 300, 314–15 (N.J. 2011) ("In light of common-law and constitutional principles protecting free speech, and with the expungement statute as a backdrop, we hold that the traditionally recognized defense of truth to a defamation action was not lost in this case because of the existence of an expungement order."); *Bahr v. Statesman Journal Co.*, 624 P.2d 664, 666 (Or. Ct. App. 1981) ("The [expungement] statute . . . authorizes certain persons to misrepresent their own past. It does not make that representation true."). Further, nothing in the Colorado statute indicates that Colorado sought to contravene the First Amendment through the availability of a post-plea discharge, and indeed this Court could not interpret the statute in that manner. As one court succinctly observed with respect to a statute even more broad than the Colorado statute governing dismissal of Ferrari's guilty plea following his satisfaction of a three-year probationary period:

> "[A] basic canon of statutory construction would foreclose choosing Ms. Martin's history-altering interpretation. Courts have a 'duty to construe statutes, whenever possible, to avoid constitutional infirmities.' . . . If the "deemer" provision of the erasure laws operated to allow defamation liability to be imposed on true and newsworthy statements, it would run afoul of the First Amendment. . . . Ms. Martin's proposed interpretation would raise serious constitutional questions, and thus even if this Court considered the statute ambiguous, it would construe the statute in a manner that would not expose publishers of historically accurate statements to liability."

*Martin v. Hearst Corp.*, No. 3:12CV1023 MPS, 2013 WL 5310165, at *4 (D. Conn. Aug. 5, 2013), *aff'd*, 777 F.3d 546 (2d Cir. 2015) (internal citations and quotations omitted)).

---

[26] Like a conviction, a plea also results in a criminal defendant's culpability for a criminal act, thereby rendering statements of Ferrari's "conviction" substantially true. *Weber v. Fernandez*, No. 02-18-00275-CV, 2019 WL 1395796, at *11 (Tex. App.—Fort Worth Mar. 28, 2019, no pet.) (mem. op.) (finding substantial truth in statement that plaintiff was a "convicted criminal" although plaintiff pleaded guilty and confessed crime rather than being convicted).

[27] The Texas Federal Court similarly concluded that Ferrari had no entitlement to seal his criminal records, on which the fate of his (and Phoenix's) claims hinged at least in part, based on the truth or falsity of Defendant's statements regarding Plaintiff's conviction. *See* Texas Federal Case, Dkt. 31.

6

Publicly available information that the Court may judicially notice demonstrates that statements that Ferrari is a felon—whether confessed or convicted—are true. True statements, whether as the basis for business disparagement or antitrust, are not actionable. *See Briner Electric Co. v. Sachs Electric Co.*, 680 S.W.2d 737, 741 (Mo.App.1984) ("[C]ompetitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relations."); *see also David L. Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728 (S.D. Tex. 1998) (discussing truth as a defense to antitrust claims premised on product disparagement). Similarly, although it begs the question of what could have been defamatory about identifying Ferrari as Pheonix's CEO before Phoenix acknowledged his role, in December 2023 when Phoenix publicly identified Ferrari as its CEO.[28]

## CONCLUSION

Neither its "Supplemental Materials," nor its arguments in support of its Motion for Leave demonstrate any falsity in Mr. Francis's Declaration or any basis for denying the Abstention Motion. In an exercise of "wise judicial administration"[29] and for the reasons stated in the Abstention Motion, this Court should stay or dismiss this lawsuit.

---

[28] *See* https://phxcapitalgroup.com/our-team/. The belated acknowledgement of Ferrari's role does not alter the fact that he has *always* served in that capacity. Extensive evidence in the Texas Federal Case demonstrates the truth of Ferrari's ownership and control over Phoenix, although to date, Francis has been forced to file much of that evidence redacted, with complete copies filed under seal because of Ferrari's improper use of an "Attorney's Eyes Only" designation. *See* Texas Federal Case at Dkt. 80, pp. 4-10; 81, App. pp. 110; 145-147; Dkt. 82 (required motion to seal); Dkt. 92, 93, App. p. 012-15, 18-29; Dkt. 90 (required motion to seal).

[29] *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 2.

Respectfully submitted,


By: /s/ Charlene C. Koonce
   Cortney C. Thomas
    Texas Bar No. 24075153
    cort@brownfoxlaw.com
   Charlene C. Koonce
    Texas Bar No. 11672850
    charlene@brownfoxlaw.com
   BROWN FOX PLLC
   8111 Preston Road, Suite 300
   Dallas, TX  75225
   Tel. 214.327.5000
   Fax. 214.327.5001

   Brian E. Robison
    Texas Bar No. 00794547
    brian@brownfoxlaw.com
   BROWN FOX PLLC
   6303 Cowboys Way, Ste. 450
   Frisco, TX  75034
   Tel. 972.707.1860
   Fax. 214.327.5001

   Joshua A. Swanson
    North Dakota Bar No. 06788
    jswanson@vogellaw.com
   VOGEL LAW FIRM
   218 NP Avenue
   PO Box 1389
   Fargo, ND 58107-1389
   701.237.6983

*Attorneys for Defendant Incline Energy Partners, L.P.*


## **CERTIFICATE OF SERVICE**

Pursuant to Rule 5(d)(1)(B) of the Federal Rules of Civil Procedure, as amended, no certificate of service is necessary because this document is being filed with the Court's electronic-filing system.