## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| **PHOENIX CAPITAL GROUP HOLDINGS, LLC,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **C.A. NO. 1:23-cv-00209** |
| **INCLINE ENERGY PARTNERS, L.P.** | § § § | |
| **Defendant.** | § | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S
## <u>MOTION FOR LEAVE TO FILE AMENDED COMPLAINT</u>

Respectfully submitted,

Cortney C. Thomas
  Texas Bar No. 24075153
  cort@brownfoxlaw.com
Charlene C. Koonce
  Texas Bar No. 11672850
  charlene@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, TX  75225
Tel. 214.327.5000
Fax. 214.327.5001

Brian E.  Robison
  Texas Bar No. 00794547
  brian@brownfoxlaw.com
BROWN FOX PLLC
6303 Cowboys Way, Ste. 450
Frisco, TX  75034
Tel. 972.707.1860
Fax. 214.327.5001

Joshua A. Swanson
  North Dakota Bar No. 06788
  VOGEL LAW FIRM
218 NP Avenue
PO Box 1389
Fargo, ND 58107-1389
701.237.6983
jswanson@vogellaw.com

## <u>TABLE OF CONTENTS</u>

I.    SUMMARY ................................................................................................ 1

II.   FACTUAL AND PROCEDURAL BACKGROUND........................................ 3

      A.    Phoenix and Ferrari Have Engaged in Blatant Forum Shopping........................... 3

      B.    Phoenix's New Claims are Grounded in Fraud and Improperly Seek to Limit the
            Relevant Product and Geographic Market................................................ 4

III.  ARGUMENT ........................................................................................... 5

      A.    Phoenix Does Not Deny Forum Shopping................................................ 5

      B.    The Court Should Rule on the Abstention Motion Before the MFL ...................... 5

      C.    Leave To Amend Should be Denied ...................................................... 7

            1.    Phoenix's Undue Delay in Seeking Leave to Amend is Prejudicial............ 7

            2.    Phoenix's New Claims Are Futile ................................................ 8

                  a.    Phoenix Fails to Satisfy Rule 9(b) ...................................... 9

                  b.    Phoenix's Proposed Relevant Market is Artificial and
                        Implausible as a Matter of Law ...................................... 11

                        i.    Phoenix's Proposed Geographic Market Lacks
                              Plausibility ................................................ 13

                        ii.   Phoenix's Proposed Product Market is Also
                              Implausible................................................ 15

                  c.    Phoenix's Allegations that Incline Possesses Monopsony
                        Power Are Not Plausible............................................ 18

IV.   CONCLUSION........................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*192 Morgan Realty, LLC v. Aquatorium, LLC*,
  No. 20CV3627RPKRML, 2022 WL 123567 (E.D.N.Y. Jan. 13, 2022) ................................... 6

*Adams v. USAA Cas. Ins. Co.*,
  863 F.3d 1069 (8th Cir. 2017) ................................................................................................. 6

*Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*,
  59 F.4th 948 (8th Cir. 2023) ................................................................................................. 18

*Anderson v. Bank of the W.*,
  23 F.4th 1056 (8th Cir. 2022) ................................................................................................. 7

*Apani S.W., Inc. v. Coca–Cola Enterprises, Inc.*,
  300 F.3d 620 (5th Cir. 2002) ................................................................................................. 15

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937, 1950, (2009) .......................................................................... 8

*Bathke v. Casey's Gen. Stores, Inc.*,
  64 F.3d 340 (8th Cir. 1995) ............................................................................................. 11, 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544, 127 S.Ct. 1955 (2007) .................................................................................... 11

*Brown v. Medtronic, Inc.*,
  628 F.3d 451 (8th Cir. 2010) ................................................................................................. 8

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
  532 F.3d 1111 (10th Cir. 2008) ....................................................................................... 16, 17

*Close v. Eldo Organic, LLC*,
  No. 2:22-CV-1630, 2022 WL 3053751 (S.D. Ohio Aug. 2, 2022) ........................................... 6

*Concord Associates, L.P. v. Entm't Properties Tr.*,
  817 F.3d 46 (2d Cir. 2016) ............................................................................................. 13, 15

*David L. Aldridge Co. v. Microsoft Corp.*,
  995 F. Supp. 728 (S.D. Tex. 1998) ......................................................................................... 7

*Donner v. Alcoa, Inc.*,
  709 F.3d 694 (8th Cir. 2013) ................................................................................................. 5

*Double D Spotting Serv., Inc. v. Supervalu, Inc.*,
  136 F.3d 554 (8th Cir. 1998) ....................................................................................... 12, 13, 15

ii

*Dunham v. Pannell,*
   263 F.2d 725 (5th Cir.1959) .................................................................................. 1

*Elkharwily v. Mayo Holding Co.*,
   955 F. Supp. 2d 988 (D. Minn. 2013), *aff'd*, 823 F.3d 462 (8th Cir. 2016) ............................. 9

*Engelman Irrigation Dist. v. Shields Bros., Inc.,*
   514 S.W.3d 746 (Tex. 2017).................................................................................. 9

*Feldmann Imports Inc. v. Mercedes-Benz USA, LLC,*
   506 F. Supp. 3d 687 (D. Minn. 2020).......................................................................... 8

*Fru-Con Constr. Corp. v. Controlled Air, Inc.,*
   574 F.3d 527 (8th Cir. 2009) ................................................................................ 5

*FTC v. Facebook, Inc.,*
   560 F. Supp. 3d 1 (D.D.C. 2021) ............................................................................. 19

*Hager v. Arkansas Dep't of Health,*
   735 F.3d 1009 (8th Cir. 2013) ............................................................................... 8

*HDC Med., Inc. v. Minntech Corp.,*
   474 F.3d 543 (8th Cir. 2007) ................................................................................ 18

*In re Processed Egg Products Antitrust Litig.,*
   851 F. Supp. 2d 867 (E.D. Pa. 2012) ......................................................................... 9

*In re Se. Milk Antitrust Litig.,*
   801 F. Supp. 2d 705 (E.D. Tenn. 2011)....................................................................... 12

*In re SuperValu, Inc., Customer Data Sec. Breach Litig.,*
   No. 14-MD-2586 ADM/TNL, 2018 WL 1189327 (D. Minn. Mar. 7, 2018*), aff'd sub nom. In
   re SuperValu, Inc.*, 925 F.3d 955 (8th Cir. 2019) ............................................................ 7

*Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.,*
   661 F. Supp. 2d 1039 (D. Minn. 2009)........................................................................ 18

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.,*
   797 F.3d 538 (8th Cir. 2015) ................................................................................ 11

*Intel Corp. v. Fortress Inv. Group LLC,*
   511 F. Supp. 3d 1006 (N.D. Cal. 2021)....................................................................... 16

*Jacobs-Raak v. Raak*, 2016 ND 240, ¶ 12, 888 N.W.2d 770........................................................ 14

*Kirk-Mayer, Inc. v. Pac Ord, Inc.,*
   626 F. Supp. 1168 (C.D. Cal. 1986) .......................................................................... 20

*Kraft v. Essentia Health, Innovis Health, LLC,*
    600 F. Supp. 3d 965 (D.N.D. 2021) ................................................................. 11

*Little Rock Cardiology Clinic PA v. Baptist Health,*
    591 F.3d 591 (8th Cir. 2009) ..................................................................... 11, 13

*Martin v. Hearst Corp.,*
    777 F.3d 546 (2d Cir. 2015) ......................................................................... 1

*McQueen v. Yamaha Motor Corp., U.S.A.,*
    488 F. Supp. 3d 848 (D. Minn. 2020) .............................................................. 8

*Morgenstern v. Wilson,*
    29 F.3d 1291 (8th Cir. 1994) ....................................................................... 12

*N. Bottling Co., Inc. v. Henry's Foods, Inc.*
    474 F. Supp. 3d 1016 (D.N.D. 2020) ............................................................. 10

*Nicolosi Distrib., Inc. v. FinishMaster, Inc.,*
    No. 18-cv-03587-BLF, 2019 WL 1560460 (N.D. Cal. Apr. 10, 2019) ................... 13

*Olin v. Dakota Access, LLC,*
    910 F.3d 1072 (8th Cir. 2018) ...................................................................... 9

*Par v. Wolfe Clinic, P.C.,*
    70 F.4th 441 (8th Cir. 2023) ..................................................................... 7, 18

*Post v. Dolgencorp, LLC,*
    No. 4:19-CV-00171-JAR, 2019 WL 1978793 (E.D. Mo. May 3, 2019) ................... 5

*Process Controls Intern., Inc.,*
    753 F. Supp. 2d at 928 (E.D. Mo. 2010) ......................................................... 19

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
    124 F.3d 430 (3d Cir. 1997) ..................................................................... 12, 17

*Sanimax USA, LLC v. City of S. St. Paul,*
    496 F. Supp. 3d 1285 (D. Minn. 2020) ........................................................... 10

*Shahrokhi v. Harter,*
    No. 220CV01623JADNJK, 2023 WL 2842704 (D. Nev. Apr. 6, 2023), *appeal dismissed*, No. 23-15639, 2023 WL 4837873 (9th Cir. June 2, 2023)................................................ 6

*Sherr v. HealthEast Care Sys.,*
    262 F. Supp. 3d 869 (D. Minn. 2017)............................................................. 11

*Synthes, Inc. v. Emerge Med., Inc.,*
    No. 11-1566, 2012 WL 4473228 (E.D. Pa. Sept. 28, 2012).................................. 19

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) ................................................................. 12

*Telecor Communications, Inc. v. Sw. Bell Tel. Co.*,
   305 F.3d 1124 (10th Cir. 2002) ............................................................................................. 2

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ................................................................................................. 12

*Trondheim Capital Partners, LP v. Life Ins. Co. of Alabama*,
   505 F. Supp. 3d 1213 (N.D. Ala. 2020) ................................................................................. 6

*U.S. v. E. I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956) ....................................................................................................... 16, 18

*Uhlig LLC v. CoreLogic, Inc.*,
   No. 21-2543-DDC-GEB, 2022 WL 4597858 (D. Kan. Sept. 30, 2022) ................................ 18

*Vess v. Ciba–Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ............................................................................................... 9

*Wakaya Perfection, LLC v. Youngevity Int'l, Inc.*,
   No. 2:16-CV-00315-DN, 2019 WL 977916 (D. Utah Feb. 28, 2019) ..................................... 6

*Whitney v. Franklin Gen. Hosp.*,
   995 F. Supp. 2d 917 (N.D. Iowa 2014) ................................................................................... 8

*WINBCO Tank Co., Inc. v. Palmer & Cay of Minn., L.L.C.*,
   435 F. Supp. 2d 945 (S.D. Iowa 2006) ................................................................................... 9

*Zeikos Inc. v. Walgreen Co.*,
   No. 23 C 303, 2023 WL 3947775 (N.D. Ill. June 12, 2023) ................................................ 19

*Zutz v. Nelson*,
   601 F.3d 842 (8th Cir. 2010) ................................................................................................. 8

**Codes**

15 U.S.C. § 2 .................................................................................................................................. 9

N.D.C.C. §51-15-01 ....................................................................................................................... 9

Incline Energy Partners, LP ("Incline") responds to Phoenix Capital Group Holdings, LLC's ("Phoenix") Motion for Leave to File Amended Complaint (Dkt. No. 30, "MFL") and Memorandum in Support, etc.[1] (the "Brief," Dkt. 31) and respectfully shows the Court as follows.

## I.    SUMMARY

Like every other claim it has asserted, Phoenix's proposed antitrust and deceptive advertising claims, (collectively the "New Claims") and its assertion of an "anticompetitive campaign" rest on Incline's discovery of two true assertions by which Phoenix contends Incline has engaged in wrongful conduct.[2] First, Adam Ferrari, identified by Phoenix as its CEO effective December 1, 2023, is factually, a felon having pleaded guilty to one of fourteen felony charges arising from forging a mineral owner's signature on a deed.[3] Second, following his indictment, Ferrari founded, capitalized, and began running Phoenix, while seeking to hide his role from the public and the SEC.[4]  Phoenix flatly denies these two true assertions because they are a death knell to any oil and gas industry participant.

A Texas State Case filed in June 2022 by Phoenix against Incline and Francis was premised on the same purportedly anti-competitive conduct, including the cancelled loan commitment with

---

[1] Incline's Reply to Phoenix's "Supplemental Materials" and its Supplemental Memorandum In Opposition to Pending Motions to Dismiss is filed separately.

[2] *See* Doc. 30-1, ¶ 65, 66 (Incline has engaged in an "anticompetitive disparagement campaign, deceitfully painting Phoenix as a criminal operation . . .;"); (Incline "convinced North Dakota mineral rights owners not to do business with Phoenix because it was purportedly operated by criminals").  Notably, as discussed in the Rule 12(b)(6) Motion, Ferrari's satisfaction of a plea deal by which the felony charges to which he pleaded were eventually dismissed does not change the truth of his status as a felon.  *Martin v. Hearst Corp*., 777 F.3d 546, 551 (2d Cir. 2015).  Similarly, as discussed in the Rule 12(b)(6) Motion, stating Ferrari is a convicted criminal is no more disparaging than stating he is a confessed criminal.

[3] The facts underlying the indictment to which Ferrari pleaded guilty are shocking but given Ferrari's guilty plea, are subject to judicial notice. A true and correct copy of the Affidavit in Support of Arrest Warrant, and other records pertaining to Ferrari's indictment, arrest, and plea deal are attached to the Koonce Declaration ("Koonce Dec.") as **Exhibit A-1,** submitted concurrently with this Response. *See also, Dunham v. Pannell,* 263 F.2d 725, 730 (5th Cir.1959) (criminal judgment may be used to prove "the truth of the facts alleged or implicit in the criminal charge on which the judgment is based").

[4] Although Phoenix previously but falsely asserted Ferrari lacked control over Pheonix, its judicially noticeable SEC filings belie these assertions.  *Compare* Doc. 1, ¶ 52 (the only "legal relationship" between Ferrari and Phoenix, etc." and Koonce Dec. **Exhibits A-24 and A-25;** *see also* Texas Federal Case, Dkt. 80, p. 4-5.

the same North Dakota bank and sale of North Dakota minerals.[5] When a final and adverse judgment appeared on the horizon in the Texas State Case, in February 2023, Ferrari filed the Texas Federal Case against Francis. While both Texas lawsuits were stayed, Phoenix filed this lawsuit, based on the same facts and allegations.  Incline immediately moved to dismiss or stay premised on *Colorado River*.[6] Rather than seeking leave to amend, Phoenix filed its Response, in which it mischaracterized the claims, arguments, and relief sought in the Texas State Case.  It also failed to rebut the overwhelming weight of the factors requiring abstention, including forum shopping, the risk of piecemeal litigation, and the application of Texas law.[7] Neither did Phoenix provide any explanation for why the Texas State Case, also premised on North Dakota transactions, was appropriate in a Texas court while this duplicative, piecemeal suit is not.

Seven months later, Phoenix requested leave to amend its Complaint and add meritless antitrust claims, premised on the same true statements underlying both Texas cases.  The antitrust claims rest on a facially artificial and legally implausible market. Phoenix's contrived allegations that the "Incline Entities"[8] possess monopsony[9] power are also implausible given Phoenix's judicial admission that it possesses at least equal market power to the Incline Entities and the many, many, other entities that compete in the Bakken formation of North Dakota.[10]  Further, although

---

[5] *See* Koonce Dec. **Exhibit A-2,** comparing the allegations in all three lawsuits. (The wrong chart was inadvertently attached to the Koonce Dec submitted with the Abstention Motion, Doc. 9-8).

[6] Doc. 8, 9, 16, (the "Abstention Motion.")  Incline alternatively requested transferring venue to Texas, *id.,* and also filed a Rule 12(b)(6) motion. Doc 7 (the "Rule 12(b)(6) Motion" and collectively, the "Motions to Dismiss").

[7] *See* Abstention Motion, pp. 8–15, and Reply in Support.

[8] Phoenix seeks to name three additional Incline entities, Incline Bakken Minerals, II, LLC, Incline Bakken, LLC, and Incline Bakken II, LLC.  As reflected in Phoenix's supplemental materials, however, (*see* Doc. 32-2, 32-3, 32-4, 32-5) the existence of these separate entities portends nothing improper, but instead reflects related corporate entities, formed consecutively, and which have different investors, like many oil and gas investment entities. Although each maintains an appropriate independent corporate existence, for simplicity, Incline references these proposed defendants with itself collectively as the "Incline Entities."

[9] "'Monopsony' is a 'condition of the market in which there is but one buyer for a particular commodity.'" *Telecor Comm'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1133 n.4 (10th Cir. 2002) (quoting Black's Law Dictionary 1007 (6th ed.1990).  It is the mirror image of a monopoly, which focuses on a seller that controls competition.

[10] For example, Hess Bakken Investments, II, LLC, which holds 1,773 producing wells in four North Dakota counties. *See* publicly available data attached to Koonce Dec. as **Exhibits A-4** and **A-5**.

relying on allegations of deception, Phoenix fails to include mandatory Rule 9(b) detail and provides only generalized collective allegations against numerous Incline "Entities."

Given the merit of the Abstention Motion, Phoenix's unexplained and prejudicial delay in seeking to amend and the futility of the claims it seeks to add, the Court should grant the Abstention Motion and deny the MFL.  Alternatively, after granting the Abstention Motion, the Court could (a) deny the MFL without prejudice to refiling after lifting the stay; (b) carry the MFL until the stay is lifted, or (c) if it grants the MFL, allow the Amended Complaint after lifting the stay.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Phoenix and Ferrari Have Engaged in Blatant Forum Shopping

1.   Although Phoenix ignores both Texas cases, this case and the Texas Federal Case closely track the allegations in the Texas State Case, including allegations regarding FIBT's discretion to terminate a loan commitment when Phoenix failed to plausibly explain Ferrari's omission from Phoenix's public filings.[11]  Here, although Phoenix complains broadly about "false statements" made to North Dakota mineral owners, in Texas it based its claims on the "Taylor email" in which Incline disclosed Ferrari's felony status and his control over Phoenix to North Dakota minerals owners.[12]  All that remains in the Texas State Case is Phoenix's defamation per se claim, premised solely on the Taylor email, remanded with instructions for the trial court to consider dismissal based on an affirmative defense.[13]  Thus, res judicata will apply here when a final judgment issues in the Texas State Case.

---

[11] See Doc. 9-2 [Original Petition ¶¶ 21; 26; 35–38].

[12] See Doc. 9-5, at pp. 14–15.

[13] The Texas appellate court concluded Phoenix was interfering with a sale of North Dakota minerals that Incline had closed. See Doc. 9-5, at pp. 14–15.  Incline's renewed motion to dismiss that lone remaining claim is pending.

**B.**   **Phoenix's New Claims are Grounded in Fraud and Improperly Seek to Limit the Relevant Product and Geographic Market.**

2.      Phoenix's Brief and Amended Complaint allege Incline's purported anticompetitive campaign rests on "lies," and "deceit."[14]  Based on such alleged deceit, Phoenix proffers an implausible "relevant market" to support its implausible antitrust claims, by defining the market in which Incline purportedly possesses monopsony power as mineral purchases of 40 acres or more "with active or known near-term drilling, that cost between $500,000 and $8,000,000" ("High Value Tracts" or "HVTs") in only Divide, Dunn, McKenzie, Mountrail, and Williams counties.[15]  Based on seller's preferences, Pheonix alleges it and Incline are the only "premium" buyers in the relevant market and contends Incline maintains an "approximately" 50% market share,[16] in markets Phoenix seeks to "dominate."[17]

3.      As discussed below, the relevant geographic market is far broader than five counties, and far more than two buyers are available to North Dakota mineral sellers even in those five counties. [18]  Further, Phoenix's assertion that Incline possesses monopsony power is conclusory and implausible, and because, among other reasons, Phoenix proffers a buyer market defined 100% by seller's preferences.

---

[14] Doc. 31, p. 16.  *See also* Doc. 30-1, ¶¶ 6, 60, 61, 119, 127, 134 (Incline "[d]eceitfully paint[ed] PHX as a criminal operation;"[e]ngaged in a disparagement campaign involving "*deceptive* and defamatory statements,' "*misinformation* spread by Defendants," "*deceptively* making disparaging and defamatory statements about Phoenix," "Defendants' *deceptive* acts and practices in connection with the advertisement of their acquisition and advisement services," "Defendants have maintained their monopsony power  . . .using unfair and *deceptive acts* and practices").

[15] Doc. 30-1, ¶ 28.

[16] Brief, p. 7 (Incline and Phoenix are the only competitors in the market Phoenix proposes) and Doc. 31-2 ¶ 47 (Incline's purported market share is approximately 50%).  *See also* Doc. 1, ¶¶ 8-9 (Phoenix has "become the leading mineral and lease acquisition company in the Williston Basin region of North Dakota. . . . [and] has transacted in over 1,000 unique deals in the Williston Basin since 2019.").

[17] Doc. 1, ¶ 41.

[18] *See* public data published by the State of North Dakota regarding the counties the State considers to be the relevant oil producing geographic market at: https://www.ndlmi.com/vosnet/lmi/default.aspx?enc=vLa15KtdCzQQMP6jrcRdIQ==.  A pdf of the data available on the website is also attached to the Koonce Dec as **Exhibit A-6.**

## III.    ARGUMENT

### A.    Phoenix Does Not Deny Forum Shopping

In ruling on the MFL and the Abstention Motion, the Court should consider Phoenix's glaring and unrebutted forum shopping.  *See Donner v. Alcoa, Inc.*, 709 F.3d 694, 697 (8th Cir. 2013) (court abuses its discretion in granting voluntary dismissal without examining purpose of dismissal, which was to allow forum shopping after dismissal); *Post v. Dolgencorp, LLC*, No. 4:19-CV-00171-JAR, 2019 WL 1978793, at \*2 (E.D. Mo. May 3, 2019) (denying motion to dismiss where intent of the motion was facilitation of forum shopping). Similarly, in evaluating Phoenix's (implausible) entitlement to amend, the Court may also observe that the New Claims are proposed solely to escape the remedy for forum shopping: a *Colorado River* stay.  The Court should reject Phoenix's improper strategy.

### B.    The Court Should Rule on the Abstention Motion Before the MFL

After Incline conferred with Phoenix before filing its Motions to Dismiss,[19] Phoenix waited nearly eight months (and six weeks after the Court granted leave to file supplemental materials)[20] before seeking leave to amend. Phoenix offers no explanation for its delay and no justification for forcing Incline to complete such comprehensive, expensive briefing or its invitation for the Court's ruling on both Motions to Dismiss while it conjured its latest theory of liability. Phoenix, however, cannot rely on claims that are not yet pleaded to differentiate this case and the Texas State Case or attack parallelism.  *Fru-Con Constr. Corp. v. Controlled Air, Inc*., 574 F.3d 527, 535 (8th Cir. 2009).  In its supplemental materials or Brief, rather than providing any authority that rebuts the propriety of abstention or transfer, Phoenix fabricates implausible antitrust claims.

---

[19] *See* Doc. 7, 9, 26.

[20] *Compare* Doc. 27 (May 30, 2024 Order) and Doc. 30, 31, and 32 (MFL and Brief, filed July 12, 2024).

Even if it had promptly sought leave to amend or could persuasively explain its delay,[21] however, the Court possesses ample discretion to grant the Abstention Motion and (a) deny the MFL; (b) deny the MFL without prejudice to refile after the Stay is lifted; (c) grant the MFL but nor allow the Amended Complaint to be filed until the stay is lifted, or (d) carry the MFL while the case is stayed. *See 192 Morgan Realty, LLC v. Aquatorium, LLC*, No. 20CV3627RPKRML, 2022 WL 123567, at *5 (E.D.N.Y. Jan. 13, 2022) (considering motion to abstain pursuant to *Colorado River* before addressing motion for leave to amend); *Trondheim Capital Partners, LP v. Life Ins. Co. of Ala.*, 505 F. Supp. 3d 1213, 1220 (N.D. Ala. 2020) (granting motion for *Burford* abstention and granting leave to amend to permit the amendment only after the court lifted the stay); *Wakaya Perfection, LLC v. Youngevity Int'l, Inc.*, No. 2:16-CV-00315-DN, 2019 WL 977916, at *3 (D. Utah Feb. 28, 2019) (granting motion to stay pending disposition of related case, and "waiting to rule on" motion for leave to amend while stay was in place in the interests of "judicial economy"); *see also Adams v. USAA Cas. Ins. Co.*, 863 F.3d 1069, 1077 (8th Cir. 2017) (district court possesses inherent power to "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.") (internal quotation omitted)); *Shahrokhi v. Harter*, No. 220CV01623JADNJK, 2023 WL 2842704, at *1 (D. Nev. Apr. 6, 2023), *appeal dismissed*, No. 23-15639, 2023 WL 4837873 (9th Cir. June 2, 2023) (discussing prior order granting stay and denying remaining motions without prejudice to refiling 20 days after an order lifting the stay); *Close v. Eldo Organic, LLC*, No. 2:22-CV-1630, 2022 WL 3053751, at *4 (S.D. Ohio Aug. 2, 2022) (denying plaintiffs' Rule 41(a)(2) motion to dismiss certain claims thereby amending their complaint as evidencing a lack of diligence and effort to avoid the pending motion to dismiss, and evaluating *Colorado River* motion to abstain based on original complaint rather than amended

---

[21] Some of Phoenix's delay ties to its improper use of one lawsuit to further another. The Amended Complaint weaves its contrived tale based on discovery obtained *by Ferrari* in the Texas Federal Court while discovery in the Texas State Case was stayed and this case was inactive, again demonstrating the improper forum shopping at work.

complaint). Given Phoenix's blatant forum shopping, the propriety of abstention,[22] and the facial implausibility of the antitrust claims, this Court should grant Incline's Abstention Motion before addressing the MFL.

## C.    Leave To Amend Should be Denied

No abuse of discretion occurs in denying a motion for leave to amend, when "compelling reasons such as undue delay, bad faith, or dilatory motive . . . undue prejudice to the non-moving party, or futility of the amendment" exist. *Anderson v. Bank of the W.*, 23 F.4th 1056, 1060–61 (8th Cir. 2022) (internal quote omitted)).

### 1.    Phoenix's Undue Delay in Seeking Leave to Amend is Prejudicial

A proposed amendment based on facts that existed when an original complaint was filed may evidence undue delay. *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 449 (8th Cir. 2023) (affirming 12(b)(6) dismissal with prejudice and denying leave to amend, based in part on facts known at the time of prior amendment). Prejudice may result from comprehensive work or briefing that the amendment seeks to moot. *See In re SuperValu, Inc., Customer Data Sec. Breach Litig.*, No. 14-MD-2586 ADM/TNL, 2018 WL 1189327, at *9 (D. Minn. Mar. 7, 2018*), aff'd sub nom. In re SuperValu, Inc.*, 925 F.3d 955 (8th Cir. 2019) ("Allowing this eleventh hour attempt to resuscitate its complaint with previously rejected factual contentions is inexcusable delay which unfairly prejudices Defendants."). Phoenix delayed, prejudicially, in seeking to add implausible federal claims based on the same true assertions that underlie its Original Complaint.[23]

---

[22] *See* Abstention Motion, Doc. 8, 9, and 16.

[23] Indeed, in several instance where Phoenix provides some Rule 9(b) detail, the statements were made before Phoenix existed, and thus could not inform purportedly improper competition. Doc. 30-1, ¶ 41. Further, true assertions are not actionable. *See* Rule 12(b)(6) Motion to Dismiss at pp. 21-22. Likewise, truth is a defense to an antitrust claim if premised on alleged defamation. *See David L. Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728 (S.D. Tex. 1998) (discussing truth as a defense to antitrust claims premised on product disparagement).

### 2.       Phoenix's New Claims Are Futile

A court may also deny leave to amend based on futility.  Through its MFL, Phoenix seeks to add three antitrust claims and a deceptive advertising claim premised on "acquisition and advisement" services (which are provided for free).[24]  Claims that cannot survive a Rule 12(b)(6) motion to dismiss are futile. *Zutz v. Nelson*, 601 F.3d 842, 850–51 (8th Cir. 2010). Evaluating whether a pleading qualifies as plausible is a "context-specific" job compelling a judge to "to draw on" his "judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). In a plausibility analysis, a court may consider "matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint." *McQueen v. Yamaha Motor Corp., U.S.A.*, 488 F. Supp. 3d 848, 855 (D. Minn. 2020); *Whitney v. Franklin Gen. Hosp.*, 995 F. Supp. 2d 917, 921 (N.D. Iowa 2014) (appropriate to consider matters "incorporated by reference, integral to her claims, subject to judicial notice," etc.). The world is not flat, however, and a court need not accept as true factual allegations that it is, or similarly implausible conclusions contradicted by judicially noticeable facts. *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1013 (8th Cir. 2013)  (a court must not "presume the truth of legal conclusions couched as factual allegations."); *Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010) (court should not indulge unreasonable inferences).  Likewise, if exhibits to the complaint or materials attached to the motion to dismiss which are central to the claims contradict allegations in the complaint, the exhibit controls. *Feldmann Imports Inc. v. Mercedes-Benz USA, LLC*, 506 F. Supp. 3d 687, 694 (D. Minn. 2020) ("[W]hen evaluating a motion to dismiss, if 'a written instrument contradicts allegations in the complaint . . . the exhibit trumps the allegations'") (quoting *Elkharwily v. Mayo Holding Co.*, 955

---

[24] The Amended Complaint references Incline's website, but Phoenix's supplemental materials omit the page that reflects advisory services are complimentary. That page is included in the Koonce Dec. as **Exhibit A-7.**

F. Supp. 2d 988, 996 (D. Minn. 2013), *aff'd*, 823 F.3d 462 (8th Cir. 2016)); *WINBCO Tank Co., Inc. v. Palmer & Cay of Minn., L.L.C.*, 435 F. Supp. 2d 945, 955 (S.D. Iowa 2006) (same).

The face of the proposed Amended Complaint shows that Phoenix's New Claims are futile for several reasons.[25] First, although each New Claim is grounded in fraud and asserted against multiple entities, Phoenix fails to satisfy the particularity requirements in Rule 9(b). The geographic area and the product definition in Phoenix's proposed "Relevant Market," an element of its antitrust claims, are artificial and implausible as a matter of law. Third, Phoenix's "flat earth" conclusion that Incline possesses monopsony power lacks plausibility. Futility (and forum shopping) require denial of the MFL.

### a.        Phoenix Fails to Satisfy Rule 9(b)

In addition to reasserting three of the four claims previously pleaded (which will be barred by res judicata), the Amended Complaint seeks to add three antitrust claims and an Unlawful Sales or Advertising Practices claim.[26] Each of these New Claims rests on Incline's purported campaign of "lies and deceit"[27] and accordingly must meet Rule 9(b)'s heightened pleading requirement. *Olin v. Dakota Access, LLC*, 910 F.3d 1072, 1076 (8th Cir. 2018) (allegations premised on misrepresentation or deception sound in fraud and must satisfy Rule 9(b)); *see also Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) (Rule 9(b) applies "to particular averments of fraud"). Rule 9(b) also applies to antitrust claims if they are grounded in fraud. *See In re Processed Egg Products Antitrust Litig.*, 851 F. Supp. 2d 867, 879 (E.D. Pa. 2012) (applying Rule

---

[25] If the Court grants the MFL, Incline reserves the right to and will attack implausibility on additional grounds.

[26] Doc. 30-1, ¶¶ 115–49; N.D.C.C. §51-15-01, *et seq.*, and 15 U.S.C. § 2. Phoenix's Deceptive Advertising Claim lacks plausibility, but even if viable, would still fall within *Colorado River's* ambit based on res judicata and a final judgment in the Texas State Case. *See Engelman Irrigation Dist. v. Shields Bros., Inc.*, 514 S.W.3d 746, 750 (Tex. 2017). With respect to deceptive advertising, the Court may judicially notice Phoenix's marketing of a *guaranteed* 9-13% return on oil and gas investments. *See https://www.investor.gov/protect-your-investments/fraud/types-fraud/ponzi-scheme* (warning signs of a Ponzi scheme include "overly consistent returns" and "high returns with little or no risk.").

[27] Brief, p. 16. *See also* Doc. 30-1, ¶¶ 6, 60, 61, 119, 127, 134

9(b) to antitrust claim grounded in fraudulent conduct). Satisfying the Rule's requirements mandates pleading the "who, what, where, when, and how" of the alleged deceit. *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). Further, where claims are asserted against multiple defendants, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Olin*, 910 F.3d at 1075.

Phoenix's allegations fail Rule 9(b). First, almost none of the alleged deceptive acts or statements is attributed to any one of the proposed defendants, which are referenced collectively as the "Incline Entities."[28] Such "group" pleading is patently insufficient for claims grounded in fraud. *Id.* Further, although Phoenix repeatedly references "deceptive," "misleading," or "false," statements or "defamatory misstatements," it fails to identify the specific information required by Rule 9(b) for those purported statements.[29] For instance, it fails to identify what was "false," "deceptive" or "misleading" about any statement, made by any one of the "Incline Entities" in any alleged communication with unidentified North Dakota mineral owners, the Bakke Family, or "siblings in McKenzie County," when such statement made, specifically to whom, where, and how.[30] Even when Phoenix provides *some* Rule 9(b) information, it fails to satisfy the standard. For example, with respect to the alleged communications made to the "Bakke Family in Williams County, North Dakota," Phoenix fails to identify what was communicated to "paint Phoenix as a criminal operation," who made the communication (including which Incline Entity), when, specifically to whom, and how the information was conveyed.[31] Similarly, Phoenix does not identify what statements are false and misleading in Francis's email to Energy Net,[32] or in Mr.

---

[28] *See* Doc. 30-1, ¶¶ 38, 46, 47, 52, 53, 57, 65, 68.

[29] Because Phoenix references specific statements in its Amended Complaint the Court may consider the actual statements. *See Sanimax USA, LLC v. City of S. St. Paul*, 496 F. Supp. 3d 1285, 1292 (D. Minn. 2020).

[30] *See* Doc. 30-1, ¶¶ 53, 61, 63, 65, 66, 67, 118-12, 127, 134.

[31] *See* Doc. 30-1, ¶ 66.

[32] Doc. 30-1, ¶¶ 55-56. The communication to Energy Net referenced by Phoenix is attached to the Koonce Dec as **Exhibit A-9.** It alleges that Ferrari "was arrested for cutting off the signature block of a signed instrument . . . then taping the signature block onto another mineral deed … and filing the scanned copy of the fraudulent deed of record

Francis's email to FIBT.[33]  And though neither accurate nor relevant, allegations that the "Incline Entities" mailed prospective sellers in Weld County, Colorado "packets containing false and misleading information about competitors" also lack all Rule 9(b) required details.[34] Nor does Phoenix identify anything misleading or inaccurate about any Incline "advertisement" underlying its Unfair Advertising Claim.  Because Phoenix's New Claims are grounded in fraud but do not satisfy Rule 9(b), the Court should deny the MFL.  *See U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 559 (8th Cir. 2006); *Kraft v. Essentia Health, Innovis Health, LLC*, 600 F. Supp. 3d 965, 974 (D.N.D. 2021) (dismissing N.D.C.C. § 51-15 claim for failure to satisfy Rule 9(b)).

> **b.      Phoenix's Proposed Relevant Market is Artificial and Implausible as a Matter of Law**

Because of the "the unusually high cost of discovery in antitrust cases," *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 558 (2007), antitrust claims with "dubious merit" should be "aggressively weeded out" at the pleading stage.  *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015); *Sherr v. HealthEast Care Sys.*, 262 F. Supp. 3d 869, 885 (D. Minn. 2017) ("The Eighth Circuit and district courts within the circuit consistently dismiss antitrust claims at the pleading stage where a plaintiff fails to adequately allege a viable relevant market.") (collecting cases)).  "'Antitrust claims often rise or fall on the definition of the relevant market.'"  *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 596 (8th Cir. 2009) (quoting *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995)).  "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all

---

without having tendered payment.  He would plead guilty to a felony count of theft for these actions."  These statements are true.  *See* Koonce Dec. **Exhibit A-1**.

[33] Doc 30-1, ¶¶ 91, 92.  Likewise, Phoenix's attorney's response, quoted in part in the Original Complaint but included in its entirety in a filing in the Texas Federal Case reflects Phoenix's efforts to conceal Ferrari's role. Dkt. 1, ¶ 52, Doc. 30-1 ¶ 94; *see also* Texas Federal Case, Dkt. 81, p. 9 for the full text of the email and a discussion of these issues.

[34] *See* Doc. 30-1, ¶ 52.  Similarly, an email sent in 2018, before Phoenix was formed and addressing mineral acquisitions outside of North Dakota has no relevance here.  *See* Doc. 30-1 ¶ 41.

interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436–37 (3d Cir. 1997). Here, Phoenix fails to define its proposed market in accordance with either option.

Phoenix seeks to define the "Relevant Market" as "High Value Transactions in only five counties."[35] These artificial parameters ignore the interchangeability of HVTs and smaller tracts as well as judicially noticeable information demonstrating that the geographic market encompasses far more than five counties. Numerous publicly available sources, as well as the Court's common sense and familiarity with the deep and wide competition in the North Dakota oil and gas market demonstrate the implausibility of Phoenix's proposed product and geographic market. Even if the relevant market was defined as narrowly as Phoenix proposes, however, Phoenix fails to plausibly plead that the Incline Entities[36] have (or could ever have) monopsony power.

A relevant market has "two components—a product market and a geographic market." *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998). "Properly defined, a geographic market is a geographic area "in which the seller [buyer] operates, and to which . . . purchaser[s] [sellers] can practicably turn for supplies."[37] *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *accord Morgenstern v. Wilson,* 29 F.3d 1291, 1296 (8th Cir. 1994). "Broken down, the test requires a court to first determine whether a plaintiff has alleged a geographic market that includes the area in which a defendant supplier [here a buyer] draws a

---

[35] Doc. 31-1, ¶¶ 28, 123.

[36] Phoenix has not provided any legal support for a contention that in alleging monopsony power it can aggregate the market share of separate entities. *See In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 726 (E.D. Tenn. 2011) ("considering a combination of market shares of more than one company is an inappropriate measure of market power.") (internal quotation and alteration omitted)).

[37] The geographic market in a monopsony case focuses on the geographic area in which *buyers* rather than *sellers* operate and the geographic area in which consumers can seek competitive buyers. *Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001) (in monopsony case, "the market is . . . competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes… A greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question.") (internal quotation and citation omitted)).

sufficiently large percentage of its business—'the market area in which the seller [buyer] operates,' its trade area." *Little Rock Cardiology Clinic PA*, 591 F.3d at 598. "The geographic market is defined by considering the commercial realities faced by consumers." *Bathke*, 64 F.3d at 345. "It includes the geographic area in which consumers can practically seek alternative sources of the product, and it can be defined as "the market area in which the seller [buyer] operates." *Double D Spotting Serv., Inc.*, 136 F.3d at 560 (internal quote omitted). In evaluating a motion to dismiss that challenges the relevant market, a district court must evaluate the plausibility of both components. *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (affirming dismissal based on district court's conclusion that plaintiff's proposed geographic market was "too narrow and inherently implausible").

### i.     Phoenix's Proposed Geographic Market Lacks Plausibility

Phoenix provides no rational basis for limiting the area in which buyers actively compete to only five counties, especially when public data reveals that buyers, including but not limited to the Incline Entities, actively compete for mineral interests in at least 17 North Dakota Counties.[38] *See Concord Assocs., L.P.*, 817 F.3d at 53–54 (rejecting a gambling-related market based primarily on four New York counties while excluding nearby gambling markets in Connecticut, Pennsylvania, and New Jersey); *Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, No. 18-cv-03587-BLF, 2019 WL 1560460, at *5 (N.D. Cal. Apr. 10, 2019) (rejecting a geographic market based on county lines where no plausible explanation for excluding other neighboring counties was provided). Phoenix alleges buyers compete for "certain parcels of land that they are familiar with, have confidence in, and/or contiguous with or connected to existing holdings."[39] But even

---

[38] The State of North Dakota defines the area of active production as including 17 counties.  *See* *https://www.ndlmi.com/vosnet/lmi/default.aspx?enc=vLa15KtdCzQQMP6jrcRdIQ==*, and publication by the State attached to the Koonce Dec. as **Exhibit A-6**.

[39] Doc. 31-1. ¶ 25.

assuming this assertion is entitled to a presumption of truth, Phoenix fails to explain how or why the five counties it uses for its definition are the only relevant counties, a glaring defect in light of the State of North Dakota's inclusion of Stanely County as one of the "core" oil and gas producing counties, but omitted in Phoenix's proposed market, and the State's exclusion of McLean County, which Phoenix includes.[40]  Indeed, public data shows that the Incline Entities buy mineral interests in ten North Dakota counties[41] and Phoenix actively purchases in at least 24 counties.[42]

Nor can Phoenix justify its implied assertion that sellers in any North Dakota county, including the five counties Phoenix focuses on, have no practical alternative buyers other than Incline, because from public records alone, it is apparent that in 2022, 2023 and 2024, with regard to just sales from one seller (the State of North Dakota) at least 25 other entities have purchased mineral leasing rights.[43] Several entities, including Phoenix, Triple T, Inc., Northern Energy Corp., and Missouri River Royalty Corp., purchase HVTs as well as smaller tracts.[44]

---

[40] *See* Koonce Dec. **Exhibit A-6**. Additionally, the State of North Dakota defines the Williston Basin as consisting of "more than 300,000 square miles in area, includes Saskatchewan, Manitoba (both in Canada), Montana, and South Dakota. The largest portion of the Williston Basin is located in North Dakota." *See* https://www.ndstudies.gov/gr8/content/unit-i-paleocene-1200-ad/lesson-1-changing-landscapes/topic-2-geology/section-2-williston-basin.

[41] *See* screen captures from websites reflecting this public data are attached to Koonce Dec. **Exhibit A-10**.

[42] *See* screen captures from websites reflecting this public data attached to Koonce Dec. **Exhibit A-9**.  Notably, the North Dakota Supreme Court has rejected the contention that only minerals in the "core" Bakken counties have value. "Although the parties assigned no value to the minerals, it is disingenuous to believe mineral interests in Adams and Stark Counties, in the oil-producing Bakken formation in North Dakota, have little or no value. . ." *Jacobs-Raak v. Raak*, 2016 ND 240, ¶ 12, 888 N.W.2d 770.

[43] *See* https://www.land.nd.gov/Minerals/AuctionHistory.  Screen captures of the data provided by the State at this website for November 2022 is attached to the Koonce Dec. as **Exhibit A-11**.  Screen captures from a similar website, https://www.land.nd.gov/surface-minerals-management/mineral-auctions, for various months in 2023 and 2024 attached to the Koonce Dec. as Exhibits **A-12, A-13, A-14 and A-15** reflect that in the five counties Phoenix contends are relevant plus Stark county (which the State includes in its "core" counties), 74 entities have purchased mineral leasing rights in tracts from the State and 67 entities have purchased mineral leasing rights from the State of 40 acres or more.  Although this judicially noticeable data reflect the winning bidder on leases, it does not reflect how many unsuccessful bidders (purchasers) were involved. Moreover, although this data reflects sales by auction, the participation of so many buyers willing and able to purchase HVTs nonetheless demonstrates the implausibility of Phoenix's contention that any seller, in any sales process for minerals, is limited to just Incline and Phoenix.

[44] Koonce Dec. **Exhibits A-12, A-14, A-15**.

Indeed, between January 1, 2021 and June 28, 2024 in just Dunn County, 16,532 standalone oil and gas transactions were filed of record.[45] Excluding intercompany transfers, easements, mortgages and the like, Incline was a grantee in only 160 of those transactions.[46] Accounting for the same, Phoenix was a grantee in 249 transactions.[47] The same publicly available data shows that Marathon Oil Company acquired mineral assets in 189 transactions.[48] Similarly, in Billings County, which Phoenix seeks to exclude from the geographic market, public data reflects that out of 4,272 transactions, Incline acquired minerals in one; Phoenix acquired minerals in 19 transactions.[49] Phoenix's contrived geographic market is implausible as a matter of law. *See Concord Associates, L.P.*, 817 F.3d at 53–54 (rejecting implausible geographic market which the Court concluded plaintiffs had failed to provide persuasive explanations as to why consumers could not reasonably obtain the services at issue from the surrounding areas, as "reasonably interchangeable"); *Apani S.W., Inc. v. Coca–Cola Enters., Inc.*, 300 F.3d 620, 663 (5th Cir. 2002) (affirming dismissal based on "fictitious geographic market which did not "correspond to the commercial realities of the industry and was not economically significant.").

### ii.    Phoenix's Proposed Product Market is Also Implausible

Phoenix's relevant product market also lacks plausibility. A relevant product market "includes all reasonably interchangeable products." *Double D Spotting Serv., Inc.*, 136 F.3d at 560.  The relevant product market in any given case "is composed of products that have reasonable

---

[45] Koonce Dec. **Exhibit A-16**. Additionally, as reflected in **Exhibit A-23** to the Koonce Dec, since 2019 when Phoenix acquired its first lease, there were at least 227 active lessees/grantees in the five counties Phoenix includes in its contrived market.

[46] Koonce Dec. **Exhibit A-17**.

[47] Koonce Dec., **Exhibit A-18**.

[48] Koonce Dec. **Exhibit A-19.**

[49] Koonce Dec. **Exhibits A-20, A-21 and A-22**. *See* data available at https://ndrinweb3.hplains.state.nd.us/recordernew/eagleweb/docSearch.jsp.  The same information for other oil producing counties which should be included in the "relevant geographic market" demonstrates the implausibility of Phoenix's proposed geographic market, for instance judicially noticeable data for McKenzie county, available at https://www.mcvvault.com/ reflects 27,093 relevant transactions, with Incline participating in 238 and Phoenix participating in 260.

interchangeability for the purposes for which they are produced—price, use and qualities considered." *U.S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). A plaintiff must justify a proposed market by defining it with reference to "reasonable interchangeability." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) (affirming 12(b)(6) dismissal based on insufficient market definitions). A court may reject a facially implausible product market. *See Intel Corp. v. Fortress Inv. Group LLC*, 511 F. Supp. 3d 1006, 1022 (N.D. Cal. 2021).

Here, Phoenix seeks to limit the relevant product market to only buyers of tracts of 40 acres or more valued between $500,000 and $8mm,[50] asserting that sellers of HVTs "strongly value the reputation and financial trustworthiness of their counterparties, seeking to limit transactional risk," and "place a premium on the purchaser's ability to accurately value their rights and close… quickly."[51] But this definition is circular because it defines the product market using the very price range it seeks to justify, effectively assuming the conclusion. In addition, Phoenix's definition is fundamentally flawed because it relies on seller preferences when the proper analysis in a monopsony context focuses on buyer-side interchangeability, not just seller preferences. *See U.S. v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 34 (D.D.C. 2022) ("[T]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of supply between the product's buyers, in the case of monopsony, and the substitutes for such buyers.") (alternations and internal quotation marks omitted)). To cross the plausibility threshold, Phoenix needed to plausibly allege that buyers of HVTs are not substitutable with buyers of smaller tracts and that small mineral-rights intermediaries and large oil and gas companies do not compete

---

[50] Doc. 30-1 ¶ 29. Phoenix's theory in this regard is inherently contradictory in contending that Incline Entities dominate a market in which it alleges only large, well-capitalized groups can participate, but also asserting every other large oil and gas company not named Incline is too slow to compete. *See Id.* at ¶ 30 and compare *Original Complaint*, Doc. 1 at ¶ 8-9; 41. Public records demonstrate the implausibility of Phoenix's arguments. *See* Koonce Dec. **Exhibit A-23**; *see also* **A-4, A-11-A-15**; **A-16-A-19**; and **A-20-A-22**, and the various websites reflecting that public data.

[51] Doc. 30-1, ¶ 45.

to purchase HVTs. Instead, Phoenix only asserts that seller demand is not interchangeable but fails to plausibly allege a lack of buyer alternatives, relying instead on "flat earth" conclusions.

Further, even assuming Phoenix had plausibly alleged that sellers prefer a certain type of buyer, it has not alleged facts suggesting that sellers would maintain that preference even if other buyers offered higher prices. Without facts showing that this preference is strong enough to prevent competition from other buyers, Phoenix's market definition fails. Further, even assuming Phoenix had plausibly alleged that sellers prefer a certain type of buyer, without facts demonstrating that this preference is strong enough to prevent competition from other buyers who offered higher prices (i.e., allegations as to cross-elasticity of demand), Phoenix's market definition fails. *Queen City Pizza, Inc.*, 124 F.3d at 438 ("Cross-elasticity" measures "reasonable interchangeability. . . . the responsiveness of the demand for one product to changes in the price of a different product."); *Campfield*, 532 F.3d at 1118 (Relevant market was implausible when not defined with reference to the rule of reasonable interchangeability **and *cross-elasticity of demand***") (emphasis added)).

Likewise, rather than defining product markets based solely on seller preferences, courts instead examine whether sellers will accept substitutes [here for "premium buyers"] when alternatives are available. *See Bertelsmann*, 646 F. Supp. 3d at 34 (describing hypothetical monopsonist test). Public data indicates that sellers do in fact substitute away from Phoenix and Incline when better offers exist, including offers for smaller or less expensive tracts. *Compare Campfield*, 532 F.3d at 1118.  Phoenix also offers no plausible explanation for why smaller or less expensive tracts should be excluded from the relevant product market, especially when public data shows that buyers like Phoenix and Incline (and many others) actively purchase smaller tracts and HVTs.[52] Thus, the reality, reflected in judicially noticeable data, is that buyers often find smaller

---

[52] *See* Koonce Dec**. Exhibits A-11-15; A-23.**  Notably, the same data reflects that the Incline Entities participate far more heavily in smaller tracts than Phoenix does, and that many competitors for HVTs also purchase smaller tracts.

tracts interchangeable with HVTs, which contradicts Phoenix's narrow definition. *See id*. Phoenix's proposed product market is therefore underinclusive and implausible. *See Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1180 (10th Cir. 2023) (affirming rejection of overly narrow market definitions that fail to account for broader competitive dynamics); *Uhlig LLC v. CoreLogic, Inc.,* No. 21-2543-DDC-GEB, 2022 WL 4597858, at *5 (D. Kan. Sept. 30, 2022) (relevant product market reflects "total market demand for plaintiffs' [defendants in a monopsony] product, not just defendants' [plaintiffs] demand").[53]

### c.   Phoenix's Allegations that Incline Possesses Monopsony Power Are Not Plausible

Monopoly (or here, monopsony) power, "the power to control prices or exclude competition," is an element of Phoenix's antitrust claims. *E.I. du Pont de Nemours & Co.*, 351 U.S. at 391; *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1056–57 (D. Minn. 2009). "[A] plaintiff must establish that the defendant has a dominant market share in a well-defined relevant market," to establish monopoly power. *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007); *see also Par*, 70 F.4th at 441 (affirming 12(b)(6) dismissal of antitrust claims where plaintiff failed to plausibly allege defendant possessed monopoly power).

Phoenix asserts, "on information and belief," that "the Incline Entities' market share in the acquisition of mineral rights [sic] is still approximately 50%."[54] Phoenix, however, provides no facts to support its belief or any assertion that supporting facts are peculiarly within Incline's knowledge (an assertion that, on its face, could never be true), thus failing to justify a presumption of truth for this conclusory assertion. *Athern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir. 2023) ("[F]actual allegations [pleaded] on information and belief" are accepted

---

[53] Likewise, even if the Court were inclined to accept as true Phoenix's conclusion that sellers do not consider "small intermediaries" as substitutes for "premium" buyers," i.e., Phoenix and Incline, *see* Doc. 30-1 ¶ 29, public information and likely the Court's experience reflect sellers' acceptance of hundreds of buyers of varying sizes and types as plausible alternatives to the Incline Entities and Phoenix in all North Dakota counties. *See* Koonce Dec. **Exhibit 23**.

[54] Doc. 30-1, ¶ 47.

if "the facts are peculiarly within the possession and control of the defendant"); *Zeikos Inc. v. Walgreen Co.*, No. 23 C 303, 2023 WL 3947775, at *4 (N.D. Ill. June 12, 2023).

Even absent Phoenix's "information and belief," however, the assertion of monopsony power lacks any factual basis and is therefore conclusory and insufficient as a matter of law. *See FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 18 (D.D.C. 2021) (rejecting as conclusory assertion of "dominant share . . . in excess of 60%... while no [competitor] of comparable scale exists"); *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 WL 4473228, at *11 (E.D. Pa. Sept. 28, 2012) (allegation that defendant "is a monopoly ... with over 50% market share" was a "threadbare recital unsupported by factual allegations [that] the Court need not accept ... as true"); *Process Controls Intern., Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912, 928 (E.D. Mo. 2010) (rejecting conclusory market share allegations, where plaintiff failed to provide "factually detailed description of the respective market share of the parties *and other market participants*") (emphasis added)).

Likewise, even if the Court affords Phoenix's market power allegations a presumption of truth, it nonetheless must reject Phoenix's monopsony power allegation as a matter of law (and math).  If Phoenix and the Incline Entities are the only premium mineral buyers in the relevant market and Incline allegedly possesses "approximately 50%" of the market share,[55] Phoenix has judicially admitted that it possesses the same 50% market share and thus the same alleged monopsony power. Accordingly, Incline *cannot* possess monopsony power as required for a plausible antitrust claim. *See Process Controls Intern., Inc.*, 753 F. Supp. 2d at 928 (finding "other allegations" in complaint "cut against" plaintiff's assertion of defendant's market dominance, particularly absent allegations that defendant's conduct had allowed it to increase market share).

---

[55] "[I]n this middle market area, there are only two entities (i.e., competitors) with all the qualifications that smaller purchasers lack. . .: Incline and Phoenix" Doc. 31, p. 7. *See also* Doc. 30-1, ¶ 106, (Incline's activities purportedly eliminated its only competitor, Phoenix); Doc. 30-1, ¶ 47 (Incline's alleged market share).

Finally, Phoenix offers no plausible facts demonstrating that any of the other competing buyers, even "premium" buyers who compete for HVTs,[56] cannot bid for the same interests even if sellers reject Phoenix as an enterprise run by a felon.  Where an alleged defendant cannot prevent other competitors from also bidding on the same products, a monopsony claim lacks plausibility.  *See Kirk-Mayer, Inc. v. Pac Ord, Inc.*, 626 F. Supp. 1168, 1171–72 (C.D. Cal. 1986) (where defendant lacked ability to exclude bids by 15 additional entities for the same products, monopsony claim lacked plausibility).  Wielding the same alleged market share, Phoenix seeks to eliminate the entities it contends, implausibly, are its only competitor, while publicly touting its competitive advantages.[57] The Court should reject Phoenix's conclusory and implausible monopsony share allegations, as well as its Relevant Market.

## IV.    CONCLUSION

The Court should view Pheonix's proposed but implausible antitrust claims in this forum shopping excursion for what they are: a step in Phoenix's goal of "dominating" the North Dakota market[58] by punishing Incline for making true statements about its felonious founder and CEO through implausible antitrust and other claims.  Those efforts should receive no traction here because the antitrust laws protect "*competition,* not *competitors." Double D Spotting Serv., Inc.*, 136 F.3d at 561. For all the reasons described above, the Court should deny the Motion for Leave and grant the Abstention Motion.

---

[56]  *See* Brief, p. 7 (Incline is the incumbent and Phoenix is its only competition); Doc. 30-1, ¶ 20-25.

[57] Judicially noticeable regulatory filings demonstrate that Phoenix, not Incline, possesses "competitive advantages" rendering its legal conclusions that Incline possesses monopsony power implausible.  For instance, in its December 31, 2022 1-K, at p. 3, Phoenix discusses its "aggregate, niche, scalable software platform" as "specific" to it and asserting no competitor possesses any similar product, and its "unique competitive advantage" in its bond offerings, calling its software and capital raising programs its "very powerful competitive advantage to its peers." *See* https://www.sec.gov/Archives/edgar/data/1818643/000165495423005486/pcgh_1k.htm and relevant pages from that filing attached to the Koonce Dec., **Exhibit A-26.**

[58] Doc. 1, ¶ 41 ("Phoenix would dominate the North Dakota marketplace if it could match Incline's speed of closing.").

Respectfully submitted,

By:  /s/ Charlene C. Koonce

    Charlene C. Koonce
     Texas Bar No. 11672850
     charlene@brownfoxlaw.com
    BROWN FOX PLLC
    8111 Preston Road, Suite 300
    Dallas, TX  75225
    Tel. 214.327.5000
    Fax. 214.327.5001

    Brian E.  Robison
    Texas Bar No. 00794547
    brian@brownfoxlaw.com
    BROWN FOX PLLC
    6303 Cowboys Way, Ste. 450
    Frisco, TX  75034
    Tel. 972.707.1860
    Fax. 214.327.5001

    Joshua A. Swanson
     North Dakota Bar No. 06788
     jswanson@vogellaw.com
    VOGEL LAW FIRM
    218 NP Avenue
    PO Box 1389
    Fargo, ND 58107-1389
    701.237.6983

*Attorneys for Defendant Incline Energy Partners, L.P.*

## CERTIFICATE OF SERVICE

Pursuant to Rule 5(d)(1)(B) of the Federal Rules of Civil Procedure, as amended, no certificate of service is necessary because this document is being filed with the Court's electronic-filing system.