IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| PHOENIX CAPITAL GROUP HOLDINGS, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>INCLINE ENERGY PARTNERS, L.P.<br><br>    Defendant. | §<br>§<br>§<br>§<br>§<br>§  C.A. NO. 1:23-cv-00209<br>§<br>§<br>§<br>§<br>§ |

**DECLARATION OF CHARLENE C. KOONCE IN RESPONSE TO PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO PENDING MOTIONS TO DISMISS AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**

1. My name is Charlene C. Koonce. I have personal knowledge of the matters set forth in this Declaration, I am of sound mind, and I am otherwise competent to testify to these matters, each of which is true and correct.

2. I am one of the attorneys representing Incline Energy Partners, LP in this matter, and also represent Mr. William Francis and Incline Energy Partners, LP in a related lawsuit pending in state court, *Phoenix Capital Group Holdings, LLC v. William Francis and Incline Energy Partners, L.P.*, Cause No. DC 22-06350 in the 116th Judicial District Court for Dallas County (the "State Case"). I also represent Francis, individually, in a lawsuit filed by Adam Ferrari, *Ferrari v. Francis,* Case No. 23-CV-455, in the in the United States District Court for the Northern District of Texas ("Texas Federal Case").

3. True and correct copies of records related to the basis for the felony charges asserted against Adam Ferrari and his plea to one of those charges are attached as **Exhibit A-1.** A complete

1

set of the criminal records related to Mr. Ferrari's crime are also included at Doc. 9-4, beginning on p. 15 of 36.

4. A true and correct copy of a chart comparing the allegations in the Original Complaint filed in this lawsuit with the similar allegations in the pending Original Petition filed by Pheonix in the Texas State Case and the Amended Complaint filed by Ferrari in the Texas Federal Case is attached as **Exhibit A-2.** Although Incline intended to submit this chart in support of the Abstention Motion at Doc. 9-9, it inadvertently attached the wrong chart.

5. A true and correct copy of a Deed reflecting the transfer of minerals located in North Dakota which formed the basis of the transaction challenged by Phoenix in the Texas State Case, and about which the "Taylor email" referenced in that case and as addressed in Incline's Abstention Motion at pp. 2-3, is attached as **Exhibit A-3**.

6. A true and correct copy of a screen capture from Hess Corporation's website, https://www.hess.com/operations/operations-map, is attached as **Exhibit A-4** and reflects that "Hess discovered oil in North Dakota in 1951 and today is one of the largest producers in the Bakken with a premier acreage position in the core of the play."  Similarly, a screen capture from https://www.mineralanswers.com/north-dakota/producers/hess-bakken-investments-ii-llc/100  is attached as **Exhibit A-5**.  The website provides specific data about numerous oil and gas producers and owners in North Dakota and reflects that Hess is ranked second nationally in terms of production, based on leases owned and operated for 1,773 producing wells in McKenzie, Mountrail, Ward, and Williams counties.  Phoenix omits Ward county from its proposed market.

7. A true and correct copy of a screen capture from the State of North Dakota's website regarding the booming oil and gas markets in the State found at https://www.ndlmi.com/vosnet/lmi/default.aspx?enc=vLa15KtdCzQQMP6jrcRdIQ==  is attached as

**Exhibit A-6**. The screen capture reflects North Dakota's reference to "17 active oil and gas producing counties," with the "core oil and gas producing counties" identified as Williams, Stanley, Mountrail, Dunn and McKenzie counties.

8. A true and correct copy of a screen capture from Incline's webpage, referenced in Phoenix's proposed Amended Complaint, but omitted from Phoenix's supplemental material is attached as **Exhibit A-7**. The page reflects that Incline's advisory services are provided for free.

9. A true and correct copy of a communication by Mr. Francis to Energy Net, referenced in Phoenix's proposed Amended Complaint at ¶ 55 is attached as **Exhibit A-8**.

10. True and correct copies of screen captures from public data reflecting Phoenix's participation in mineral transactions in at least **24** North Dakota counties are attached as **Exhibit A-9.** The screen captures for Williams County and Montrail County are from https://idocmarket.com/. The screen captures for McKenzie County are from https://www.mcvvault.com/. Screen captures for all other counties are from https://ndrinweb3.hplains.state.nd.us/recordernew/eagleweb/docSearch.jsp.

11. True and correct copies of screen captures from public data reflecting Incline's participation in mineral transactions in ten North Dakota counties are attached as **Exhibit A-10**. The screen captures for Williams County and Montrail County are from https://idocmarket.com/. The screen captures for McKenzie County are from https://www.mcvvault.com/. Screen captures for all other counties are from https://ndrinweb3.hplains.state.nd.us/recordernew/eagleweb/docSearch.jsp. The same websites reflect that Incline is not purchasing or leasing mineral interests in Bottineau, Grant, Kidder, Logan, McHenry, Mercer, Morton, Oliver Pierce, Renville, Sheridan, Slope, Stutsman, and Ward counties, while Phoenix is active in all of those counties.

12. True and correct copies of screen captures from https://www.land.nd.gov/Minerals/AuctionHistory, reflecting auction results for mineral leases purchased from the State of North Dakota in November 2022 are attached as **Exhibit A-11.** A summary of that data is included last the last page of the exhibit and reflects that during that month, 12 buyers purchased mineral leases, 11 of which purchased tracts of 40 acres of more in Divide, Dunn, Williams, McKenzie, Mountrail, and Stark counties if transactions occurred in those counties during the month reflected.

13. True and correct copies of screen captures from https://www.land.nd.gov/surface-minerals-management/mineral-auctions reflecting auction results for mineral leases purchased from the State of North Dakota in March 2023 are attached as **Exhibit A-12**. A summary of that data is included last the last page of the exhibit and reflects that during that month, 13 buyers purchased mineral leases, twelve of which purchased tracts of 40 acres of more in Divide, Dunn, Williams, McKenzie, Mountrail, and Stark counties if transactions occurred in those counties during the month reflected.

14. True and correct copies of screen captures from https://www.land.nd.gov/surface-minerals-management/mineral-auctions reflecting auction results for mineral leases purchased from the State of North Dakota in August 2023 are attached as **Exhibit A-13**. A summary of that data is included last the last page of the exhibit and reflects that during that month, 6 buyers purchased mineral leases, five of which purchased tracts of 40 acres of more in Divide, Dunn, Williams, McKenzie, Mountrail, and Stark counties if transactions occurred in those counties during the month reflected.

15. True and correct copies of screen captures from https://www.land.nd.gov/surface-minerals-management/mineral-auctions reflecting auction results for mineral leases purchased

from the State of North Dakota in February 2024 are attached as **Exhibit A-14**. A summary of that data is included last the last page of the exhibit and reflects that during that month, 18 buyers purchased mineral leases, 16 of which purchased tracts of 40 acres of more in Divide, Dunn, Williams, McKenzie, Mountrail, and Stark counties if transactions occurred in those counties during the month reflected.

16. True and correct copies of screen captures from https://www.land.nd.gov/surface-minerals-management/mineral-auctions reflecting auction results for mineral leases purchased from the State of North Dakota in August 2024 are attached as **Exhibit A-15**. A summary of that data is included last the last page of the exhibit and reflects that during that month, 25 buyers purchased mineral leases, 23 of which purchased tracts of 40 acres of more in Divide, Dunn, Williams, McKenzie, Mountrail, and Stark counties if transactions occurred in those counties during the month reflected.

17. True and correct copies of a screen captures from https://ndrinweb3.hplains.state.nd.us/recordernew/eagleweb/docSearch.jsp, which reflects the total number of transactions filed of record in Dunn County between January 1, 2021, and June 28, 2024, 16,532, is attached as **Exhibit A-16.**

18. True and correct copies of screen captures from https://ndrinweb3.hplains.state.nd.us/recordernew/eagleweb/docSearch.jsp which reflects all transactions filed of record in Dunn County between January 1, 2021, and June 28, 2024 in which Incline was a grantee are attached as **Exhibit A-17.** The results show a total of 169 transactions found. Accounting for intercompany transfers, easements, mortgages and the like, the publicly available data shows that in the referenced date range, Incline acquired mineral assets in Dunn County in 160 transactions.

19. True and correct copies of screen captures from https://ndrinweb3.hplains.state.nd.us/recordernew/eagleweb/docSearch.jsp which reflects all transactions filed of record in Dunn County between January 1, 2021, and June 28, 2024 in which Phoenix was a grantee are attached as **Exhibit A-18**. The results show a total of 302 transactions found. Accounting for intercompany transfers, easements, mortgages and the like, the publicly available data shows that in the referenced date range, Phoenix acquired mineral assets in Dunn County in 249 transactions.

20. True and correct copies of screen captures from https://ndrinweb3.hplains.state.nd.us/recordernew/eagleweb/docSearch.jsp which reflects all transactions filed of record in Dunn County between January 1, 2021, and June 28, 2024 in which Marathon Oil Company was a grantee are attached as **Exhibit A-19**. The results show a total of 200 transactions found. Accounting for intercompany transfers, easements, mortgages and the like, the publicly available data shows that in the referenced date range, Phoenix acquired mineral assets in Dunn County in 189 transactions.

21. True and correct copies of screen captures from https://ndrinweb3.hplains.state.nd.us/recordernew/eagleweb/docSearch.jsp which reflect all transactions filed of record in Billings County (which Phoenix seeks to exclude from the geographic market) between January 1, 2021, and June 28, 2024 are attached as **Exhibit A-20**. The data available on the website and as reflected in the screen capture attached as **Exhibit A-21** shows that out of 4,272 transactions, Incline acquired minerals in one. The data available on the website and as reflected in the screen capture attached as **Exhibit A-22** Phoenix acquired minerals in 19 transactions.

22. True and correct copies of screen captures reflecting that at least 227 individual grantees acquired leases in all the five counties to which Phoenix seeks to limit the geographic market, Divide, Dunn, McKenzie, Williams, and Montrail counties are attached as **Exhibit A-23** The exhibit includes screen captures showing results for *each* of the 227 grantees, in *each* of the five counties. For instance, screen captures reflecting American Land Services, LLC's acquisitions in each of the five counties are included. The exhibit is limited to just the first page of the data available for each entity on the relevant web page, because printing all pages for each of the 227 grantees in all five counties would exceed several thousand pages, and thus in some instances, the screen captures include leases taken before 2019. For each grantee and for each county, however, the data on the website and available to the Court demonstrates that each of the 227 grantees (225 of which Phoenix seeks to exclude from its proposed market) acquired new leases in all five counties, after 2019. Screen captures included in the Exhibit reflecting data regarding grantees in Mountrail and Williams counties were obtained from https://idocmarket.com/. Screen captures reflecting the same data for McKenzie County were obtained from https://www.mcvvault.com/. Screen captures of the publicly available data for Divide and Dunn counties were obtained from https://ndrinweb3.hplains.state.nd.us/recordernew/eagleweb/docSearch.jsp.

23. Although Phoenix previously but falsely asserted Ferrari lacked control over Pheonix, first by contending he was only a consultant and by omitting his indirect ownership and then it as "economic" ownership, Phoenix's judicially noticeable SEC filings belie these assertions. True and correct copies of relevant pages from Phoenix's September 15, 2021 Preliminary Offering Circular is attached as **Exhibit A-24** and available at: https://www.sec.gov/Archives/edgar/data/1818643/000165495421010125/filename2.htm. In the Preliminary Offering Circular, Phoenix disclosed it was capitalized and controlled by Lion of

Judah, LLC ("LJC"), an entity it initially disclosed was "controlled by a family member of an officer of the Company." In an amended Offering Circular, filed on December 8, 2021, true and correct copies of which are attached as **Exhibit A-25**, Phoenix disclosed that LJC is "beneficially" owned by Ferrari's parents.  A true and correct copy of the Phoenix's amended December 8, 2021 Offering Circular is available at:

https://www.sec.gov/Archives/edgar/data/1818643/000165495421013332/pcg_1a.htm. The Offering Circular is available at https://www.sec.gov/Archives/edgar/data/1818643/000165495421010125/filename2.htm. As Phoenix's majority owner, LJC had the authority to select and control Phoenix's management. *See id.* at second page.

24. Eventually, as reflecting in Phoenix's Annual Report (Form 1-K) for the year ended December 31, 2022 (filed May 1, 2023, after both Texas cases had been filed) and available at https://www.sec.gov/Archives/edgar/data/1818643/000165495423005486/pcgh_1k.htm, on p. 9, Phoenix revealed for the for the first time that Ferrari "is the economic interest owner of Lion of Judah, LLC."[1]  A true and correct copy of relevant pages from the May 1, 2023 Form 1-K is attached as **Exhibit A-26.**

25. In its December 31, 2022 1-K, at p. 3, Phoenix also discussed its "aggregate, niche, scalable software platform" as "specific" to it in which it also stated that no competitor possesses any similar product and provided Phoenix with a "unique competitive advantage" in its Reg A and Reg D bond offerings. Phoenix also references its software and capital raising programs as its

---

[1] In a later Annual Report for the year ended December 31, 2023, Phoenix stated that Ferrari did not have "voting or dispositive power" over LJC (although he alone capitalized it).  Phoenix's December 31, 2023 Form 1-K is available at https://www.sec.gov/Archives/edgar/data/1818643/000119312524123112/d799473dpartii.htm .

"very powerful competitive advantage to its peers." *See* **Exhibit A-26**. For example, on page three of the 1K, Phoenix writes the following:

> We have developed a highly customized and proprietary software platform which has customized inputs that pull in detailed land and title data, well level data including operator, production metrics, well status, date of all activities well specific activities, and historical reporting. Separately, a discounted cash flow model, using management inputs for discount rate and the price of oil, are used in an underwriting function to price assets. Various application programming interfaces ("APIs") pull data from 3rd party databases and aggregate them into a dashboard with various levels of permission for our team. These APIs call-in refreshed data each night at midnight, so the dynamic nature of the system creates efficiency on a day-to-day basis. In function, this tool provides our sales and marketing team with a summary version of assets to prospect for acquisition. These assets are graded internally based on management's desired target criteria for high probability of high near-term cash flows. A daily acquisition price is furnished to the sales team so that the sales team is informed as to the maximum price that we are willing to offer in any prospective transaction. Interested prospects then go through an automated document request using the Salesforce workflow, which distributes the opportunities to our operations team for the preparation of an offering and sale package. The offering and sale package is then delivered to the prospective seller. Using the CRM features, the sales team is able to record all notes in real time and each opportunity can be tracked from its original data upload through the lifecycle of the sales process. While the data inputs are largely based on public information, considerable customization and coding has been done specific to what we desire from the tool. This aggregate, niche, scalable software platform is specific to us and there is no known competitive product. As such, the software creates considerable intrinsic value to operational efficiencies, however, also has de-facto value should it ever be licensed or sold. We currently have no intention of licensing or selling the software."

26. I declare under penalty of perjury that the foregoing is true and correct.

August 26, 2024.

                                                             */s/ Charlene C. Koonce*
                                                            CHARLENE C. KOONCE